UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CAROL LEITNER,

Plaintiff,                                              **COMPLAINT**

- against -
                                                        **PLAINTIFF DEMANDS**
WESTCHESTER COMMUNITY COLLEGE, JOSEPH                    **A TRIAL BY JURY**
HANKIN, in his personal and official capacity as President
of Westchester Community College, CHET ROGALSKI,
in his personal and official capacity as Dean and Vice
President of Academic Affairs, JIANPING WANG, in her
personal and official capacity as Associate Dean of the Arts
and Humanities, and GABRIELLE MILLER, in her
personal and official capacity as Curricular Chairperson of
the Communications and Media Arts Department,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Carol Leitner ("Professor Leitner"), by her attorneys, Morvillo,

Abramowitz, Grand, Iason, Anello & Bohrer, P.C., complaining of defendants, Westchester

Community College ("WCC"); Joseph Hankin, the President of WCC; Chet Rogalski, the former

Dean and Vice President of Academic Affairs; Jianping Wang, the Associate Dean of the Arts

and Humanities; and Gabrielle Miller, the Curricular Chairperson of the Communications and

Media Arts Department (collectively the "Individual Defendants"), alleges as follows:

## NATURE OF THE CLAIMS

1.      Carol Leitner is sixty-eight years old and has spent her entire life teaching.

She graduated from Hunter College and holds a masters degree in Speech Arts from the City

University of New York.   In 1981, she began teaching as an Adjunct Professor in the

Communication and Media Arts Department of WCC, a community college located in Westchester

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: LM
DATE FILED: 6 11 12

County, New York, where she taught courses on "Speech Communication" and "Voice and Diction."

2.      For the next thirty years, Professor Leitner developed the communication skills of her students through spirited—and sometimes controversial—discussion of student speeches and presentations that covered diverse subjects and perspectives. Indeed, the syllabus for Professor Leitner's Speech Communication class explicitly provided for "[g]roup discussions about social issues," where teams of students debated controversial social issues, such as abortion and euthanasia, in front of the class. This syllabus has been submitted to and approved by the Communication and Media Arts Department for decades.

3.      Since 1984, the federal courts have repeatedly warned WCC, President Hankin, and other WCC administrators not to punish professors for engaging in constitutionally protected speech. *See Mahoney v. Hankin*, 593 F. Supp. 1171 (S.D.N.Y. 1984); *Mahoney v. Hankin*, 844 F.2d 64 (2d Cir. 1988); *Munroe v. Westchester Community College*, 04-cv-06775 (S.D.N.Y. 2006). In the *Mahoney* case, the courts instructed WCC and its administration that a professor's in-class speech relating to his or her academic subject matter—no matter how controversial—is constitutionally protected. More recently, in the *Munroe* case, after trial, a jury found that President Hankin and other WCC administrators improperly fired a professor in retaliation for his speech against WCC policies, violating the professor's First Amendment rights.

4.      However, even after being called to account in federal court time and again, WCC, President Hankin, and the WCC administration have yet to learn their lesson. Yet again, in 2011, President Hankin and his administration improperly retaliated against a professor—the plaintiff, Professor Leitner—by firing her for the content of her in-class speech. Professor Leitner's termination was the culmination of a pattern of infringement of her First and Fourteenth

Amendment rights by WCC and its administration. The pattern started in the fall of 2007, less than

two years after the jury's verdict in the *Munroe* case, when Jianping Wang, the Associate Dean of

the Arts and Humanities, directed Professor Leitner to comply with the WCC Faculty Speech Code

("Speech Code"). The Speech Code, which is memorialized in the "Students' Rights and

Responsibilities" section of the Westchester Community College Student Handbook, states that "a

student should be treated with courtesy and respect." As interpreted and enforced by WCC and its

administration, the Speech Code imposes a degree of academic censorship that is unheard of at a

public college. Indeed, in a letter to Professor Leitner, Dean Wang specifically described the

Speech Code as prohibiting in-class statements by professors that could potentially "*mak[e] any*

*students feel offended, insulted, [or] humiliated*," whether the statements were made "*intentionally*

*or unintentionally*." (emphasis added).

       5.     Dedicated to the belief that communication skills are developed through a

robust exchange of ideas, Professor Leitner continued to conduct herself professionally as she

always had, but refused to shelter her students from potentially offensive viewpoints. She continued

to discuss the various topics that students addressed in their speeches, and she encouraged her

students to do the same, believing that an intellectually challenging course of discussion was

precisely what a college's rules and procedures should encourage. In keeping with her long-

standing teaching methodology, in the fall of 2010, Professor Leitner taught a segment of her

Speech Communication course involving the recitation, interpretation, and discussion of a poetry

selection.

       6.     As part of this portion of the curriculum, on November 15, 2010, one of the

students in Professor Leitner's class recited a poem about contemporary American politics, after

which the class discussion turned to one of the hottest issues on the nation's political agenda at the

time: illegal immigration.  During that discussion, Professor Leitner stated a political viewpoint, which apparently differed from that of the WCC administration.

7.      The next day, a parent complained to the WCC administration that her daughter, who is Mexican, felt "humiliated" by Professor Leitner's in-class remarks.  Incredibly, Gabrielle Miller, who was then the Acting Chairperson of the Communications and Media Arts Department, admonished Professor Leitner and told her that political issues were off limits in WCC speech classes: "[Y]ou are teaching a speech class, not a political science class, and therefore discussion should be limited to matters of speech communication."  Evidencing the real reason for her admonition, Professor Miller wrote that Professor Leitner's political statements were "extremely disturbing."

