UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CAROL LEITNER

Index No: 12 CIV 3778 (Seibel, C.)

Plaintiff,

-against-

WESTCHESTER COMMUNITY COLLEGE, JOSEPH
HANKIN, in his personal and official capacity as
President of Westchester Community College, CHET
ROGALSKI, in his personal and official capacity as
Dean and Vice President of Academic Affairs,
JIANPING WANG, in her personal and official capacity
as Associate Dean of the Arts and Humanities, and
GABRIELLE MILLER , in her personal and official
capacity    as    Curricular    Chairperson    of    the
Communications and Media Arts Department

Defendants.

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

GAINES, GRUNER, PONZINI & NOVICK, LLP
11 Martine Avenue, 8th Floor
White Plains, NY 10271
914-288-9595

Of Counsel
     John M. Murtagh  (JM5815)
     Denise M. Cossu  (DC6900)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT.............................................................................1

THE COMPLAINT..............................................................................................1

APPLICABLE STANDARD................................................................................11

ARGUMENT......................................................................................................13

POINT I

PLAINTIFF'S CLAIMS AGAINST WCC AND THE INDIVIDUAL DEFENDANTS
SUED IN THEIR OFFICIAL CAPACITIES MUST BE DISMISSED PURSUANT TO
THE ELEVENTH AMENDMENT............................................ ..................13

    A.    The Eleventh Amendment Bars Plaintiff's Claims Against WCC ..................14

    B.    The Eleventh Amendment Bars Plaintiff's Claims Against The Individual
        Defendants in Their Official Capacities............................................18

POINT II

PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS MUST BE
DISMISSED....................................................................................................20

POINT III

PLAINTIFF'S DUE PROCESS CLAIMS BASED UPON ALLEGED VAGUENESS,
ARBITRARY AND DISCRIMINATORY ENFORCEMENT, AND OVER BREADTH
MUST FAIL...................................................................................................27

POINT IV

PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST
FAIL AS THEY ARE COVERED BY THE DOCTRINE OF QUALIFIED
IMMUNITY...................................................................................................33

CONCLUSION..................................................................................................35

i

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page Numbers**

A.B. Small v. American Sugar & Refining Co., 267 U.S. 233 (1925) ................................. 28

Arnett v. Kennedy, 416 U.S. 134 (1974) ......................................................................... 28

ATSI Comm., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ............................... 12

Becker v. City Univ. of N.Y., 94 F. Supp. 2d 487 (S.D.N.Y. 2000) ............................... 17

Bicknell v. Vergennes Union High School Bd. Of Directors, 475 F.Supp 615 (D.Vt. 1979) ...... 22

Brown v. City of Oneonta, 235 F.3d 769 (2d Cir. 2000), cert. denied, 534 U.S. 816 (2001) ...... 11

Carter v. Inc. Village of Ocean Beach, 415 Fed. Appx. 290 (2d Cir. 2011) ................................. 29

Condit v. Dunne, 317 F. Supp.2d 344 (S.D.N.Y. 2004) ................................................... 12

Connally v. General Constr. Co., 269 U.S. 385 (1926) .............................................. 27, 28

Connick v. Myers, 461 U.S. 138 (1983) ........................................................................ 21

Conyers v. Rossides, 558 F.3d 137 (2d Cir. 2009) ........................................................ 11

Davis v. Stratton, 575 F. Supp.2d 410 (N.D.N.Y. 2008) ........................................... 14, 17

diLeo v. Greenfield, 541 F.2d 949 (2d Cir. 1976) ..................................................... 30, 32

Dube v. State University of New York, 900 F.2d 587 (2d Cir. 1990) ......................... 14, 17

Edelman v. Jordan, 415 U.S. 651 (1974) ....................................................................... 18

Feingold v. Hankin, 269 F. Supp. 2d 268 (S.D.N.Y. 2003) ........................................... 16

Garcetti v. Ceballos, 547 U.S. 410 126 S.Ct. 1951, 164 L. Ed. 2d 89 (2006) .......... 20, 21, 33

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ............................................................... 33, 34

Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260 (1988) ......................................... 22, 24

Hope v. Pelzer, 536 U.S. 730 (2002) ............................................................................. 33

Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) ............................................................. 21

Kelly v. Huntington UFSD, 2012 U.S. Dist. LEXIS 45725 (E.D.N.Y. 2012) ............................. 20

Kenney v. Genesee Valley BOCES, 2008 U.S. Dist. LEXIS 8808 (W.D.N.Y. 2008)................. 20

Kern v. City of Rochester, 93 F.3d 38 (2d Cir. 1997), cert. denied 520 U.S. 1155 (1996).......... 11

Kirby v. Yonkers Sch. Dist., 767 F. Supp. 2d 452 (S.D.N.Y. 2011)..................................20, 23-24

Kirkland v. Northside Independent School Dist., Independent School Dist., 890 F.2d 794 (5th Cir.

    1989) ................................................................................................................................. 22

Kohlhausen v. SUNY Rockland Community College, 2011 U.S. Dist. LEXIS 42055 (S.D.N.Y.

    2011) ............................................................................................................................ 14, 17

Kramer v. New York City Board of Ed., 715 F. Supp.2d 335 (E.D.N.Y. 2010);.................... 20, 24

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991)................................................ 12

Lee v. York County Sch. Div., 484 F.3d 687 (4th Cir. 2007) ............................................. 22

Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99 (2d Cir. 1999) ........................... 12

Lewis v. Cowen, 165 F.3d 154 (2d Cir. 1999) ............................................................... 21

Makarova v. United States, 201 F.3d 110 (2d Cir. 2000)................................................... 12

Malik v. Meissner, 82 F.3d 560 (2d Cir. 1996) .............................................................. 12

Mamot v. Bd. Of Regents, 367 Fed. Appx. 191, 2010 U.S. App. LEXIS 3501 (2d Cir. 2010)... 13

Marchi v. Board of Cooperative Education Services of Albany, 173 F.3d 469 (2d Cir. 1999) .. 30,

    32

Massaro v. New York City Department of Education, 2012 U.S. App. LEXIS 10911 (2d Cir.

    2012) ............................................................................................................................... 20

Meisel v. Grunberg, 651 F.Supp.2d 98 (S.D.N.Y. 2009) .................................................. 12

Morey v. Somers Cent. Sch. Dist., 410 Fed. Appx. 398 (2d Cir. 2011)................................... 21

Mostaghim v. Fashion Inst. Of Tech., 2001 U.S. Dist. LEXIS 19782 (S.D.N.Y. 2001) .............. 16

Munno v. Town of Orangetown, 391 F.Supp.2d 263 (S.D.N.Y. 2005 ......................................... 12

Panse v. Eastwood, 303 Fed Appx. 933 (2d Cir. 2008) .................................................... 21

Pasternak v. Baines, 2006 U.S. Dist. LEXIS 62898 (W.D.N.Y. 2006) ................................ 18, 19

Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984) ...................................... 13

Planck v. SUNY Board of Trustees, 18 A.D.3d 988 N.Y.S.2d 147 (3d Dept. 2005) ................... 16

Quern v. Jordan, 440 U.S. 332 (1979) ............................................................................ 13

Sanchez v. Turner, 2002 U.S. Dist. LEXIS 10911 (S.D.N.Y. 2002) ................................... 20

Scott v. Fisher, 616 F.3d 100 (2d. Cir. 2010) ................................................................. 34

Silano v. Sag Harbor Union Free Sch. Dist. Bd. Of Educ., 42 F.3d 719 (2d Cir. 1994) ........ 22, 24

Sousa v. Roque, 578 F.3d 164 (2d Cir. 2009) ................................................................. 20

Staskowski v. County of Nassau, 2006 U.S. Dist. LEXIS 84194, (E.D.N.Y. 2006) ................. 17

Trakis v. Manhattanville College, 859 N.Y.S.2d 453 (2nd Dept. 2008) ............................... 29

Trotman v. Palisades Interstate Park Commission, 557 F.2d 35 (2d Cir. 1977) .................... 13

United States v. Mazurie, 419 U.S. 544 (1975) ............................................................... 28

Vega v. Miller, 273 F.3d 460 (2d. Cir. 2001) ............................................................. 33, 34

Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635 (1997) ............................... 18

Ward v. Hickey, 996 F.2d 448 (1st Cir. 1993) ................................................................. 32

Weintraub v. Board of Education of the City of New York, 593 F.3d 196 (2d Cir. 2010) .... 20, 21

Ya-Chen Chen v. The City University of New York, 2011 U.S. Dist. LEXIS 130094 (S.D.N.Y.

2011) .............................................................................................................................. 18

**Statutes, Rules, and Regulations**

42 U.S.C. §1983.................................................................................passim

NY Education Law §§6301, 6302, 6303, 6304, 6306..............................................15

**Other Authorities**

Lawrence L., New Institutes of Applied Arts and Sciences, The Journal of Higher Education,

Vol. 18, No. 9 (Dec., 1947), pp. 478-482).............................................................. 14

## PRELIMINARY STATEMENT

The defendants Westchester Community College ("WCC"), Joseph Hankin, Chet Rogalski, Jianping Wang, and Gabrielle Miller ("Individual Defendants") (collectively referred to as "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Complaint dated May 11, 2012.[1] As discussed below, the Complaint should be dismissed pursuant to Rules 12 (b)(1) and 12 (b)(6) of the Federal Rules of Civil Procedure on the dual grounds that this Court lacks subject matter jurisdiction and that the Complaint fails to state a claim under 42 US.C. § 1983. Plaintiff's claims against WCC and the Individual Defendants sued in their official capacities are barred pursuant to the Eleventh Amendment.[2] In addition, Plaintiff's speech, as alleged in the Complaint, is not entitled to constitutional protection and her due process claims based upon alleged vagueness, arbitrary and discriminatory enforcement and overbreadth of the Handbook must also fail. Moreover, all of the claims alleged against the Individual Defendants are likewise subject to dismissal on the grounds of qualified immunity.