8.      Thereafter, Professor Miller, Dean Wang, Chet Rogalski (the Dean and Vice President of Academic Affairs), and President Hankin engaged in a campaign of retaliation against Professor Leitner because of her in-class political speech.  These administrators conducted a reckless, self-serving and arbitrary investigation of the class discussion at issue, blatantly violated WCC's faculty disciplinary procedures, and cloaked their distaste for Professor Leitner's "offensive" political views by insisting—with little or no explanation—that Professor Leitner did not treat her students with "courtesy and respect."  The administrators then scrutinized Professor Leitner's every move and every statement, no matter how integral to her class curriculum, leading ultimately to their allegation that Professor Leitner also violated the Speech Code by her insistence that students in her class reduce their regional accents and use standard diction during speech projects.  Not only was this instruction integral to a speech class, but it was also core constitutionally protected speech.

9.     Ultimately, WCC and the Individual Defendants used these purported violations of the Speech Code to fire Professor Leitner, even though the administration never specifically identified a *single statement* she made that violated the Speech Code.

10.     By enforcing the Speech Code, Professor Miller, Dean Wang, Dean Rogalski, President Hankin and WCC imposed a pall of orthodoxy in WCC classrooms.  If Professor Leitner had expressed what the WCC administration obviously believed was a more politically correct viewpoint on illegal immigration, she would still be teaching at WCC today.  As long as the Speech Code remains in effect, other WCC professors' free speech rights also could be violated.

11.     Professor Leitner brings this proceeding under 42 U.S.C. § 1983 to remedy the retaliation she has suffered in response to her constitutionally protected in-class speech, and to enjoin the ongoing academic censorship imposed by the Speech Code, in violation of the First and Fourteenth Amendments of the United States Constitution and Article One, Sections Six and Eight of the New York State Constitution.  The Speech Code is also unconstitutionally vague as applied to Professor Leitner; it gives inadequate notice of the speech it prohibits and creates a regime of arbitrary and discriminatory enforcement.  Further, the Speech Code is unconstitutionally overbroad and therefore invalid as applied to Professor Leitner and other WCC faculty.  Professor Leitner seeks compensatory, emotional, and punitive damages as well as equitable relief, including reinstatement and an injunction against the enforcement of the Speech Code.

## THE PARTIES

12.     Plaintiff Carol Leitner is a citizen of the state of Connecticut.  She was employed as an Adjunct Professor at WCC, and subsequently as a Senior Adjunct Professor, from 1981 until July 6, 2011, when her employment was unlawfully terminated.

13.     WCC is a community college that is affiliated with the State University of New York ("SUNY").   Westchester County is the local sponsor of WCC, and the laws of Westchester County provide that WCC is a "county department."   WCC's principal campus is located in Valhalla, New York.

14.     WCC was established by Westchester County with the approval of the SUNY Board of Trustees.

15.     According to New York State regulations, the WCC Board of Trustees is "charged by law to administer the college."   The WCC Board of Trustees consists of ten members, a majority of whom are chosen by Westchester County and WCC's student body.   Five members of the WCC Board of Trustees are appointed by the Westchester County Board, one member is elected from the WCC student body, and four members are appointed by the Governor of New York.

16.     The WCC Board of Trustees appoints the President of WCC, subject to the approval of the SUNY Board of Trustees.   Upon information and belief, the President of WCC, or his designee, may appoint all WCC employees.   Upon information and belief, the WCC Board of Trustees and the President of WCC are primarily responsible for formulating college policy and managing the affairs of the college, subject to limited oversight by the SUNY Board of Trustees.

17.     Upon information and belief, less than one third of WCC's operating budget comes from New York State aid.   The remaining two thirds come from, among other sources, student tuition and fees, and contributions from Westchester County, WCC's local sponsor.   After WCC's operating budget is approved by the SUNY Board of Trustees, the WCC Board of Trustees is authorized to transfer appropriations from one expense to another, which affords WCC significant fiscal autonomy.   Westchester County is authorized by law to issue bonds or notes to raise funds for its share of WCC's operating budget and capital costs.

18.     Upon information and belief, Westchester County holds title to all of WCC's real property.

19.     Westchester County is required by law to provide WCC employees with a legal defense and indemnification with respect to claims arising out of their employment.

20.     Upon information and belief, judgments obtained against WCC are paid out of WCC's operating budget; they are not paid by New York State.

21.     WCC's Valhalla campus is unionized, and WCC professors are eligible to become members of the Westchester Community College Federation of Teachers ("WCCFT").

22.     WCC has adopted a specific procedure for the discipline of faculty members, which is memorialized in a memorandum written in 1983 (the "1983 Memorandum"). The 1983 Memorandum provides that if "some difficulty with the performance or decorum of a faculty member" comes to the attention of the administration, the relevant Dean and Department Chairperson will conduct an informal step one meeting with the faculty member and his or her union representative.  If "the problem occur[s] a second time," the Dean and the Department Chairperson will hold a step two hearing with the same persons.  An administrator will then draft a letter stating his or her findings, which must describe: (1) "the problem"; (2) "the course of action to remediate"; and (3) "the basis for determining resolution."  If "the problem occur[s] a third time," the Academic Dean will convene a step three hearing, after which the Academic Dean can recommend that the President of WCC terminate the faculty member.

23.     Defendant Joseph Hankin is, and at all times relevant to this complaint was, the President of WCC.  Upon information and belief, President Hankin is a citizen of the State of New York.

24.     Defendant Chet Rogalski, until recently, was the Vice President and Dean of Academic Affairs for WCC.  He began working at WCC in 2006.  Upon information and belief, Dean Rogalski is a citizen of the State of New York.

25.     Defendant Jianping Wang is, and at all times relevant to this complaint was, the Associate Dean for the Arts and Humanities at WCC.  Upon information and belief, Dean Wang is a citizen of the State of New York.

26.     Defendant Gabrielle Miller is the Curricular Chairperson of the WCC Communications and Media Arts Department.  In or around February or March 2011, when Professor Miller recommended that Dean Wang punish Professor Leitner for her constitutionally protected speech, Professor Miller was the Acting Chairperson of the Department.  Upon information and belief, Professor Miller is a citizen of the State of New York.