## THE COMPLAINT

The gravamen of the Complaint is the contention that Defendants improperly retaliated against Plaintiff "by firing her for the content of her in-class speech" as the "culmination of a

---

[1] A true and correct copy of the Complaint (hereinafter referred to as "Compl.") is attached to the Declaration of John M. Murtagh, Esq. ("Murtagh Decl.") as Exhibit "1."

[2] The applicability of Eleventh Amendment immunity was discussed during the pre-motion conference held on July 27, 2012. Defendants contended that such immunity applies because WCC operates as an entity of the SUNY system and Plaintiff argued that it is a "county department" (Compl. at ¶13). In an effort to resolve the issue, the Court suggested that Defendants provide proof to Plaintiff that WCC is a SUNY school and that if correct, Plaintiff "ought to drop the claims that would be barred by the Eleventh Amendment, unless you've come up with some other argument." By letter dated August 29, 2012, Defendants provided Plaintiff with evidence demonstrating that WCC is, indeed, part of the SUNY system, entitled to the immunities afforded by the Eleventh Amendment, and demanded that Plaintiff discontinue her claims against WCC and the Individual Defendants. Not unexpectedly, Plaintiff rejected Defendants' demand by letter response dated September 20, 2012. (True and correct copies of relevant portions of the transcript of the proceedings, the August 29, 2012 letter with attached Exhibits ("Murtagh Letter"), and September 20, 2012 letter response ("Plaintiff's Response") are attached to the Murtagh Decl. as Exhibits "2," "3" and "4," respectively).

pattern of infringement of her First and Fourteenth Amendment rights" (Compl. at ¶4). Plaintiff further contends that this was accomplished by the enforcement of an allegedly unconstitutionally vague and overbroad "Students Rights and Responsibilities" portion of the WCC Student Handbook (Compl. at ¶4).[3] She also alleges that in so doing, Defendants violated WCC's own internal disciplinary procedures, as codified in a memorandum dated and adopted in 1983 ("1983 Memorandum") (Compl. at ¶22).[4] Plaintiff claims irreparable harm from the loss of her free speech rights and seeks a declaration that the alleged acts and practices are in violation of federal and state law; an order enjoining enforcement of the Handbook," reinstating Plaintiff to her prior position and directing Defendants to refrain from providing "negative, misleading or disparaging references" pertaining to Plaintiff's employment; and an award of compensatory and punitive damages, as well as interest and attorneys' fees.

The 1983 Memorandum sets forth a procedure for disciplinary action against full and part time faculty members. By its terms, "should some difficulty with the performance or decorum of a faculty member come to the attention of a department member, department chairperson, or associates dean, dean, or president," it will be referred to the appropriate dean and a four-step process will be followed to "protect the rights of the individual and the quality of the education at the institution." If requested, the faculty member may be represented by a union representative.[5]

---

[3] A true and correct copy of "Students Rights and Responsibilities" portion of the Westchester Community College Student Handbook is attached to the Murtagh Decl. as Exhibit "5."

[4] A true and correct copy of the 1983 Memorandum is attached to the Murtagh Decl. as Exhibit "6."

[5] The WCC campus is unionized and Plaintiff was a member of Local 2431, Westchester Community College Federation of Teachers ("WCCFT") (Compl. at ¶21). There is a Collective Bargaining Agreement in place which provides, in pertinent part, for a grievance procedure for "any claimed violation, misrepresentation or inequitable application of this contract, or of the existing laws, rules, procedures, regulations, or administrative orders or work rules of the County or the College which relate to wages, hours, or working conditions..." A true and correct copy of the Collective Bargaining Agreement is attached to the Murtagh Decl. as Exhibit "7."

In this case, Plaintiff alleges censorship of her in-class speech because she claims that "in or about 2004, she told a student that, because of the size of his lips, his pronunciation of bilabial sounds (*i.e.*, sounds produced using both lips) would be improved if he pressed his lips together more tightly" (Compl. at ¶33). In fact, this incident which actually appears to have occurred in 1991 gave rise to a written student complaint that Plaintiff taught in a racially biased manner, as follows:

> Over the course of the Fall '90 semester, Professor Leitner made statements such as:
>
> 1. Blacks belong to subgroups, and if they want to flourish and mingle in society later in life, they must come out of these subgroups and have a desire to speak like White people.
> 2. If you have bold features, i.e. "big lips," you're unable to enunciate properly and correctly.
> 3. A question asked on the last day of class was, "How do you feel when you hear Black people speak White?"
>
> Although I am unable to recall everything questionable that was said by Prof. Leitner, these three examples will serve as a sample of what was being said in my class last semester.[6]

The Complaint further alleges that "as a result [of this incident which occurred in 1991], Dr. Eileen Shea, then the Chairperson of the Department, ordered a step one meeting to discipline Professor Leitner" (Compl. at ¶33). No basis is alleged to causally link this particular incident to the "step one meeting" and, in fact, this incident caused no such meeting to occur. It was only in 2004, that Dr. Shea requested a progressive disciplinary hearing in accordance with the 1983 Memorandum, as reflected in her letter dated September 17, 2004 to Defendant Jianping Wang, the Associate Dean of the Arts and Humanities. Indeed, her request did not reference this particular incident at all, but rather, indicated a need to formally discuss and

---

[6] A true and correct copy of the 1991 student complaint is annexed hereto as Exhibit "8."

resolve recurring student complaints, notwithstanding her prior efforts to resolve them informally with Plaintiff, as follows:

> I am requesting a progressive disciplinary hearing with Professor Carol Leitner, you and me to discuss recurring issues that need to be resolved with regard to student complaint. I have met several times with Carol over these matters, and feel there is a need to formalize this process.[7]

Dean Wang advised Plaintiff of the request by letter dated September 21, 2004 and again, by letter dated October 26, 2004.[8] It appears that such a meeting was held and thereafter, in accordance with the directives of the 1983 Memorandum, a Step One letter from Dean Wang, dated December 3, 2004 was delivered to Plaintiff stating only that a Step One Progressive Disciplinary Meeting was held on December 1, 2004 with regard to student complaints against her and that Anne D'Orazio, and Richard Rosell, the President and Vice President of WCCFT, respectively, were present.[9]

The Complaint also alleges a further effort in 2007 to improperly "censor" Plaintiff's in-class speech and "punish" her because of a complaint arising out of her criticism of a student performing a mock job interview contained in a letter to Dr. Shea dated February 6, 2007.[10] Again, Dr. Shea did not "convene a step two disciplinary hearing based upon this complaint" (Compl. at ¶ 34). Instead, by letter dated February 22, 2007, she wrote to Plaintiff as follows:

> I have received a letter of complaint from a student in one of your classes last semester, which I have enclosed. I took some time in writing to you about this matter since I wanted to review my notes from previous years, and also, wanted to give this new complaint careful thought and consideration. As you can see from the letter, the allegations are again the same ones that have been repeated by students over the years. You and I have met many times in the past to discuss these complaints. The continued pattern of student complaints concerns me

---

[7] A true and correct copy of the September 17, 2004 letter is attached to the Murtagh Decl. as Exhibit "9."

[8] A true and correct copy of the September 21, 2004 letter and October 26, 2004 letter is attached to the Murtagh Decl. as Exhibit "10."

[9] A true and correct copy of the Step One Letter is attached to the Murtagh Decl. as Exhibit "11."

[10] A true and correct copy of the February 6, 2007 letter complaint is attached to the Murtagh Decl. as Exhibit "12."

Unfortunately, Carol, I am not convinced that our previous discussions have been particularly effective in assisting you in diminishing these complaints. However, I am willing to discuss this current letter with you in the hopes of, once again, alleviating the problems and helping you resolve the situation.[11]

Another letter from Dr. Shea dated March 24, 2007 followed, indicating that she had met with Plaintiff and expressing her hope that the student complaints would not continue.[12] Thereafter, by letter dated April 8, 2007 to Dean Wang, Dr. Shea requested a further hearing because, "After repeated attempts to address student complaints recently without convincing evidence of much effectiveness, I have come to the conclusion that I am no longer able to supervise Professor Carol Leitner in a meaningful way."[13]

By letter dated April 24, 2007, Dean Wang advised Plaintiff of the requested Step Two hearing "regarding complaints from students in [her] Speech Communication and Voice and Diction classes" and further advised Plaintiff of her right to bring a union representative to the meeting.[14] Subsequently, by letter dated September 6, 2007 ("Step Two Letter"), Dean Wang memorialized the Step Two hearings and set forth Dr. Shea's concern regarding a "disturbing pattern of student complaints" that Plaintiff "belittled, disrespected and humiliated them" and that Plaintiff saw "nothing wrong" in what she was doing so that student complaints would "most likely happen again in the future." It also memorialized Dr. Shea's position that "student feelings do and should matter;" that "all of the literature supports the fact that feelings and relationship established with the instructor are key[s] to learning;" that "abusive, belittling techniques are contrary to the professional association and to practices and procedures in the department; and that "this is not academic freedom."