## JURISDICTION AND VENUE

27.     The jurisdiction of this Court is proper under 42 U.S.C. § 1983; 28 U.S.C. § 1331; and 28 U.S.C. § 1343(3) and (4).  The Court has supplemental jurisdiction over Professor Leitner's state law claims under 28 U.S.C. § 1367.

28.     Venue is proper within the Southern District of New York because a substantial part of the events giving rise to Professor Leitner's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Background

29.     For over forty years, Professor Leitner has been a teacher, educating students of all ages and at all levels of the academic spectrum.  Professor Leitner began her teaching career teaching second grade, and then moved on to teaching English classes at Walton High School in the Bronx for five years, where she also coached students on their commencement speeches.  Before

she became a professor at WCC, Professor Leitner taught speech classes at Mercy College, Lehman College, and Pace University.

30.    In 1981, Professor Leitner began her career at WCC as an Adjunct Professor, where she educated adults for the next thirty years.  Professor Leitner regularly taught classes in "Speech Communication" and "Voice and Diction," aimed at improving the communication skills of WCC's diverse student body.

31.    Dedicated to the belief that she could improve students' lives by requiring them to rise up and meet the demands of a rigorous academic experience, Professor Leitner consistently maintained the highest standards for all her students, whatever their nationalities or backgrounds.  Unfortunately, WCC at some point appears to have determined that merit would no longer be a guiding principle behind its educational philosophy and turned to an academically lenient approach to teaching, which prioritized students' feelings rather than their academic achievement.

## II.    The Administration Censors Professor Leitner's Speech

32.    Following WCC's shift to a more lenient educational philosophy, the Communications and Media Arts Department began to censor Professor Leitner's in-class speech and pursue dubious student complaints against her.

33.    In or around 2004, in her Voice and Diction class, Professor Leitner told a student that, because of the size of his lips, his pronunciation of bilabial sounds (*i.e.*, sounds produced using both lips) would be improved if he pressed his lips together more tightly.  Professor Leitner's suggestion to the student was appropriate and consistent with the course's objective of improving student diction.   Nevertheless, the student was apparently offended by Professor

Leitner's suggestion, and complained to the administration.  As a result, Dr. Eileen Shea, then the Chairperson of the Department, ordered a step one meeting to discipline Professor Leitner.

34.     The WCC administration continued to censor Professor Leitner's in-class speech in 2007.  First, Dr. Shea sought to punish Professor Leitner because of Professor Leitner's critique of a student in her Voice and Diction class.  The incident occurred while students were performing mock job interviews.  After a student delivered an extremely poor performance during an interview—the student was unprepared, spoke too fast, committed numerous diction errors, and was extremely difficult to understand—Professor Leitner told him that his performance was poor and stated, in substance, "If you speak like that, you are never going to get a job."  Upon information and belief, Professor Leitner's critique of the student's performance offended *another* student in the class who then complained to Dr. Shea.  Dr. Shea convened a step two disciplinary hearing based on that student's complaint.

35.     Second, another student, who had been absent for nearly one third of the semester, complained to Dr. Shea because he was dissatisfied with the low grades he was receiving in Professor Leitner's Voice and Diction class in the Spring of 2007.  Without asking why the student was doing poorly, Dr. Shea asked Professor Leitner if she "could see it in her heart" to raise the student's final grade.  Dr. Shea then added the student's complaint to the allegations against Professor Leitner in her step two hearing.

36.     Finally, Dr. Shea pursued a third student complaint alleging that Professor Leitner had missed a class during 2007 to receive Botox injections.  In reality, as Professor Leitner proved, she had missed class because she had suffered a stroke.

37.     Dean Wang proceeded to hold a step two hearing to determine if Professor Leitner should be disciplined.  Notwithstanding the clearly baseless nature of these student

accusations and without articulating the basis for her decision, Dean Wang concluded that Professor

Leitner had violated the Speech Code. After the hearing, Dean Wang provided Professor Leitner

with a letter, dated September 6, 2007, purportedly containing her findings from the hearing (the

"Step Two Letter"). Ignoring the clear requirement in the 1983 Memorandum that the Step Two

Letter provide a basis for Dean Wang's conclusion, Dean Wang failed to state which of the

alleged instances of misconduct she believed to have violated the Speech Code. Instead, Dean

Wang merely parroted the vague language of the Speech Code:

> . . . This college prides itself in being a caring place for our students, faculty, and staff. We do not tolerate any belittling, humiliating, and insulting behavior toward our students, intentionally or unintentionally. *Therefore, I expect you not to use any language that can be construed as abusive, belittling, humiliating, or insulting to any students in the future, intentionally or unintentionally.*

> . . . I request that your classroom conduct and behavior be consistent with our institutional values and expectations, i.e., to treat every student with *courtesy and respect.* Please refer to the new Student Handbook pp. 109-110 regarding Students' Rights and Responsibilities.

> On behalf of the college, I strongly encourage you to reexamine your classroom demeanor *to make sure that you are not making any students feel offended, insulted, [or] humiliated, whether you do so intentionally or unintentionally. When and if you feel that you have may have unintentionally offended a student, please take immediate action to address directly with the student to avoid further misunderstanding.*

(emphasis added).

      38.    Thus, according to Dean Wang's directive, the Speech Code not only

prohibits professors from making "offensive," "insulting," or "humiliating" statements while

they teach, but also requires that the determination of whether faculty speech is in fact

"offensive," "insulting," or "humiliating" be based on the *subjective reaction* of a given student.

These requirements represent an incomprehensible and impermissibly vague standard that

neither Professor Leitner nor any faculty member could nor can understand.

39.    Recognizing the impropriety of Dean Wang's conclusory statements in the Step Two Letter, Professor Leitner's WCCFT union representative promptly called for the letter's withdrawal.  The administration took no corrective action in response to the WCCFT's objections.