---

[11] A true and correct copy of the February 22, 2007 letter is attached to the Murtagh Decl. as Exhibit "13."

[12] A true and correct copy of the March 24, 2007 letter is attached to the Murtagh Decl. as Exhibit "14."

[13] A true and correct copy of the April 8, 2007 letter is attached to the Murtagh Decl. as Exhibit "15."

[14] A true and correct copy of the April 24, 2007 letter is attached to the Murtagh Decl. as Exhibit "16."

As the hearing officer, Dr. Wang concluded, that Plaintiff's continuous pattern of student complaints with regard to her "belittling, humiliating and insulting remarks" towards some of her students "is a professional problem" that WCC could not tolerate. Dr. Wang also stated that belittling, humiliating and insulting remarks were not just a matter of style, stating:

> They are matters of principles and we as a caring college take those complaints seriously. Therefore, I request that your classroom conduct and behavior be consistent with our institutional values and expectations, i.e. to treat every student with courtesy and respect. Please refer to the new Student Handbook pp. 109-110 regarding Students' Rights and Responsibilities.[15]

Rather than sign the Step Two Letter, Plaintiff provided a written rebuttal dated September 7, 2007 ("Rebuttal Letter") (Complaint at ¶40).[16] In addition, Dr. Anne D'Orazio, President of the WCCFT filed a Response dated September 13, 2007 ("WCCFT Response"), demanding in part, that it be "removed from consideration, that the Step Two Hearing be "declared null" and that the "failure to state a claim be acknowledged."[17] Neither the Union nor Plaintiff filed a grievance related to the Step Two Letter or Hearing, although the Collective Bargaining Agreement clearly provides for such a procedure (*See*, Exhibit 7, Collective Bargaining Agreement at ¶7.6).

The Complaint also refers to an incident on November 15, 2010 related to one student, Araceli Cruz (misspelled as "Aracelli"), who chose, as part of an assignment, to recite two poems about American politics. During the course of an ensuing classroom discussion, Plaintiff expressed that "she favored Arizona's new law, and questioned the fairness of providing public

---

[15] A true and correct copy of the Step Two Letter is attached to the Murtagh Decl. as Exhibit "17." Plaintiff also alleges a student complaint about a low grade and a student's claim that Plaintiff had missed a class because of Botox injections, when she had actually had a stroke (Compl. at ¶¶ 35 and 36). However, neither of these alleged complaints involve First Amendment considerations with respect to Plaintiff, nor are they discussed in the Step Two letter as a basis for the disciplinary hearing.

[16] A true and correct copy of the Rebuttal Letter is attached to the Murtagh Decl. as Exhibit "18."

[17] A true and correct copy of the WCCFT Response is attached to the Murtagh Decl. as Exhibit "19."

services like emergency medical care to illegal immigrants who did not pay taxes" (Compl. at ¶¶ 42 – 47).

The incident triggered a complaint by Ms. Cruz's foster mother, Barbara Alammari who wrote an email to Plaintiff the next day, stating, in part, as follows:

> […] I do not understand why you chose to critique the poem and also say hateful and insulting things about Mexican people. Araceli is Mexican. You said that you would not feel safe if Mexicans live near you, that you would be afraid that they would break into you [sic] car or your house and steal from you, and you said many, many other things. The entire class with one exception opposed you, and they were almost all offended by the things that you said about Araceli's poems, about Mexican immigrants, about other minority groups. In fact, one student walked out in protest.
>
> *   *   *
>
> Araceli also cried about the incident again this morning. Last night's class will be a defining moment in her life it was the first time in her life that someone said mean and hateful, hurtful, angry, offensive, disrespectful things about Mexican immigrants to her face. That person was you.... [18]

Ms. Alamarri also filed a formal written complaint ("Alamarri Complaint"), further expounding upon the incident, in part, as follows:

> ... [T]he student doing the presentation is Mexican. The professor, for some reason, launched into a tirade against Mexican immigrants. The professor said, "Mexicans are crossing the border just to come and commit crimes." The student recalls, "She sounded so afraid of Mexicans, she said that they are criminals who can harm you and your family. They might come into your home and rob you."
>
> ... [S]he went on to say that Mexican immigrants cause trouble, commit crimes, and that this is bad for neighborhoods and society. She said, "imagine if they were around your neighborhood, you wouldn't feel safe." She said how glad she was about the woman who recently passed the law in Arizona that immigrants have been upset about. The professor also mentioned terrorism. She also said, "Immigrants come illegally into the United States and they are causing trouble and there is not enough money to support them. If one of them (illegal immigrants) goes to the hospital, that is taking tax money from your parents'

---

[18] A true and correct copy of the November 16, 2010 email, also forwarded to Defendant Gabrielle Miller, then Acting Chairperson of the Communication and Media Arts Department, is annexed to the Murtagh Decl. as Exhibit "20."

taxes. They take the money from your parents' taxes to pay for hospital bills of illegal immigrants." She also asked the class, "who here has papers?"[19]

Plaintiff alleges that several days later, Professor Miller met with her to discuss the Alamarri Complaint and that by letter date stamped February 23, 2011 ("February 23, 2011 Letter") advised that she would bring the matter to the attention of Dean Wang. (Compl. at ¶¶ 53 and 54). That letter stated, in part:

> When I brought up [your saying] negative, hurtful things about Mexican immigrants you blamed the student for the incident claiming the poem was an "inciting" poem and sparked what happened. ...
>
> There are two issues here. The first is that [Araceli's] political rights are infringed upon if she is denied the opportunity to choose a poem which conflicts with your personal political views. In addition, you are teaching a speech class, not a political science class, and therefore discussion should be limited to matters of speech communication. The second is that your comments regarding immigrants, particularly Mexican immigrants that were described in the e-mail and in a formal written complaint sent to me by [Araceli's] foster mother are extremely disturbing. ...[20]

Subsequently, Dean Wang requested a Step Three Hearing by letter dated March 21, 2011 (Compl. at ¶59.) and re-submitted her request by letter dated May 26, 2011 ("May 26, 2011 Request"), setting forth additional complaints received since the date of the earlier Request.[21] In addition, on April 19, 2011, during the intervening period of time between the March 21, 2011 Request and May 26, 2011 Request, an incident arose concerning Plaintiff, which was reported and recorded on a Westchester Community College Security Department Incident Report the following day ("April 20, 2011 Incident Report"). That Report set forth the following, in pertinent part:

---

[19] A true and correct copy of the Alamarrl Complaint is annexed to the Murtagh Decl. as Exhibit "21."

[20] A true and correct copy of the February 23, 2011 Letter is annexed to the Murtagh Decl. as Exhibit "22"

[21] A true and correct copy of the May 26, 2011 Request, including the earlier March 21, 2011 Request is annexed to the Murtagh Decl. as Exhibit 23.

On Tuesday, April 19, 2011 at approx. 1800 pm at off-site Mahopac High School, student Katherine Furci was approached by Pro. Carol Leitner upon leaving the restroom. Professor Leitner refused to let her leave the building unless she signed a letter stating she did not enter a complaint about the professor from last semester. The student was held there against her will until she signed the statement. Professor also stated she knew what kind of car the student was driving. Security suggested student file a police report with Carmel Police Dept.[22]

A police report was also filed with the Carmel Police Department on April 20, 2011 ("Carmel Police Department Report"), indicating that the "Complainant" was "forcibly detained" by Plaintiff and forced to sign paperwork before being released. In addition, Plaintiff indicated to the Complainant that she knew what vehicle the Complainant drove.[23] As a result of this incident, Plaintiff was suspended "pending the outcome of an investigation into [her] interactions with [her] former student."[24] By letter dated May 12, 2011, Plaintiff was removed from the priority list of the Communications, Journalism, and Performing Arts Department, effective May 23, 2011 ("May 12, 2011 letter") because of the events of April 19, 2011.[25]

The Complaint also refers to a decision of Arbitrator Joel Ronald Ax, Esq. dated February 2, 2001, which was rendered in connection with a grievance filed by WCCFT in connection with another professor's Step Two Hearing (the "Ax Decision") (Compl. at ¶¶ 60-62). The Ax Decision stated in part that in connection with Step One or Step Two, "A good faith effort [should] be made to see that the student meets with the faculty member in an attempt to resolve [student complaints]."[26] The Complaint alleges Professor Miller was required to refer the complaining student back to Plaintiff to attempt to resolve the complaint, and, if that failed, meet with both the student and the professor in a further effort to resolve the matter (Compl. at ¶ 60).

---

[22] A true and correct copy of the April 20, 2011 Incident Report is attached to the Murtagh Decl. as Exhibit "24."

[23] A true and correct copy of the Carmel Police Department Report is attached to the Murtagh Decl. as Exhibit "25."

[24] A true and correct copy of the suspension notice is attached to the Murtagh Decl. as Exhibit "26."

[25] A true and correct copy of the May 12, 2011 letter is attached to the Murtagh Decl. as Exhibit "27.".

[26] A true and correct copy of the Ax Decision is attached to the Murtagh Decl. as Exhibit "28"

Because no such meeting took place regarding the Alamarri Complaint, the two additional student complaints contained in the earlier March 21, 2011 Request, or the further complaints included in the May 26, 2011 Request for a Step Three Hearing, Plaintiff alleges violations of the Ax Decision and improper retaliation against her arising out of her allegedly constitutionally protected speech (Compl. at ¶¶ 61-65). Thus, the Complaint states that "on June 9, 2011, after failing to follow their own internal procedures set forth in the 1983 Memorandum, and then failing to follow the procedure required by the Ax arbitration decision, the WCC administration held a step three hearing" (Compl. at ¶66). However, the Ax Decision, by its terms, refers to an *informal* practice, relevant only to the Step One and Step Two proceedings, not the Step Three Hearing.