40.    Professor Leitner refused to sign the Step Two Letter and filed a letter objecting to it in her personnel file.

41.    For the next five semesters, Professor Leitner received consistently positive student evaluations.

### III.    Professor Leitner Voices a Political Opinion During Class Discussion

42.    In the fall semester of 2010, Professor Leitner was teaching her regular course, Speech Communication.  The course covers the theory and practice of public speaking and requires students to deliver a series of speeches on different topics.  On November 15, 2010, Professor Leitner was covering the "oral interpretation" section of the curriculum, which requires students to recite one long or two short poems, describe the poet's background, and give an interpretation of the student's selection.  Student presentations were often followed by class discussion, which afforded the entire class additional opportunities to publicly communicate their ideas.

43.    Aracelli Cruz, a student in Professor Leitner's class that semester, chose to recite two short poems about American politics.  Ms. Cruz's first poem, titled "Whole Different Game," discussed slavery, the empowerment of black citizens, and the election of Barack Obama.

44.    For her second poem, Ms. Cruz chose to sing, rather than recite, the following untitled poem, which was based on the song "America the Beautiful":

O beautiful for spacious skies
For amber waves of skepticism
Over once majestic purple mountains
Now shrouded in mind-numbing doubt,
Hidden agendas and mis-guided patriotism.
America, America, who sheds this haze on thee?
And crowns thy diminishing good under
Piles of mis-guided dogma?
Tis those second and third generations of
Andy Hardy patriots so effortlessly manipulated
by big spending it seems.
Grace is no longer guaranteed to be
On thee. Forget about crowning thy good
With brotherhood while you're at it!
Because Facebook polls might seal our fate.

45.     Ms. Cruz's presentation of the poem contained many diction errors that were exacerbated by her decision to sing the poem, including numerous mistakes in pronunciation which Professor Leitner had repeatedly corrected during previous classes.   In addition, although Ms. Cruz was required to discuss the background of the poet and offer an interpretation of her poems, she did not do so.

46.     After Ms. Cruz failed to provide any interpretation of her poems, Professor Leitner asked Ms. Cruz to repeat the second poem.   Professor Leitner made this request because she found the poem difficult to understand, especially in light of Ms. Cruz's failure to provide Professor Leitner with a written copy of it, as required by the assignment.

47.     During Ms. Cruz's second presentation of the untitled second poem, Professor Leitner asked Ms. Cruz a question in order to prod her to offer the required interpretation of her poem. Ms. Cruz did not respond to Professor Leitner's question. Rather, another student answered and turned the discussion to the issue of immigration policy. At the time, the Fall of 2010, one of the most prominent national news stories was Arizona's new law authorizing police officers to request identification from suspected illegal immigrants. During

this discussion, in which students expressed divergent views, Professor Leitner stated, in substance, that she favored Arizona's new law, and questioned the fairness of providing certain public services, like emergency medical care, to illegal immigrants who did not pay taxes. This comment then engendered further discussion.

48.   After class, Professor Leitner spoke alone with Ms. Cruz to explain the problems with Ms. Cruz's performance—specifically, that she committed numerous diction errors in her presentation, failed to adequately explain the background of the poet, and, most importantly, failed to provide any interpretation of the poems she had chosen to recite, even after Professor Leitner prompted a class discussion.   Professor Leitner suggested that if Ms. Cruz wanted to try to improve her grade, she repeat the assignment with a different poem or poems the following week.  Ms. Cruz agreed to do so, but never did.  Instead, the next day, Ms. Cruz's foster mother, Barbara Alammari, submitted a complaint about the class discussion following Ms. Cruz's presentation.  Ms. Alammari's complaint included an email addressed to Professor Leitner and a WCC student complaint form filled out by Ms. Alammari.

49.   Ms. Alammari's second-hand account of the discussion in Professor Leitner's class contained a number of false and misleading statements.  Specifically, relying on a misstatement of Professor Leitner's syllabus, Ms. Alammari—who was not present during the class—insisted that Ms. Cruz had properly completed the class assignment:

> According to the syllabus, the assignment was: "Poetry reading and skills necessary for oral *presentation*.  Demonstration of improvement in standard diction and poise in presentation, will show good progress in speech delivery." Aracelli did all of these things. She read poetry. She exhibited skills necessary for oral *presentation*. She demonstrated improvement in diction and poise in presentation. She showed good progress in speech delivery.

(emphasis added).  Contrary to Ms. Alammari's statement, however, Professor Leitner's syllabus provided for "poetry reading and skills necessary for oral *interpretation*" (not presentation).

(emphasis added).  The class discussion after Ms. Cruz's presentation tracked precisely the description provided in the syllabus: a discussion "interpreting" the poem.  Professor Leitner did not deviate from her syllabus, but rather asked Ms. Cruz to perform the precise exercise that the syllabus described and precisely the same exercise required from the entire class.  Further, Ms. Alammari stated that Professor Leitner made various insulting comments about Mexican immigrants.  This allegation was false.  Professor Leitner made no derogatory comments about any immigrant group.

50.     After she received Ms. Alammari's email, Professor Leitner responded by inviting Ms. Alammari to meet with her and discuss her concerns.  Ms. Alammari never replied, nor did she make any other effort to discuss the matter with Professor Leitner.

51.     The next week, Ms. Cruz arrived at Professor Leitner's class early and provided Professor Leitner with a copy of the untitled second poem she had recited the previous week.  Professor Leitner then asked Ms. Cruz again to provide an interpretation of the poem.  Ms. Cruz said that, although she understood the poem, she could not explain it.  Ms. Cruz did not prepare another poem or poems for presentation.

52.     After the class, Professor Leitner spoke with Ms. Cruz and Ms. Cruz's sister, Norma Cruz, who was waiting to speak with Professor Leitner.  Norma Cruz apparently objected to the class discussion that followed Ms. Cruz's presentation, stating, in substance, "Why did you let the discussion go on for so long?"  Professor Leitner explained that she does not "muzzle" her students during class discussion.  Professor Leitner also explained the deficiencies in Ms. Cruz's presentation and again suggested that Ms. Cruz repeat the assignment with a different poem.  Although Ms. Cruz again agreed to do so, she never did.