In any event, a Step Three Hearing was held on June 9, 2011 (Compl. at ¶66). Defendant Chet Rogalski, Vice President and Dean of Academic Affairs, prepared a report dated June 14, 2011 ("Step Three Report") to Defendant Joseph Hankin, President of WCC. The Step Three Report, indicated that student complaints had continued since the Step One and Step Two meetings; that these complaints were both serious and similar in nature; and that there was a need for a Step Three Hearing. In addition, according to the Report, Dr. Wang stated the position that WCC "is a sensitive, nurturing institution of higher learning and students cannot be belittled and humiliated by their professors." In conclusion, Dr. Rogalski recommended that Plaintiff's employment be terminated, stating as follows:

> The more I listened to [Plaintiff's] disparaging remarks about students during the hearing, the more I became convinced that she does not treat all of her students with dignity and respect. This is additionally evident by the large number of claims by students over the years about how their teacher has humiliated them during class.
>
> Regarding the Faculty Union's claim that the administration did not follow the proper protocol in handling students' complaints – that students were not sent back to the professor, I have a lot of confidence in Dean Wang and Chairperson

Miller that they did so. As we know, students, especially if they have been humiliated and intimidated by the professor, tend not to want to visit the professor expecting that they will only receive the same kind of treatment again or worse.

I also do not agree with the Faculty Union that belittling behavior toward students is a pedagogical style.

In Dr. Wang's memo to [Plaintiff] after the Step II hearing, she strongly requests that [Plaintiff's] "classroom conduct and behavior be consistent with our institutional values and expectations, i.e. to treat every student with courtesy and respect." Unfortunately, [Plaintiff] chose not to adhere to that request.[27]

By Memorandum dated July 6, 2011, President Hankin acknowledged receipt of the findings of the Step Three Committee, concurred with their conclusions, and dismissed Plaintiff from the College effective July 6, 2011.[28] (Compl. at ¶67.) No grievance was adjudicated in connection with the Step III Hearing or Plaintiff's termination.  In fact, on July 13, 2012, the WCCFT withdrew its formal request for arbitration "regarding the Carol Leitner matter."[29]

## APPLICABLE STANDARD

Where, as here, the case is at the pleading stage and no evidentiary hearings have been held, in determining a dismissal motion under Rule 12(b)(1) the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009). However the Court is not required to accept conclusory assertions unsupported by factual allegations. *See*, Brown v. City of Oneonta, 235 F.3d 769, 773 (2d Cir. 2000), *cert. denied*, 534 U.S. 816 (2001); Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1997), *cert. denied* 520 U.S. 1155 (1996).  A plaintiff must "provide the grounds upon which his claim rests through factual allegations sufficient to "raise a right to relief above the speculative level." ATSI Comm., Inc. v. Shaar Fund, Ltd., 493 F.3d 87,

---

[27] A true and correct copy of the Step Three Report is attached to the Murtagh Decl. as Exhibit "29."

[28] A true and correct copy of the July 6, 2011 Memorandum is attached to the Murtagh Decl. as Exhibit "30."

[29] A true and correct copy of the Arbitration Withdrawal is attached to the Murtagh Decl. as Exhibit "31."

98 (2d Cir. 2007). If a plaintiff has not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." Bell Atlantic Corp., 550 U.S. at 570.

In addition, in determining a dismissal motion, the District Court may consider "facts stated on the face of the complaint, … documents appended to the complaint or incorporated in the complaint by reference, and … matters of which judicial notice may be taken." Meisel v. Grunberg, 651 F.Supp.2d 98, 107 (S.D.N.Y. 2009), *quoting* Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999). Furthermore, the Court may consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint." Munno v. Town of Orangetown, 391 F.Supp.2d 263, 268 (S.D.N.Y. 2005; *see also*, Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

To resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may additionally consider evidence outside the pleadings. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996). In this case, Plaintiff acknowledges the WCCFT presence on the campus and cites to and relies upon various documents including the 1983 Memorandum, Ax Decision, portions of the WCC Student Handbook, as well as the Step One, Step Two and Step Three Letters and disciplinary proceedings and underlying student complaints, which may therefore be considered by this Court without converting the motion to one for summary judgment. Condit v. Dunne, 317 F. Supp.2d 344, 357 (S.D.N.Y. 2004).

## ARGUMENT

### POINT I

### PLAINTIFF'S CLAIMS AGAINST WCC AND THE INDIVIDUAL DEFENDANTS SUED IN THEIR OFFICIAL CAPACITIES MUST BE DISMISSED PURSUANT TO THE ELEVENTH AMENDMENT

The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." In the case at bar, Plaintiff brings her action pursuant to 42 U.S.C. §1983. The Eleventh Amendment bars such a federal court action against a state or its agencies absent a waiver of immunity or congressional legislation specifically overriding immunity. Mamot v. Bd. Of Regents, 367 Fed. Appx. 191, 2010 U.S. App. LEXIS 3501 (2d Cir. 2010), *citing* Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-1 (1984). It is well-established that New York has not consented to §1983 suits in federal court and that §1983 was not intended to override a state's sovereign immunity. Mamot at *192, **2, *citing* Trotman v. Palisades Interstate Park Commission, 557 F.2d 35, 38-40 (2d Cir. 1977) and Quern v. Jordan, 440 U.S. 332 (1979). For the reasons set forth below, Plaintiff's claims for relief against defendant WCC (Counts Two, Four, Six and Eight) should be dismissed in their entirety as barred by the Eleventh Amendment. In addition, insofar as the Plaintiff seeks monetary damages, her claims against the Individual Defendants in their official capacities should also be dismissed. Furthermore, Plaintiff's claim for reinstatement is not prospective in nature, nor has she alleged any ongoing violation of federal law. As a result, Plaintiffs' claims for reinstatement are likewise barred.[30]

---

[30] Moreover, even if this Court should find that Plaintiff's claim for reinstatement is not barred by the Eleventh Amendment, her claims of First Amendment retaliation fail on their merits (*see* Point II, *infra*). Similarly, Plaintiff's due process claims based upon the allegedly vague provisions of the Student Handbook also lack merit (*see* Point III).

## A.  The Eleventh Amendment Bars Plaintiff's Claims Against WCC

Plaintiff acknowledges that WCC is a community college "affiliated" with the State University of New York ("SUNY") and was "established by Westchester County with the approval of the SUNY Board of Trustees" (Compl. at ¶¶13-14). For Eleventh Amendment purposes, SUNY is an "integral part of the government of the State [of New York] and when it is sued the State is the real party." Dube v. State University of New York, 900 F.2d 587, 594 (2d Cir. 1990). Thus, no relief, either legal or equitable, is available against SUNY. Id.  As discussed below, WCC is part of the SUNY system and, as a result, is entitled to sovereign immunity with respect to all of Plaintiff's 42 U.S.C. §1983 claims. Kohlhausen v. SUNY Rockland Community College, 2011 U.S. Dist. LEXIS 42055 (S.D.N.Y. 2011)(recognizing Rockland Community College to be a SUNY school entitled to Eleventh Amendment immunity); see also, Davis v. Stratton, 575 F. Supp.2d 410 (N.D.N.Y. 2008)(recognizing Schenectady County Community College to be a SUNY school entitled to Eleventh Amendment immunity.)

In 1946, the State of New York established the New York State Institute of Applied Arts and Sciences with a school located in White Plains, New York, which was both financed and operated by the State of New York. In 1948, the Institute was "folded into" the State University of New York, which began that year with twenty-two four-year colleges and eleven two-year colleges, including the Institute (see, Exhibit 3, Murtagh Letter, at Exhibits A, B and C; see also, Jarvie, Lawrence L., New Institutes of Applied Arts and Sciences, The Journal of Higher Education, Vol. 18, No. 9 (Dec., 1947), pp. 478-482). Thus, WCC is unusual, if not unique, in that it was not created sui generis as a community college but was rather, an existing "state" institute which, years after it was established, gained additional county sponsorship.