IV.     **The Administration Punishes Professor Leitner
Because of Her In-Class Political Speech**

53.     Several days after the class in which Ms. Cruz presented her poetry
selections, Professor Gabrielle Miller, then the Acting Chairperson of the Communications and
Media Arts Department, met with Professor Leitner to discuss Ms. Alammari's complaint.
Professor Leitner explained that Ms. Cruz failed to adequately perform the assignment and that
Professor Leitner gave Ms. Cruz the opportunity to correct her mistakes by repeating the
assignment the next week with a different selection.  Professor Leitner also explained that Ms.
Alammari's second-hand account of the class discussion contained numerous inaccuracies.
Ignoring Professor Leitner's explanation of the events, Professor Miller focused on that fact that,
according to Ms. Alammari, Ms. Cruz was so upset that she cried after Professor Leitner's class
and the next morning.  After their discussion, Professor Miller said that she had no choice but to
bring the matter to the attention of Dean Wang.

54.     Thereafter, Professor Miller took no action for over three months.  Then,
by a letter date-stamped February 23, 2011, Professor Miller stated that she was bringing the
matter to the attention of Dean Wang for formal discipline because: (1) Professor Leitner
"infringed upon" Ms. Cruz's "political right" to present a poem of her choice; (2) Professor
Leitner inappropriately spoke about a "political science" topic in her class; and (3) Professor
Leitner expressed a political viewpoint that Professor Miller found "extremely disturbing."

55.     Professor Miller's reasons for punishing Professor Leitner are improper,
blatantly contradictory, and pretextual.  Professor Miller insisted that Professor Leitner violated
Ms. Cruz's "political right" to present a controversial political poem of her choosing, but then
suggested that Professor Leitner did not possess the same political right to discuss a "political
science" topic during a class.  Moreover, contrary to Professor Miller's charge, it was not

improper for Professor Leitner to speak about a "political science" topic in her class. Indeed, WCC encourages such class discussion. For example, Professor Miller's own Speech Communication syllabus, which is posted as a model on the WCC website, states that a general objective of her class is to "[f]ocus and research a topic, organize ideas, and clearly articulate *and defend them to others.*" (emphasis added). Thus, the real reason for punishing Professor Leitner was not the fact that she addressed a political science topic in her class. The real reason was that she *expressed a political opinion with which Professor Miller did not agree.*

56.     The pretextual nature of Professor Miller's criticism of Professor Leitner is further evidenced by the factual inaccuracies in Professor Miller's letter. Specifically, Professor Leitner did not infringe on Ms. Cruz's "political right" to select a poem of her choice. Professor Leitner repeatedly urged Ms. Cruz to give an interpretation of the poem that Ms. Cruz chose to present and twice gave Ms. Cruz the opportunity to complete the assignment with any other poem she wanted to choose.

57.     Further underscoring the pretextual nature of Professor Miller's letter, the administration failed to properly investigate Ms. Alammari's complaint. Although Dean Wang and Professor Miller claimed to undertake an "investigation," they failed to take the most basic steps necessary for a proper investigation. First, upon information and belief, neither Professor Miller nor Dean Wang spoke with Ms. Cruz herself about the incident, but instead relied on Ms. Alammari's second-hand account. In addition, rather than locate and examine members of the class who recalled the discussion following Ms. Cruz's poem, the administration spoke to only five students, three of whom either were not present the day of Ms. Cruz's presentation or did not recall the presentation or following discussion.

58.    Thus, Dean Wang and Professor Miller's investigation came down to conversations with two students. According to a memorandum Dean Wang wrote about the investigation, the only thing these students said was that they recalled what Dean Wang vaguely described as "the incident." However, the administrators did not provide any specifics of what the students recalled. To the contrary, Dean Wang's memorandum failed to identify a single "offensive" statement that these two students recalled Professor Leitner making in response to Ms. Cruz's presentation. Shockingly, the memorandum relied on a statement by a student who had not been present for the discussion at issue because he had previously dropped Professor Leitner's class. Conveniently, the memorandum noted the student's "memory" of "similar situations" in the past—without noting that he had dropped the class before Ms. Cruz's presentation.

59.    On March 21, 2011, Dean Wang called a step three hearing to terminate Professor Leitner.

## V.    The Administration Violates WCC Disciplinary Procedures

60.    In 2001, in an arbitration between the WCCFT and WCC challenging the propriety of another professor's step two hearing, the arbitrator set forth the following procedures for WCC administrators to follow in the future before holding a disciplinary hearing ("the Ax arbitration decision"): the Department Chair must (1) refer the student back to the professor to attempt to resolve the complaint, and, if that fails, (2) meet with both the student and the professor in a further effort to resolve the matter.

61.    The defendants violated the Ax arbitration decision when they punished Professor Leitner for Ms. Alammari's complaint. Even though the Ax arbitration decision clearly states that the Department Chair must meet with both the complaining student and the

18

professor, no such meeting occurred.  Upon information and belief, Professor Miller, the Acting Department Chair, did not meet with Ms. Cruz herself, nor did she encourage Ms. Cruz to discuss her concerns with Professor Leitner.

62.     The administration also violated the Ax arbitration decision when Dean Wang included two additional student complaints in her March 2011 request for a step three hearing.  Professor Leitner was not informed of these complaints until *five months* after the complaints had been submitted to the administration.  Thus, no good faith effort was made to refer the students back to Professor Leitner to resolve their complaints, and Professor Leitner was denied the opportunity to meet with these students and the Department Chair in an effort to resolve the complaints.  Notably, Dean Wang and Professor Miller belatedly pursued formal discipline against Professor Leitner based on these other two complaints only *after* Professor Leitner's classroom discussion of Ms. Cruz's poem—further underscoring their true retaliatory intent.