Local sponsors of community colleges, such as Westchester County, are subject to approval by SUNY and cannot establish a community college without SUNY authorization. NY

Education Law §§6301(3) and 6302. In 1953, Westchester County's Board of Supervisors passed Resolution 86-1953 assuming local sponsorship of the renamed Westchester Community College, subject to the approval of the SUNY Board of Trustees and pursuant to New York Education Law. That authorization came on June 22, 1953, when William C. Carlson, President of SUNY, so advised Westchester County's Board of Supervisors (*see,* Exhibit 3, Murtagh Letter, at Exhibit "E"). The Institute Director became its first President and the WCC Board of Trustees was expanded to nine members, four appointed by the Governor and five by Westchester County (*see,* Murtagh Letter, at Exhibits B, D and E.) From the time of the SUNY authorization to the present, WCC has been and remains one of the now thirty community colleges of the SUNY system, as listed in the "Discover Viewbook 2013, The State University of New York" and on SUNY's own website (*see,* Exhibit 3, Murtagh Letter, at Exhibit F;" *see also,* http:// www.suny.edu/About_SUNY/ourcampuses.cfm)

Currently, four out of ten members of the WCC Board of Trustees were appointed by the Governor of the State of New York. NY Education Law §6306. In addition, the WCC President must also be approved by the SUNY Board of Trustees. NY Education Law §6306(2). In addition, the curriculum of all community colleges, including WCC, is developed with the assistance and guidance of the SUNY Trustees and is subject to their approval and to any amendments or modifications that they may from time to time prescribe. NY Education Law §§6303(2), 6303(4), 6306(2). Indeed, courses completed at WCC are transferable for full credit to four year colleges in the SUNY system under the "Transfer Guarantee Program" instituted by SUNY. (*see,* Exhibit 3, Murtagh Letter, at Exhibit H"). Moreover, one third of the operating costs of WCC are paid by New York and the operating costs as well as student tuition costs are

subject to the approval of the SUNY Trustees. *See*, NY Education Law §6304.[31] The cases cited in Plaintiff's Response (Exhibit 4) also do not support the claim that WCC is not a part of the SUNY system and not entitled to Eleventh Amendment protection. In Mostaghim v. Fashion Inst. Of Tech., 2001 U.S. Dist. LEXIS 19782 (S.D.N.Y. 2001) a student sued defendants, including Fashion Institute of Technology ("FIT"), City University of New York ("CUNY") and State University of New York ("SUNY") asserting that as a result of his complaints, he was retaliated against by having his work graded unfairly and FIT pursuing disciplinary proceedings against him. CUNY and SUNY both moved to have the claims asserted against them dismissed on the grounds that neither institution is part of FIT or otherwise liable for the conduct alleged. The Court granted their applications. In Feingold v. Hankin, 269 F. Supp. 2d 268 (S.D.N.Y. 2003), a matter concerning a retired professor's claim to payments in lieu of his pension, the district court dismissed the complaint against the individual defendants, held that Westchester County was the real party in interest, and directed the plaintiff to properly serve the summons and complaint upon the County. Planck v. SUNY Board of Trustees, 18 A.D.3d 988, 795 N.Y.S.2d 147 (3d Dept. 2005) involved a complaint by a former student of Schenectady County Community College ("SCCC") brought against, *inter alia*, SCCC and the SUNY Board of Trustees, alleging discrimination based on his disability in the form of harassment, denial of proper grievance procedures and wrongful discharge from SCCC. In affirming the lower court's dismissal of the complaint as against the SUNY Board, the Appellate Division noted that no specific action by the SUNY Board had been alleged supporting the plaintiff's claim that the

---

[31] Plaintiff's Response argued that WCC is not a SUNY school because when it was established, its real property was transferred to Westchester County and NY Education Law §352 (2) requires that the real property vest in the State when SUNY "acquires, absorbs, merges or consolidates with or becomes successor to any higher educational institution." However, this provision does not even apply to WCC. SUNY did not "acquire, absorb[], merge or consolidate with or becomes successor to WCC." In fact, as described above, before Westchester County became a sponsor for the college, it was established, financed and operated by the State of New York as the New York State Institute of Applied Arts and Sciences. The "establishment" by the Westchester County Board of Supervisors, does not undermine WCC's SUNY status.

SUNY Board should be held accountable for the alleged acts of SCCC.[32] Not one of these cases

involves the applicability of the Eleventh Amendment

By contrast, Kohlhausen, which is directly on point to the case at bar, clearly recognized

that community colleges, such as WCC are protected by the Eleventh Amendment in litigations

brought pursuant to 42 U.S.C. §1983 as follows:

> The State University of New York "is an integral part of the government of the
> State and when it is sued the State is the real party." Dube v. State Univ. of N.Y.,
> 900 F.2d 587, 594 (2d Cir. 1990) (citations omitted). The Defendants argue that
> because SUNY Rockland Community College and its Board operate as an entity
> of the SUNY system, they are entitled to sovereign immunity. See, e.g., Davis v.
> Stratton, 575 F. Supp.2d 410, 424 (N.D.N.Y. 2008) (Schenectady County
> Community College "is an entity of the SUNY system. Thus, no relief, either
> legal or equitable, would be available against SCCC."), rev'd on other grounds,
> 360 Fed. App'x 182 (2d Cir. 2010). In response, Kohlhausen argues that because
> community colleges are established and primarily funded by local sponsors, they
> are primarily municipal organs that cannot benefit from state sovereign immunity.
> The Court finds that despite such local funding, the degree of state funding for
> and control over SUNY Rockland Community College render the school an arm
> of the state.
>
> * * *
>
> Accordingly, despite the fact that local sponsors are significant partners in the
> relatively independent operation of community colleges such as SUNY Rockland,
> the community colleges are "ultimately accountable to, and dependent upon, the
> state." Clissuras, 359 F.3d at 83 (quoting Becker v. City Univ. of N.Y., 94 F.
> Supp. 2d 487, 490 (S.D.N.Y. 2000)). [*24] In light of this determination -- and
> considering similar holdings in this Circuit, see Davis, 575 F. Supp. 2d 410; see
> also Staskowski v. County of Nassau, No. 05-CV-5984, 2006 U.S. Dist. LEXIS
> 84194, 2006 WL 3370699, at *1 (E.D.N.Y. Nov. 16, 2006) -- the Court finds
> SUNY Rockland enjoys Eleventh Amendment immunity, as an arm of the state.

Kohlhausen, 2011 U.S. Dist. LEXIS 42055 at *21-*24.

The same reasoning and result pertain here. WCC is an entity of the SUNY system and

an arm of the State. Therefore, it enjoys Eleventh Amendment immunity and no relief, either

legal or equitable, is available against it.

---

[32] It is particularly notable that when the analysis involved whether SCCC is a SUNY for purposes of the
applicability of the Eleventh Amendment, the district court unequivocally recognized that "SCCC is an entity of the
SUNY system. Thus, no relief, either legal or equitable, would be available against SCCC." Davis v. Stratton, 575 F.
Supp.2d 410, 424 (N.D.N.Y. 2008).

## B.  The Eleventh Amendment Bars Plaintiff's Claims Against The Individual Defendants in Their Official Capacities

With respect to the claims asserted against the Individual Defendants in their official capacities, any claims for monetary or compensatory damages should also be dismissed pursuant to the Eleventh Amendment. Edelman v. Jordan, 415 U.S. 651 (1974). Plaintiff argues that her claims for prospective, injunctive relief from violations of federal law provide an exception to the Eleventh Amendment sovereign immunity bar and that this exception "plainly applies to Professor Leitner's claim for reinstatement," relying upon State Employees Bargaining Agent Coalition v. Rowland, supra and Ex parte Young, supra (see, Exhibit 4, Plaintiff's Response). However, under the circumstances herein, Plaintiff's argument fails. Ya-Chen Chen v. The City University of New York, 2011 U.S. Dist. LEXIS 130094 (S.D.N.Y. 2011) (dismissing non-tenured professor's 42 U.S.C. §1983 claim for reinstatement as not prospective and barred by the Eleventh Amendment); Pasternak v. Baines, 2006 U.S. Dist. LEXIS 62898 (W.D.N.Y. 2006) (dismissing claim for reinstatement to employment position as compensation for past conduct and barred by the Eleventh Amendment).

Whether a litigant's claim falls under the Ex parte Young exception to the Eleventh Amendment's bar is a "straightforward inquiry" that asks "whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (1997) (internal citations omitted). Ya-Chen Chen v. The City University of New York, is instructive. In that case, plaintiff was chastised for her interaction with a student and received a poor evaluation for the 2008-2009 academic year. Plaintiff signed the evaluation, but did not agree to its contents and contested the evaluation.  She was subsequently removed from her position as Director of Asian Studies and thereafter advised that she would not be reappointed to her position as an Assistant Professor of

Asian Studies for the 2010-2011 academic year. Plaintiff appealed the decision not to reappoint her internally to the Divisional Personnel and Budget Committee, to the Review Committee and finally, to the President of the College. In each instance, she was unsuccessful. Plaintiff then brought an action is federal court, against the College and the administrators alleging unlawful discrimination and retaliation in violation of her civil rights.

Judge Colleen McMahon dismissed plaintiff's claim for reinstatement, reasoning as follows:

> Although "[t]he *Eleventh Amendment* does not preclude suits against State officers in their official capacity seeking prospective relief ... [u]nder Ex parte Young" a plaintiff must be able to allege an ongoing violation of federal law and seek [] relief properly characterized as prospective." In determining whether the doctrine of Ex parte Young avoids an *Eleventh Amendment* bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"
>
> Here, Count Three of the Complaint is labeled as a claim "for prospective and injunctive relief under 42 U.S.C. §1983 against defendant officials, Paaswell, Lesen, Calichman, and Murphy." However, all of the claims Chen has raised in her complaint are discrete acts of discrimination and retaliation, none of which she alleges are ongoing, since her employment allegedly terminated on August 30, 2010. *See, e.g., Pasternak v. Baines, No Civ. 0369C, 2006 U.S. Dist. LEXIS 62898, 2006 WL 2570982 at *9 (W.D.N.Y. Sept. 5, 2006)*("Here, plaintiff has alleged no ongoing violations of federal law, only discrete acts of past discrimination and retaliation by defendant...While reinstatement is generally regarded as pro[sp]ective injunctive relief, reinstatement to an employment position as compensation for past instances of allegedly discriminatory conduct is not considered prospective equitable relief pursuant to Ex parte Young.")
>
> Here, Chen has not alleged any ongoing violations of federal law, and it is evident that she could not do so, since her employment with CUNY has ended. Therefore, Count Three of the Complaint is dismissed.