## VI.     The Administration Punishes Professor Leitner for More Constitutionally Protected Speech

63.     After calling for a step three hearing to consider her termination, the WCC administration continued to retaliate against Professor Leitner.  Specifically, in May 2011, Dean Wang included additional student complaints for consideration in the step three hearing.  These complaints described an incident on the first day of Professor Leitner's Speech Communication class for the Spring 2011 semester, when Professor Leitner told a South African student with a strong accent, that, despite the student's vocal resistance to accent reduction, standard diction was part of the course curriculum, and the student would be expected to reduce her regional dialect and improve her standard pronunciation during speech projects.  Apparently, other

students in the class were "offended" by Professor Leitner's statements to the South African student and complained to the administration.

64.     Since 1981, the first year that Professor Leitner taught Speech Communication at WCC, this course has included instruction on standard diction, a widely accepted component of a college course on speech communication.  Indeed, the textbook Professor Leitner used in her course provided for the use of "standard pronunciation" rather than regional dialects. Moreover, WCC itself recognizes that teaching standard pronunciation and foreign accent reduction is an important pedagogical goal.  The WCC Academic Support Center even offers a program in "Speech Pronunciation Improvement," including "foreign accent reduction," for all WCC students.  Furthermore, a model WCC "Speech Communication" syllabus posted on the webpage of Dr. Eileen Shea, the former Department Chair of the Communications and Media Arts Department, states that a class objective is to "[r]ecognize and explain factors that contribute to distortion and *incorrect pronunciation* of speech during communication." (emphasis added).

65.     Notwithstanding the fact that proper diction and accent reduction were obviously appropriate subjects in Professor Leitner's *speech* class, Professor Miller and Dean Wang sought to punish Professor Leitner for attempting to teach her students to improve their diction.  Professor Leitner's comments on the role of proper pronunciation in her class lie at the core of her academic subject matter as a speech professor, and hence were protected by the federal and state constitutions, and the WCC Collective Bargaining agreement, which protects each professor's right, "without limitation, [to] discuss his/her own subject in the classroom. . . ." By seizing on these student complaints as a basis to further punish Professor Leitner, Professor

Miller and Dean Wang once again retaliated against Professor Leitner for additional constitutionally protected speech.

## VII.   President Hankin and Dean Rogalski Fire Professor Leitner for Violating the Speech Code

66.     On June 9, 2011, after failing to follow their own internal procedures set forth in the 1983 Memorandum, and then failing to follow the procedure required by the Ax arbitration decision, the WCC administration held a step three hearing. After that hearing, Dean Rogalski recommended that President Hankin terminate Professor Leitner. According to the letter setting forth his findings, Dean Rogalski's recommendation stemmed from Professor Leitner's purported failure to comply with Dean Wang's 2007 directive to follow the Speech Code.

67.     On July 6, 2011, President Hankin accepted Professor Rogalski's recommendation and fired Professor Leitner. Professor Leitner's termination violated her rights under the United States and New York constitutions, and was the culmination of the defendants' longstanding campaign of retaliation against her. The WCC administration could finally rest assured that its political orthodoxy would go uncontested in the Communications and Media Arts Department.

## VIII.   The Speech Code Provides Inadequate Notice and Encourages Arbitrary and Discriminatory Enforcement

68.     The Speech Code, as interpreted by Professor Miller, Dean Wang, Dean Rogalski, and President Hankin, and upon information and belief, other WCC administrators, provides as follows: a professor's in-class speech must convey "courtesy and respect" for each student, and may not "mak[e] any student[] feel offended, insulted, [or] humiliated, whether . . . intentionally or unintentionally."

69.     The meaning of the Speech Code is ambiguous, variable, and dependent on the subjective reaction of a given student, rendering the Speech Code unconstitutionally vague.  Furthermore, because Professor Leitner has developed the communication skills of her students through the discussion of controversial political and social issues for thirty years, she could not possibly have known that participating in a class discussion about illegal immigration violated the Speech Code.  Thus, the Speech Code did not provide Professor Leitner, and does not provide current WCC professors, with reasonable notice of what a professor can say in class.

70.     The Speech Code also provides no standards for the administrators who apply it, and as a result, it creates a regime of arbitrary and discriminatory enforcement.  This lack of standards empowers WCC administrators to punish faculty members for expressing "offensive" viewpoints or using a pedagogical style that "offends" students.

71.     The actions of Professor Miller, Dean Wang, and Dean Rogalski demonstrate that the Speech Code grants administrators unfettered discretion to make arbitrary disciplinary decisions.  The very administrators charged with enforcing the Speech Code themselves differed over whether conduct by Professor Leitner violated the Speech Code.  Thus, the administration did not and cannot consistently apply the Speech Code.

72.     In addition, the arbitrary nature of the Speech Code allows punishment without reference to specific violations.  For example, in his June 14, 2011 recommendation to fire Professor Leitner, Dean Rogalski did not identify *a single statement* by Professor Leitner that violated the Speech Code.  In fact, no administrator has ever identified a specific statement by Professor Leitner that violated the Speech Code and explained why it did so.  Instead, administrators like Dean Wang resorted to purposefully vague platitudes—*e.g.*, "I conclude that

the latest student complaints are serious and are of a similar nature to those addressed in the previous two steps of hearings."

73.    Moreover, Dean Rogalski's recommendation did not discuss *any* of the student complaints at issue in the step three hearing. Rather, Dean Rogalski concluded that Professor Leitner violated the Speech Code based on his general sense that Professor Leitner did not treat students with "courtesy and respect." This conclusion exemplifies arbitrary and discriminatory enforcement.

## COUNT ONE

### Against the Individual Defendants

### Retaliation Based on Constitutionally Protected Speech

74.    Professor Leitner repeats and realleges paragraphs 1–73 as if fully set forth herein.

75.    As discussed above, Professor Leitner made political comments during a class discussion.

76.    Professor Leitner's speech constituted part of her classroom discourse and constituted speech on a matter of public concern protected by the First Amendment of the United States Constitution and Article One, Section Eight of the New York State Constitution.