Chen, 2011 U.S. Dist. 130094 at *22-*24 (*internal citations omitted*).

Similarly, in the case at bar, Plaintiff has alleged no ongoing violations of federal law for which her reinstatement could be viewed as providing prospective relief, only discrete acts of alleged violation of her First Amendment rights, culminating in termination from her non-

tenured, part-time position as an adjunct professor. (Compl. at ¶4). As in <u>Chen</u>, Plaintiff was removed from her position as the culmination of her disciplinary problems and student complaints. Also, like Chen, Plaintiff has not alleged any ongoing violations of Federal law "and it is evident that she could not do so, since her employment with [WCC] has ended." Accordingly, as in <u>Chen</u>, to the extent that Plaintiff seeks reinstatement from the Individual Defendants in their official capacities, that claim is likewise barred by the Eleventh Amendment.

## POINT II

## PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIMS MUST BE DISMISSED

Plaintiff asserts retaliation claims under the First Amendment pursuant to 42 U.S.C. §1983, and the New York State Constitution. The analysis of both claims is the same. <u>Sanchez v. Turner</u>, 2002 U.S. Dist. LEXIS 10911 (S.D.N.Y. 2002).

As recognized most recently by the Second Circuit in <u>Massaro v. New York City Department of Education</u>, 2012 U.S. App. LEXIS 10911 (2d Cir. 2012) at *2-*3:

> To determine whether a plaintiff's speech is constitutionally protected, "a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009)* (quoting *Garcetti v. Ceballos, 547 U.S. 410, 418 126 S.Ct. 1951, 164 L. Ed. 2d 89 (2006).* If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no *First Amendment* cause of action based on … her employer's reaction to the speech.'

*See also*, <u>Weintraub v. Board of Education of the City of New York</u>, 593 F.3d 196 (2d Cir. 2010); <u>Kelly v. Huntington UFSD</u>, 2012 U.S. Dist. LEXIS 45725 (E.D.N.Y. 2012); <u>Kirby v. Yonkers Sch. Dist.</u>, 767 F. Supp. 2d 452 (S.D.N.Y. 2011); <u>Kramer v. New York City Board of Ed.</u>, 715 F. Supp.2d 335 (E.D.N.Y. 2010); <u>Kenney v. Genesee Valley BOCES</u>, 2008 U.S. Dist. LEXIS 8808 (W.D.N.Y. 2008).

As to the first of these elements, whether an employee spoke as an employee and not as a citizen is "largely a question of law for the court." Jackler v. Byrne, 658 F.3d 225, 237 (2d Cir. 2011). Similarly, "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999); see also, Connick v. Myers, 461 U.S. 138, 147-48 (1983).

In general, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). While the First Amendment "invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance," nor does it "prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." Id. 547 U.S. at 424. In addition, statements can be made "pursuant to a public employee's official job duties even though it is not required by, or included in, the employee's job description or in response to a request by the employer." Weintraub, 593 F.3d at 203 (2d Cir. 2010); see also, Morey v. Somers Cent. Sch. Dist., 410 Fed. Appx. 398, 399 (2d Cir. 2011).

As Plaintiff will no doubt observe, Garcetti declined to address whether its rule "would apply in the same manner to a case involving scholarship or teaching." Id., 547 U.S. at 424. Indeed, as the Second Circuit specifically noted in Panse v. Eastwood, 303 Fed Appx. 933 (2d Cir. 2008) "it is an open question in this Circuit whether Garcetti applies to classroom instruction." Yet, at the same time, even pre-Garcetti, school administrators could limit the content of school-sponsored speech, as long as those limitations were reasonably related to a legitimate pedagogical concern. In addition, "[w]hether a school official's action is "reasonably

related to a legitimate pedagogical concern 'will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation.'" Panse, at 935 (*internal citations omitted*).

As noted in Kenney, *supra*, at *10-*11:

For example, in *Lee v. York County Sch. Div., 484 F.3d 687, 697 (4th Cir. 2007)*, the Fourth Circuit stated that,

> When a *First Amendment* free speech dispute involves a teacher-employee who is speaking within the classroom, the determination of whether her speech involves a matter of public concern is dependent on whether or not the speech is curricular. This determination -- whether the contested speech is curricular in nature -- is a question of law for the court.
>
>       * * *
>
> In evaluating whether a schoolteacher's in-class speech is curricular in nature, and thus not a matter of public concern, we are obliged to apply the *Hazelwood* definition of curriculum. To be curricular under this definition, the contested speech must satisfy both of the definition's categories of requirements. The *Hazelwood* definition first explains that, in order for a school board to regulate speech, such speech must constitute school-sponsored expression bearing the imprimatur of the school. *Hazelwood* then narrows this broad category by also requiring that, in order to be considered curricular in nature, the speech must also be supervised by faculty members and designed to impart particular knowledge to the students.

*Id., 484 F.3d at 697* (citing *Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988)*; other citations and footnotes omitted); see also *Kirkland v. Northside Independent School Dist., Independent School Dist., 890 F.2d 794, 798-799 (5th Cir. 1989)*("[I]ssues do not rise to a level of 'public concern' by virtue of the speaker's interest in the subject matter; rather, they achieve that protected status if the words or conduct are conveyed by the teacher *in his role as a citizen* and not in his *role as an employee* of the school district.")(*emphasis in original; citation and footnote omitted*); see also, *Silano v. v. Sag Harbor Union Free Sch. Dist. Bd. Of Educ., 42 F.3d 719 (2d Cir. 1994)* (Holding that a high school lecturer "had no *First Amendment* right to use a film clip showing bare breasted women in a lecture to a tenth-grade mathematics class."); *Bicknell v. Vergennes Union High School Bd. Of Directors, 475 F.Supp 615 (D.Vt. 1979)* (Nor do we believe that school librarians have an independent *first amendment* right to control the

collection of the school library under the rubric of academic freedom. The selection of works for the library is a curricular rather than a methodological matter and the public secondary school boards have considerable discretion as to the substantive content of the curriculum.") (*citation and internal quotation marks omitted*), aff'd 638 F.2d 438 (2d Cir. 1980).

In Kenney, plaintiff, a BOCES Criminal Justice Instructor and police officer, brought an action alleging freedom of speech retaliation claims pursuant to the First Amendment and the New York State Constitution. He alleged that he had made a presentation to a class of other teachers which included a video recording of an individual committing suicide by shooting himself in the head with a handgun. The BOCES Superintendent determined that the video was inappropriate and plaintiff was suspended.  Shortly thereafter he was told to resign or that he would be terminated immediately.

The district court held that the use of the suicide video was not protected speech since plaintiff was not speaking as a private citizen on a matter of public concern. Plaintiff was acting in his capacity as a teacher, and not as a private citizen when he used the suicide video as part of the curriculum of the class, in order to demonstrate "the science and math of ballistics and the effects of bullets on human bodies." In addition, although the plaintiff asserted that the video touched on "issues of public concern and interest to the classes being taught by him," the Court found that the suicide video did not "address a matter of public concern" in the constitutional sense. "Apart from making generalized statements about the importance of "academic freedom," Plaintiff has not explained how his use of the suicide video amounts to protected activity." *Id.* at *13.

In Kirby v. Yonkers Sch. Dist., *supra*, the Southern District also concluded that a teacher's in-class speech was not protected and dismissed plaintiff's retaliation claims. In that case, the plaintiff, a non-tenured health teacher claimed that he was terminated in retaliation for conducting a classroom exercise called the "Icebreaker" in which the students were made to

draw the male reproductive system on the blackboard as part of his class involving health and human reproduction. The Icebreaker took place in the plaintiff's classroom and according to him, was intended to make the students feel more comfortable while reviewing the male anatomy. Accordingly, the speech was deemed to be school sponsored. *Id.* at 461, relying upon Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271 (1988) (characterizing as "school-sponsored" activities that are "designed to impart particular knowledge or skills to student[s]") and Silano v. Sag Harbor Union Free Sch. Dist. Bd. Of Educ., 42 F.3d 719, 723 (2d Cir. 1994) (deeming "school-sponsored," a guest "lecture that took place in a traditional classroom setting and was designed to impart particular knowledge to the student participants").

The district court also held that school administrators had a legitimate interest in ensuring that its teachers convey information to their students in an effective and appropriate manner. Kirby, *supra* at 461, *relying upon* Kramer v. New York City Board of Ed., 715 F. Supp. at 357 (holding that "[a]lthough the school's decision not to countenance [plaintiff's] instructional method 'reflected its own restrictive views of the appropriate values to which ... students should be exposed, that decision was the school's to make'") and Silano v. Sag Harbor Union Free Sch. Dist. Bd. Of Educ., 42 F.3d 719 (holding that "given that the disputed film clip was entirely unnecessary to the subject matter of [plaintiff's] lecture, the school officials had a legitimate pedagogical purpose in restricting the display of photographs of bare-chested women in a tenth grade classroom").

Finally, the Kirby court, in arriving at its decision, noted that school administrators may limit the content of school-sponsored speech so long as the limitations are "reasonably related to legitimate pedagogical concerns" and that they have broad discretion to restrict school-sponsored speech in order to further educational goals. 767 F. Supp. 2d at 460. It then concluded that the

school administrators reasonably determined that making the students draw the male reproductive system was inappropriate and unnecessary to the plaintiff teacher's explanation of the male reproductive system and as a result, his use of the Icebreaker exercise was not protected by the First Amendment and the School District had the power to seek to banish it from the classroom.