77.    The Individual Defendants knew that Professor Leitner engaged in such speech and knew or should have known that her speech was constitutionally protected.

78.    By the acts described above, including but not limited to recommending Professor Leitner for discipline and termination, the Individual Defendants retaliated against Professor Leitner in the terms and conditions of her employment based on her constitutionally protected speech.

79.     Professor Leitner's constitutionally protected speech was a substantial motivating factor in the adverse actions taken by the Individual Defendants.

80.     By the acts described above, the Individual Defendants retaliated against Professor Leitner in violation of the First Amendment of the United States Constitution, under 42 U.S.C. § 1983, and Article One, Section Eight of the New York State Constitution, for her in-class academic discourse and speech on a matter of public concern.

81.     The Individual Defendants acted intentionally and with malice, or with reckless indifference to Professor Leitner's constitutional rights.

82.     Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages, as a direct and proximate result of the Individual Defendants' illegal conduct.

## COUNT TWO

### Against WCC

### Retaliation Based on Constitutionally Protected Speech

83.     Professor Leitner repeats and realleges paragraphs 1–82 as if fully set forth herein.

84.     The Speech Code, as interpreted in Dean Wang's Step Two Letter, represents the policy, custom, or practice of WCC.  Although the Speech Code is not separately codified, it is included in the Westchester Community College Student Handbook and was the basis for Dean Wang's conclusions in her Step Two Letter.   Moreover, when Dean Rogalski recommended that President Hankin terminate Professor Leitner, Dean Rogalski specifically described the Speech Code, and Dean Wang's Step Two Letter, as reflecting the "institutional

values and expectations" of WCC. Accordingly, the Individual Defendants retaliated against Professor Leitner because of her classroom discourse and speech on a matter of public concern pursuant to the policy, custom, or practice of WCC, and WCC thereby violated Professor Leitner's constitutional rights.

85.    President Hankin had final authority over the decision to terminate Professor Leitner for violating the Speech Code, and he had discretion in exercising that authority. President Hankin's action in terminating Professor Leitner represents the official policy of WCC.

86.    Upon information and belief, WCC failed to adequately train its administrators with respect to the free speech rights of the WCC faculty, and acted with deliberate indifference to the free speech rights of Professor Leitner and WCC faculty members. President Hankin and other WCC policymakers knew or should have known: that administrators would encounter complaints about speech used by faculty members that would raise free speech issues; that training administrators regarding the free speech rights of WCC faculty would avoid the violation of the faculty's free speech rights; and that the imposition of faculty discipline by untrained administrators would likely cause the violation and chilling of faculty free speech rights.

87.    By the conduct described above, WCC caused the Individual Defendants to retaliate against Professor Leitner in violation of the First Amendment of the United States Constitution, under 42 U.S.C. § 1983, and Article One, Section Eight of the New York State Constitution, for her in-class academic discourse and speech on a matter of public concern.

88.    Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages, as a direct and proximate result of WCC's illegal conduct.

## COUNT THREE

### Against the Individual Defendants

### Vagueness: Lack of Reasonable Notice

89.   Professor Leitner repeats and realleges paragraphs 1–88 as if fully set forth herein.

90.   As demonstrated above, the Speech Code is unconstitutionally vague.  By enforcing the unconstitutionally vague Speech Code against Professor Leitner, the Individual Defendants violated her rights protected by the Due Process Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983, and Article One, Section Six of the New York State Constitution.

91.   The Individual Defendants acted intentionally and with malice, or with reckless indifference to Professor Leitner's constitutional rights.

92.   As a direct and proximate result of the Individual Defendants' enforcement of the unconstitutionally vague Speech Code, Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages.

## COUNT FOUR

### Against WCC

### Vagueness: Lack of Reasonable Notice

93.   Professor Leitner repeats and realleges paragraphs 1–92 as if fully set forth herein.

94.   The Speech Code represents the policy, custom, or practice of WCC, and the Individual Defendants enforced the Speech Code against Professor Leitner pursuant to that policy, custom, or practice.

95.   . President Hankin's action in terminating Professor Leitner pursuant to the unconstitutionally vague Speech Code represents the official policy of WCC.

96.    Upon information and belief, WCC failed to adequately train its administrators with respect to the due process rights of the WCC faculty and acted with deliberate indifference to the due process rights of Professor Leitner and other WCC faculty members. President Hankin and other WCC policymakers knew or should have known: that administrators would encounter complaints about speech used by faculty members that would raise fair notice issues; that training administrators regarding faculty free speech and due process rights, and the right to fair notice, would avoid the violation of faculty due process rights; and that the imposition of faculty discipline by untrained administrators would likely cause the violation of faculty due process rights.

97.    The Speech Code failed to provide reasonable notice to Professor Leitner that her in-class speech was prohibited.  By the conduct described above, WCC caused the Individual Defendants to enforce the Speech Code against Professor Leitner in violation of the Due Process Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983, and Article One, Section Six of the New York State Constitution.

98.    Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages, as a direct and proximate result of WCC's illegal conduct.

## COUNT FIVE

### Against the Individual Defendants

### Vagueness: Arbitrary and Discriminatory Enforcement

99.     Professor Leitner repeats and realleges paragraphs 1–98 as if fully set forth herein.

100.    Based on the plain language of the Speech Code and the enforcement of the Speech Code against Professor Leitner, the Speech Code authorizes and encourages arbitrary and discriminatory enforcement.   Upon information and belief, other professors have been subject to arbitrary and discriminatory enforcement of the Speech Code.  WCC delegated, and continues to delegate, unconstitutionally broad discretion to Professor Miller, Dean Wang, Dean Rogalski, President Hankin, and other WCC officials to discipline Professor Leitner and other WCC faculty members based on the content of their speech.  By the actions described above, the Individual Defendants subjected Professor Leitner to the arbitrary and discriminatory enforcement of an unconstitutionally vague regulation, in violation of the Due Process Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983, and Article One, Section Six of the New York State Constitution.