In the case at bar, Plaintiff alleges specific instances of student complaints based upon the content of her in-class speech. For example, she alleges that her comment to a student regarding the size of his lips was "appropriate," even though he was "apparently offended" and that this in-class statement initiated a disciplinary meeting (Compl. at ¶ 33). Putting aside for a moment the temporal disconnect between the allegations in the Complaint and the actual content of the student letter regarding Plaintiff's in-class speech on this issue (*see* Exhibit 8, 1991 student complaint), Plaintiff's admonition cannot be seen as protected speech insofar as she was not speaking as a private citizen on a matter of public concern. According to her own allegations, she used that comment to advance "the course's objective of improving student diction" and was acting in her capacity as a teacher and not as a private citizen. In addition, Plaintiff does not even attempt to assert that the comment involved issues of public concern. As a result, the step one meeting allegedly called as a result of this comment, cannot be deemed to be retaliation for this in-class speech.

Plaintiff's allegations regarding the initiation of the step two disciplinary hearing arising from additional student complaints also fail to demonstrate violations of Plaintiff's freedom of speech rights. The allegations (1) concerning her critique of a student's performance during a mock job interview and subsequent student complaint; (2) concerning a low grade given to a student and his resulting complaint; and (3) concerning a student complaint that she had missed a

class to receive Botox injections, when she had actually had a stroke (Compl. at ¶¶ 34, 35 and 36), also do not allege protected speech. The first and second alleged bases for her claims do not involve statements made by Plaintiff as a private citizen, but rather, relate solely to statements made in her capacity as a teacher, nor do they involve matters of public concern.  With respect to the claim regarding a student's incorrect assertion as to Botox injections, such does not involve any speech or expressive conduct on the part of the Plaintiff whatsoever and, while it may concern Plaintiff as a private citizen, it certainly does not address a matter of public concern.

Finally, Plaintiff's allegations regarding her in class comments during the 2010 fall semester, also do not allege protected speech. According to the Complaint, one of her students, who was Mexican, recited a poem which resulted in a classroom discussion about immigration policy during which Plaintiff stated that "she favored Arizona's new law, and questioned the fairness of providing public services like emergency medical care to illegal immigrants who did not pay taxes" (Compl. at ¶¶ 42 – 47). Plaintiff alleges that she used the student's poem and the resulting discussion as part of her curriculum to "afford the entire class additional opportunities to publicly communicate their ideas" (Compl. at ¶¶ 42 – 47). Therefore, she was acting in her capacity as a teacher, and not as a private citizen, when she engaged in the discussion. In addition, although the Plaintiff asserted that at the time "one of the most prominent national news stories was Arizona's new law authorizing police officers to request identification from suspected illegal immigrants" (Compl. at ¶47), there is no allegation to support the apparent position that her personal opinion regarding illegal immigrants' purported failure to pay taxes, while at the same time, take advantage of emergency room health care, addressed a matter of public concern, in the constitutional sense. Again, regardless of Plaintiff's speculative and

unsupported accusations as to the Defendants' purpose, their actions do not, as a matter of law, rise to the level of retaliation based upon constitutionally protected speech.

As recognized in Silano and Kirby, all of Plaintiff's alleged speech, takes place in the classroom and therefore may be characterized as school-sponsored. As a result, Defendants have a legitimate interest in ensuring that their teachers convey information to their students in an effective and appropriate manner and may place limitations on a teacher's in class speech that are "reasonably related to legitimate pedagogical concerns." As alleged in the Complaint, Plaintiff's supervisors, including Defendants herein, determined that Plaintiff's "abusive," "belittling," "humiliating" and "insulting" comments were not consistent with WCC's policy to treat the students with courtesy and respect (Compl. at ¶¶37-38). They also determined that Plaintiff's "abusive, belittling techniques" were detrimental to her students' learning and contrary to her professional obligations and to practices and procedures in her department (Exhibit 17, Step Two Letter). In addition, as noted by her supervisor, Plaintiff's personal opinions regarding illegal immigrants were unnecessary in the teaching of her class (Exhibit 22, February 23, 2011 Letter). Thus, the Defendant's alleged restrictions on Plaintiff's in-class speech were clearly "reasonably related to a legitimate pedagogical concern" and not violative of Plaintiff's free speech rights. Accordingly, Plaintiff's retaliation claims must fail.

## POINT III

### PLAINTIFF'S DUE PROCESS CLAIMS BASED UPON ALLEGED VAGUENESS, ARBITRARY AND DISCRIMINATORY ENFORCEMENT, AND OVERBREADTH MUST FAIL

The vagueness doctrine arose as an aspect of Fourteenth Amendment due process in the context of criminal statutes because it was thought unfair to punish persons for conduct which they had no notice could subject them to criminal punishment. See, Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). It has been extended to civil cases. See, A.B. Small v. American

Sugar & Refining Co., 267 U.S. 233 (1925) and has further been applied in civil cases involving the discharge of public employees. *See*, Arnett v. Kennedy, 416 U.S. 134 (1974). The relevant inquiry is whether the statute or standard is:

> sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties … consonant alike with ordinary notions of fair play and settled rules of law.

Connally, 269 U.S. at 391. It is undertaken on a case by case basis and the statute or standard is examined as to whether it is vague as applied to the affected party. *See*, United States v. Mazurie, 419 U.S. 544 (1975).

Plaintiff due process claims assert that the language contained in the WCC Student Handbook that "a student should be treated with courtesy and respect" is unconstitutionally vague on its face (Compl. at ¶4). She further contends that Dean Wang's letter directing that Plaintiff refrain from making in-class statements that could "'make any students feel offended, insulted [or] humiliated,' whether the statements were made 'intentionally or unintentionally'" impermissibly imposes "academic censorship" upon Plaintiff and the WCC Faculty (Compl. at ¶ 4).[33] The purportedly vague Handbook provision is set forth in a section entitled "Student's Rights and Responsibilities," which also discusses (1) a faculty member's obligation to encourage "free discussions, inquiry and expression," evaluating student performance on an academic basis, not on opinions or conduct unrelated to academic standards; (2) a student's right to be informed about the content of the course and criteria for evaluation of his/her academic performance; (3) a student's responsibility for learning the course content, and the right to take

---

[33] Thus, Counts Three and Four allege due process violations arising from the enforcement of this allegedly "unconstitutionally vague" section of the Handbook, which allegedly "failed to provide reasonable notice to [Plaintiff] that her in-class speech was prohibited" (Compl. at ¶¶ 90, 97). Counts Five and Six allege that the enforcement of the "unconstitutionally vague" portion of the Student Handbook as against her and, "upon information and belief," other professors in an allegedly arbitrary and discriminatory manner, also violates due process. Counts Seven and Eight similarly allege supposed "due process" violations, this time based upon the "overbreadth" of the Handbook and the purportedly "vague and incomprehensible" admonition from Dr. Wang that faculty in-class speech be "courteous" and "respectful"

reasoned exception to the data or views offered in class; (4) a student's right to receive a grade based upon a fair and just academic evaluation of that student's performance in school, where race, religion, color, national origin, sex, handicap, appearance and political affiliation are irrelevant; (5) a student's right to have information about his/her views, beliefs and political associations that professors may acquire be considered confidential; and that finally (6) that students should be treated with courtesy and respect (Exhibit 5, "Students Rights and Responsibilities" section of the Westchester Community College Student Handbook).

Dr. Wang's letter about which Plaintiff complains is actually the September 6, 2007 Step Two Letter, which states, in relevant part that:

1. … [The] continuous pattern for more than a decade of having student complaints against you with regard to your belittling, humiliating and insulting remarks toward some of your students is a professional problem this college cannot tolerate.
2. … We do not tolerate any belittling, humiliating and insulting behavior toward our students, intentionally or unintentionally. Therefore, I expect you not to use any language that may be construed as abusive, belittling, humiliating or insulting to any students in the future, intentionally or unintentionally.
3. [The] belittling, humiliating and insulting remarks you made toward some of your students are not just matters of style. They are matters of principles and we as a caring college take those complaints seriously. Therefore, I request that your classroom conduct and behavior be consistent with our institutional values and expectations, i.e. to treat every student with courtesy and respect. Please refer to the new Student Handbook pp. 109-110 regarding Students' Rights and Responsibilities.

(Exhibit 17, Step Two Letter). However, neither the Handbook, nor the Step Two Letter is impermissibly vague or overbroad, requiring dismissal of Plaintiff's Due Process claims.[34]

---

[34] Plaintiff does not allege traditional procedural or substantive due process claims. Thus, she does not contend that she was not afforded notice and an opportunity to be heard prior to her termination, nor does she contend that Defendants' actions were so outrageous as to "shock the conscience" as required to state procedural and substantive due process violations. As a result, this memorandum of law does not discuss such inchoate and unpled causes of action. Suffice it to say, however, that any such claims would fail because plaintiff, a non-tenured, part-time adjunct professor does not have the requisite property interest in her employment to sustain such due process claims. *See,* Trakis v. Manhattanville College, 859 N.Y.S.2d 453 (2nd Dept. 2008); Carter v. Inc. Village of Ocean Beach, 415 Fed. Appx. 290 (2d Cir. 2011). In addition, Plaintiff was afforded both notice and an opportunity to be heard by virtue of the disciplinary hearings during which she was represented.