101.    The Individual Defendants acted intentionally and with malice, or with reckless indifference to Professor Leitner's constitutional rights.

102.    As a direct and proximate result of the Individual Defendants' arbitrary and discriminatory enforcement of the Speech Code, Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages.

## COUNT SIX

### Against WCC

### Vagueness: Arbitrary and Discriminatory Enforcement

103.   Professor Leitner repeats and realleges paragraphs 1–102 as if fully set forth herein.

104.   The Speech Code represents the policy, custom, or practice of WCC, and the Individual Defendants punished Professor Leitner pursuant to that policy, custom, or practice.

105.   President Hankin's action in terminating Professor Leitner pursuant to the unconstitutionally vague Speech Code represents the official policy of WCC.

106.   Upon information and belief, WCC failed to adequately train its administrators with respect to the due process rights of the WCC faculty, and acted with deliberate indifference to the due process rights of Professor Leitner and other WCC faculty members. President Hankin and other WCC policymakers knew or should have known: that administrators would encounter complaints about speech used by faculty members that raise issues of arbitrary and discriminatory enforcement; that training administrators regarding faculty free speech and due process rights, and the right against arbitrary and discriminatory enforcement, would avoid the violation of faculty due process rights; and that the imposition of faculty discipline by untrained administrators would likely cause the violation of faculty due process rights.

107.   By the conduct described above, WCC created a regime of faculty discipline that authorizes encourages arbitrary and discriminatory enforcement.  WCC caused the Individual Defendants to enforce the Speech Code against Professor Leitner in an arbitrary and discriminatory

manner, in violation of the Due Process of Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983, and Article One, Section Six of the New York State Constitution.

108.    Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages, as a direct and proximate result of WCC's illegal conduct.

## COUNT SEVEN

### Against All Defendants

### Overbreadth as Relating to Professor Leitner

109.    Professor Leitner repeats and realleges paragraphs 1–108 as if fully set forth herein.

110.    The Speech Code prohibits speech without providing appropriate standards and uses only vague and incomprehensible language: in-class faculty speech must be "courteous" and "respectful," and may not be "offensive," "insulting," "belittling," or "humiliating." Thus, no limiting construction of the Speech Code is available.

111.    The Speech Code prohibits a substantial amount of constitutionally protected speech, including *any* in-class statement by a WCC professor that a student deems "offensive."

112.    The Speech Code prohibits a great deal of speech that *should* be taking place in a college classroom.

113.    The Speech Code's overbreadth is substantial in relation to its legitimate sweep.

114.    Therefore, the Speech Code is unconstitutionally overbroad and all enforcement of the Code is invalid.

115.    By creating and maintaining an unconstitutionally overbroad and invalid Speech Code as the policy, custom or practice of WCC, and enforcing the Speech Code against Professor Leitner, the defendants have violated, and continue to violate, Professor Leitner's rights under the First Amendment of the United States Constitution, under 42 U.S.C. § 1983, and Article One, Section Eight of the New York State Constitution.

116.    The Individual Defendants acted intentionally and with malice, or with reckless indifference to Professor Leitner's constitutional rights.

117.    Professor Leitner has suffered, is now suffering, and will continue to suffer irreparable harm from the loss of her free speech rights, and has incurred and will continue to incur monetary and emotional damages, as a direct and proximate result of the defendants' illegal conduct.

## COUNT EIGHT

### Against All Defendants

### Overbreadth as Relating to the WCC Faculty

118.    Professor Leitner repeats and realleges paragraphs 1–117 as if fully set forth herein.

119.    The Speech Code prohibits a substantial amount of constitutionally protected speech.

120.    The Speech Code's overbreadth is substantial in relation to its legitimate sweep.

121.    Therefore, the Speech Code is unconstitutionally overbroad and all enforcement of the Code is invalid.

122.    The existence of WCC's unconstitutionally overbroad and invalid Speech Code, and the threat of its enforcement by the defendants, has violated and continues to violate the rights of all WCC professors under the First Amendment of the United States Constitution, under 42 U.S.C. § 1983, and Article One, Section Eight of the New York State Constitution.

123.    Professor Leitner has standing to enforce the constitutional rights of other WCC professors pursuant to the overbreadth doctrine.

124.    As a direct and proximate result of the existence and enforcement of WCC's unconstitutionally overbroad and invalid Speech Code, all WCC professors have suffered, are suffering, and will continue to suffer irreparable harm from the loss of their free speech rights.

## REQUEST FOR RELIEF

Wherefore, Professor Leitner respectfully requests the following relief from the Court:

(a)    a declaration that the acts and practices complained of herein are in violation of federal law and state law;

(b)    an order enjoining WCC from enforcing the Speech Code against Professor Leitner or any other professor employed by WCC; directing defendants to reinstate Professor Leitner as a Senior Adjunct Professor at WCC, with the same priority in course selection she would have had but for the defendants' unconstitutional and illegal conduct; and directing defendants to refrain from providing negative, misleading, or disparaging references pertaining to Professor Leitner's employment at WCC;

(c)    an award of compensatory damages, including all earnings Professor Leitner would have received but for the defendants' unconstitutional and illegal conduct, including but not

limited to, back pay, front pay, lost employment and unemployment benefits, and damages for reputational injury, emotional distress, humiliation, and pain and suffering;

(d)    an award of additional amounts as punitive damages;

(e)    an award of such interest as is allowed by law;

(f)    an award of reasonable attorneys' fees and costs; and

(g)    such other relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Professor Leitner demands a trial by jury in this action.

Dated:  May 11, 2012
        New York, NY

                    MORVILLO, ABRAMOWITZ, IASON,
                    ANELLO, & BOHRER, P.C.

            By:  _Catherine M. Foti_____
                    Catherine M.  Foti
                    Curtis B.  Leitner
                    Attorneys for Plaintiff
                    565 Fifth Avenue
                    New York, NY 10017

33