In the seminal case, diLeo v. Greenfield, 541 F.2d 949 (2d Cir. 1976), there were numerous complaints about the plaintiff teacher's classroom conduct and apparent lack of concern for the emotions of his students. He had met with, and been cautioned by, school administrators for his behavior several times in an effort to resolve those complaints regarding his classroom performance. However, as in this case, he did not modify his behavior and continued to deride and embarrass his students. He was subsequently discharged pursuant to a Connecticut statute, permitting termination for "other due and sufficient cause," which plaintiff claimed was unconstitutionally vague or overbroad. The Second Circuit, however, dismissed the plaintiff's claims, noting that the teacher "had engaged in a persistent pattern of neglecting his professional duties and harassing and humiliating students;" that he had met with and been cautioned by, school administrators for his behavior several times before; and that he reasonably knew the behavior that was the cause of his discharge. Id. at 953. Thus, it "could not be said that [plaintiff] did not or should not reasonably have known that such behavior constituted due and sufficient cause for dismissal. Nor [could] he successfully contend that he had to guess whether the challenged statute would apply to such derelictions and bizarre conduct." Id. [internal citations omitted]. Here, there had been a "continuous pattern" of student complaints about Plaintiff's "belittling, humiliating and insulting remarks" and she had met with and been cautioned regarding this behavior on numerous occasions. Like the diLeo plaintiff, she reasonably knew the behavior that was the cause of her eventual termination. Accordingly, like the language of the questioned statute, the Handbook and Step Two Letter language are neither vague, nor incomprehensible.

Marchi v. Board of Cooperative Education Services of Albany, 173 F.3d 469 (2d Cir. 1999) is also instructive and similarly militates in favor of dismissal of Plaintiff's due process

claims. In that case, plaintiff, a certified special education teacher claimed that a directive

ordering him to refrain from using religious references in the delivery of his instructional

program was unconstitutionally vague and overbroad. The directive stated, in part, as follows:

> Your personal beliefs about the role of religion in our society and its value to
> families and their children cannot be a part of the instruction given to your
> students.
>
> Consequently, you are to cease and desist from using any references to religion in
> the delivery of your instructional program unless it is a required element of a
> course of instruction for your students and has prior approval […].

*Id.* at 472-473.

The following summer, plaintiff commenced a §1983 action alleging that BOCES

violated his right to academic freedom, free association, free speech, and free exercise of

religion, and that the directive had been applied to proscribe protected speech between plaintiff

and a student's parents. The district court granted defendant's summary judgment motion and

denied plaintiff's request for leave to amend his complaint. On appeal, plaintiff contended that

the directive was unconstitutional as applied and facially invalid because it was

unconstitutionally vague and overbroad. The Second Circuit affirmed the lower court, noting that

while the directive "is unquestionably a restraint" on plaintiff's First Amendment rights, not all

restraint on free speech rights are invalid. It also addressed Plaintiff's claim that the directive was

unconstitutionally vague on its face because the term "instructional program" was not defined

and defendant refused to define it or to articulate standards for determining whether a particular

activity fell within its proscription. In dismissing this claim, the Circuit Court reasoned:

> When a plaintiff alleges that a law or policy violates the First Amendment on its
> face, he must demonstrate that the challenged law either 'could never be applied
> in a valid manner' or that even though it may be validly applied to the plaintiff
> and others, it nevertheless is so broad that 'it may inhibit the constitutionally
> protected speech of third parties." *[internal citations omitted]*. Basic principles of
> due process assure that punishment should be imposed only if the defendant could
> reasonably be expected to have known that his conduct was proscribed. As the
> Supreme Court has held, a statute or policy is unconstitutionally vague if people

31

of common intelligence must guess at its meaning and may differ as to its application. [*internal citations omitted*] Additionally, in order to prevent arbitrary and discriminatory enforcement, a law must provide sufficient standards to guide its application. [*internal citations omitted*].

In this case, the directive prohibits [plaintiff] from "using any reference to religion in the delivery of [his] course of instruction ... and has prior approval from Dr. DiPierro." Though the key proscription — "references to religion" — will inevitably require interpretation in various circumstances, its basic meaning is as clear as context permits, and, as a facial matter, gives [plaintiff] fair notice of what conduct is proscribed.

Moreover, [plaintiff's] assertion that BOCES has refused to provide any explanation of the term "instructional program" is belied by the record ... [which revealed] that [plaintiff had] received extensive guidance with regard to the directive's parameters since his return to teaching.

Aware that precise delineation of sanctionable conduct is close to impossible, courts have granted schools, acting in their capacity as employers, significant leeway. For example, in *Ward v. Hickey*, 996 F.2d 448 (1st Cir. 1993), the First Circuit held that a school, is not required to state expressly all types of objectionable conduct in order to place teachers on notice that some conduct is sanctionable. Rather, the Court held that the relevant inquiry is whether, "based on existing regulations, policies, discussions and other forms of communications between school administration and teachers," it was reasonable for the teacher to know that her conduct was prohibited. *Id.* at 454.

Marchi v. Board of Cooperative Education Services of Albany, 173 F.3d at 479-480; *see also*, diLeo v. Greenfield, 541 F.2d 949, 953 (2d Cir. 1976). Thus, the Court held, the school administration was not obligated to articulate every imaginable situation that might fall within the directive's purview and that the language of the directive, which limited its application to the "instructional program," and that the guidance plaintiff received, gave plaintiff notice of what conduct was proscribed. Accordingly, the directive was held to be constitutional, neither facially vague nor overbroad.

In this case, Plaintiff alleges that the words "courtesy and respect" are "unconstitutionally vague" both facially and in their application and the further claims that the words "courteous," "respectful," "offensive," "insulting," "belittling" and "humiliating" are "vague and incomprehensible." These allegations are belied by the Record here and the application of

common sense. Neither Plaintiff, a person of "common intelligence," nor anyone else for that matter, need guess at the meaning of those words, common in everyday parlance. In addition, as in both Marchi and diLeo, Plaintiff was counseled by her supervisors and received extensive guidance regarding the proscribed behavior. She received a direction, at the conclusion of the Step Two hearing to refrain from continuing to engage in belittling, insulting and humiliating behavior towards her students. Notwithstanding that directive, complaints of Plaintiff's belittling and humiliating behavior persisted, a Step Three hearing was held, and she was terminated because she did not comply with the directive. As in both diLeo and Marchi, there is no due process violation relative to Plaintiff's claims of vagueness and overbreadth and, as a result, her due process claims must be dismissed.

## POINT IV

### PLAINTIFF'S CLAIMS AGAINST THE INIVIDUAL DEFENDANTS MUST FAIL AS THEY ARE COVERED BY THE DOCTRINE OF QUALIFIED IMMUNITY.

The defense of qualified immunity shields government officials performing discretionary functions from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It "requires consideration of the clarity of the law establishing the right allegedly violated and whether a reasonable person acting under the circumstances then confronting a defendant would have understood that the applicable law was being violated." Vega v. Miller, 273 F.3d 460, 466 (2d Cir. 2001). To be "clearly established," the contours of the constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). Courts consider: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and

(3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." Scott v. Fisher, 616 F.3d 100, 105 (2d. Cir. 2010). Thus, in determining whether to grant immunity, the courts look to the "objective legal reasonableness" of the alleged action, taking into account the "clearly established" legal rules that were in effect when the action was taken. Harlow, *supra*, at 819.

Plaintiff contends that the Individual Defendants violated her First Amendment rights in terminating her employment, purportedly in response to "political comments" she made during a class discussion and that the Individual Defendants knew or should have known that the speech was constitutionally protected. (Compl. at ¶ 77). In proffering this charge, Plaintiff imposes a burden on the Individual Defendants which has eluded and divided the courts.[35]

Vega v. Miller, 273 F.3d 460 (2d. Cir. 2001) is instructive on the issue. In that case, the speech related to a "clustering" activity in which college students yelled out sexually explicit vocabulary as the teacher wrote many of the words on the blackboard. The teacher was subsequently discharged. In analyzing his free speech claim, the Vega Court recognized, "the authority of educational administrators to take actions "reasonably related to legitimate pedagogical concerns" and held that the school administrators were entitled to qualified immunity, because they could have reasonably believed, that in disciplining a teacher for not exercising professional judgment and allowing the "clustering" exercise to continue, they were not violating his First Amendment rights. Here, there can be no question that the act of disciplining Plaintiff for her failure to curtail the use of "abusive, belittling techniques," contrary to "the professional association and to the practices and procedures [of] the department," was

---

[35] Indeed, during the July 27, 2012 pre-motion conference, the Court acknowledged the "muddiness" of the law, and noted that the lack of clarity on the issue of protected speech "is going to be helpful to the individual [defendants] in terms of qualified immunity." (Exhibit 2, at p. 12).

undertaken in furtherance of a legitimate pedagogical concern (Exhibit 17)(*see also,* Exhibit 2, at p. 20).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court dismiss Plaintiff's claims as against Defendants with prejudice, together with such other and further relief as the Court may deem just and proper.

Dated: White Plains, New York
October 26, 2012

Yours, etc.

GAINES, GRUNER, PONZINI & NOVICK, LLP

By:_____
John M. Murtagh (JM 5815)
Denise M. Cossu (DC 6900)
Attorneys for Defendants
11 Martine Avenue, 8th Floor
White Plains, New York 10606
(914) 288-9595

35