UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CAROL LEITNER,                                          :
                                                       :
                              Plaintiff,               :
                                                       :
              - against -                              :
                                                       :
WESTCHESTER COMMUNITY COLLEGE,                          :
JOSEPH HANKIN, in his personal and official            :    12-cv-3778
capacity as President of Westchester Community         :
College, CHET ROGALSKI, in his personal and            :    Hon. Cathy Seibel
official capacity as Dean and Vice President of        :
Academic Affairs, JIANPING WANG, in her                :    **ORAL ARGUMENT REQUESTED**
personal and official capacity as Associate Dean of    :
the Arts and Sciences, and GABRIELLE MILLER,           :
in her personal and official capacity as Curricular    :
Chairperson of the Communications and Media            :
Arts Department,                                       :
                                                       :
                              Defendants.              :
                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## PLAINTIFF CAROL LEITNER'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York  10017
(212) 856-9600

Catherine M. Foti
Curtis B. Leitner
*Attorneys for Plaintiff Carol Leitner*

## TABLE OF CONTENTS

Preliminary Statement ............................................................................ 1

The Factual Allegations ........................................................................... 3

Legal Standard ........................................................................................ 8

Argument ................................................................................................ 9

I.  The Complaint Adequately States First Amendment Retaliation Claims ........... 9

    A.  The Complaint Adequately Alleges That Professor Leitner Engaged in Protected Speech ............................................................. 9

        1.  Second Circuit Precedent Holds that a College Professor's In-Class Speech Is Constitutionally Protected .......................... 9

        2.  *Garcetti* Does Not Change Second Circuit Law Governing a College Professor's In-Class Speech ......................................... 10

        3.  The Complaint Adequately Alleges That Professor Leitner's In-Class Speech Is Protected .................................................. 11

    B.  The Complaint Adequately Alleges the Defendants Retaliated Against Professor Leitner Because of Her Protected Speech ............................. 13

    C.  The Individual Defendants Are Not Qualifiedly Immune From Professor Leitner's First Amendment Claims ..................................... 16

II.  The Complaint Suffiently States As-Applied Vagueness Claims ...................... 19

    A.  The Defendants' Speech Restrictions Did Not Provide Notice To, and Were Arbitrarily Enforced Against, Professor Leitner ................... 19

    B.  The Defendants' Reliance on *diLeo* and *Marchi* Ignores the Allegations in the Complaint ................................................... 22

III.  The Complaint Adequately States Overbreadth Claims ................................ 24

    A.  The Overbreadth Standard ............................................................ 24

    B.  The Complaint Adequately Alleges That the Speech Code, WCC's Policy of Enforcement, and the Step Two Letter, Are Overbroad .......... 25

IV.  The Eleventh Amendment Does Not Apply to Professor Leitner's Claims ......... 28

    A.  WCC Is Not Entitled to Sovereign Immunity ................................... 28

1.    WCC Is a Department of Westchester County, and Therefore Is Not Entitled To Sovereign Immunity......................................29

2.    WCC Has Failed to Show it is Entitled to Sovereign Immunity Under the Controlling Second Circuit Factors...........................30

3.    WCC Is Not Entitled to Sovereign Immunity Merely Because It Is Part of the "SUNY System"..................................32

B.    The Complaint Adequately Alleges Claims for Equitable Relief..............34

Conclusion ..........................................................................................................35

## TABLE OF AUTHORITIES

### Cases

*Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) ............................................. 26

*Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490 (S.D.N.Y. 2011) ........ 11

*Booher v. Board of Regents*, 1998 U.S. Dist. LEXIS 11404 (D. Ky. 1998) ................................... 26

*Brown v. North Country Community College*, 311 N.Y.S.2d 517 (Sup.Ct. Essex Co. 1970) ...... 29

*Chavez v. United States*, 764 F. Supp. 2d 638 (S.D.N.Y. 2011) .................................................... 23

*Clissuras v. CUNY*, 359 F.3d 79 (2d Cir. 2004) ............................................................................ 33

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996) ............................................ 20

*Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005
    (N.D. Cal. 2007) ....................................................................................................... 13, 25, 26

*Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) ..................................... 20, 23, 26

*Davis v. Stratton*, 575 F.Supp.2d 410 (N.D.N.Y. 2008) ............................................................... 29

*Dean v. Westchester County P.R.C.*, 309 F. Supp. 2d 587 (S.D.N.Y. 2004) ................................ 29

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) ............................................................ 13, 26

*DiFolco v. MSNBC Cable*, 622 F.3d 104 (2d Cir. 2010) ........................................................... 8, 14

*diLeo v. Greenfield,* 541 F.2d 949 (2d Cir. 1976) ......................................................................... 22

*Doe v. Univ. of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989) ............................................ 21, 26

*Dotson v. Griesa*, 398 F.3d 156 (2d Cir. 2005) ............................................................................ 35

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) ............ 8

*Dube v. The State University of New York*, 900 F.2d 587 (2d Cir. 1990) .............................. passim

*Dwyer v. Regan*, 777 F.2d 825, (2d Cir. 1985) ............................................................................. 35

*Edmonds v. Cent. N.Y. Psychiatric Ctr.*, 10-cv-5810, 2011, WL 3809913
    (S.D.N.Y. Aug. 25, 2011) ............................................................................................... 17, 19

*Elementis Chemicals v. T H Agric. & Nutrition*, 373 F. Supp. 2d 257 (S.D.N.Y. 2005) ............. 11

*Emigra Group v. Fragomen, Del Rey, Bernsen &* Loewy, 612 F. Supp. 2d 330
   (S.D.N.Y. 2009) ................................................................................................... 23

*Feingold v. Hankin*, 269 F. Supp. 2d 268 (S.D.N.Y. 2003) ...................................... 29

*Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698 (W.D. Pa. 2003) .............. 21

*Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) ............................ 25

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................................... 10, 11

*Garcia v. Lewis*, 05-cv-1153, 2005 WL 1423253 (S.D.N.Y. June 16, 2005) ............... 11

*Geagan v. CUNY*, 09-cv-271, 2011 WL 3370395 (S.D.N.Y. July 14, 2011) ............... 33

*Gengo v. CUNY*, 08-cv-681, 2011 WL 1204716 (E.D.N.Y. Mar. 29, 2011) ................ 33

*Giambalvo v. Sommer*, 10-cv-6774, 2012 WL 4471532 (S.D.N.Y. Sept. 19, 2012) .... 16

*Gollomp v. Spitzer*, 568 F.3d 355 (2d Cir. 2009) ....................................... 28, 30, 31, 33

*Gorton v. Gettel*, 554 F.3d 60 (2d Cir. 2009) .......................................... 30, 31, 32, 34

*Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671 (6th Cir. 2001) .................................... 10

*Healy v. James*, 408 U.S. 169 (1972) .............................................................. 13, 25

*Hess v. Port Auth.*, 513 U.S. 30 (1994) ................................................................. 34

*Hoye v. City of Oakland*, 653 F.3d 835 (9th Cir. 2011) ............................................ 27

*Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328 (D. Conn. 2007) .... 32

*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ................................................. 16, 18

*KAPL, Inc. v. Meachum*, 544 U.S. 957 (2005) ...................................................... 11

*Kenney v. Genesee Valley BOCES*, 07-cv-6442, 2008 WL 343110 (W.D.N.Y. Feb. 6, 2008) .... 13

*Kerr v. Hurd*, 694 F. Supp. 2d 817 (S.D. Ohio 2010) .............................................. 11

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967) ............... 23

*Killion v. Franklin Regional School Dist.*, 136 F.Supp.2d 446 (W.D. Pa. 2009) ......... 21

*Kohlhausen v. SUNY Rockland Community College*, 2011 WL 1404934 (S.D.N.Y. 2011) ........ 31

*Kracunas v. Iona College*, 119 F.3d 80 (2d Cir. 1997) ............................................. 13

*Kramer v. New York City Board of Education*, 71 F. Supp.2d 335 (E.D.N.Y. 2010) ........... 19, 23

*Kulkarni v.CUNY*, 01-cv-3019, 2001 WL 1415200 (S.D.N.Y. Nov. 13, 2001) .......................... 35

*Kyriacou v. Peralta Cmty. Coll. Dist.*, 08-cv-4630 , 2009 WL 89088
  (N.D. Cal. Mar. 31, 2009) ................................................................................... 21

*Lopez v. Fresno City Coll.*, 11-cv-01468, 2012 WL 844911(E.D. Cal. Mar. 12, 2012) .............. 11

*Mahoney v. Hankin*, 844 F.2d 64 (2d Cir. 1988) ................................................. 10, 16, 18

*Malkan v. Mutua*, 12-cv-236, 2012 WL 4722688 (W.D.N.Y. Oct. 3, 2012)......................... 34, 35

*Mancuso v. New York State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996).................................. 32

*Marchi  v. BOCES*, 173 F.3d 469 (2d Cir.  1999)............................................................ passim

*McCauley v. University of Virgin Islands*, 618 F.3d 232 (3rd Cir. 2010) ..................................... 20

*McKie v. Laguardia Cmty. Coll.*, 04-cv-5555, 2008 WL 4489796  (E.D.N.Y. Sept. 30, 2008) .. 33

*Meachum v. Knolls Atomic Power Laboratory*, 381 F.3d 56 (2d Cir. 2004)............................... 11

*Moche v. City Univ. of New York*, 781 F. Supp. 160 (E.D.N.Y. 1992) .................................. 31, 33

*Mostaghim v. Fashion Inst. of Tech.*, 01-cv-8090, 2001 WL 1537544 (S.D.N.Y. Dec. 3, 2001)29,
  34

*Mt. Healthy v. Doyle*, 429 U.S. 274 (1977) ....................................................................... 29, 30

*Nitke v. Ashcroft*, 253 F.Supp. 2d 587 (S.D.N.Y. 2003).......................................................... 24

*Panse v. Eastwood*, 303 Fed. App'x. 933 (2d Cir. 2008) ........................................................ 18

*Paulsen v. Gotbaum*, 90-cv- 6152, 1992 WL 8361 (S.D.N.Y. Jan. 15, 1992) ............................ 25

*Peoples v. Fischer*, 11-cv-2694, 2012 WL 2402593 (S.D.N.Y. June 26, 2012) ........................ 16

*Planck v. SUNY Bd. of Trustees*, 795 N.Y.S. 2d 147 (3d Dep't 2005) ........................................ 29

*Rehman v. State Univ. of New York at Stony Brook*, 596 F. Supp. 2d 643 (E.D.N.Y. 2009) ....... 35

*Richard v. City of Pasadena*, 889 F. Supp. 384 (C.D. Cal. 1995) ............................................. 25

*Rodriguez v. Maricopa County*, 605 F.3d 703 (2010) .............................................................. 10

*Saxe v. State College Area School District*, 240 F.3d 200 (3d Cir. 2001)....................... 15, 26, 27

*Shea on Behalf of Am. Reporter v. Reno*, 930 F. Supp. 916 (S.D.N.Y. 1996).............................. 24

*Sheldon v. Bilbir Dhillon*, 08-cv-03438, 2009 WL 4282086 (N.D. Cal. Nov. 25, 2009)............. 11

*Silva v. Univ. of New Hampshire*, 888 F. Supp. 293 (D.N.H. 1994) ............................................ 20

*Smith ex rel. Smith v. Mount Pleasant Pub. Sch.*, 285 F. Supp. 2d 987 (E.D. Mich. 2003) ......... 21

*Staskowski v. County of Nassau*, No. 05-cv-5984, 2006 WL 3370699 (E.D.N.Y. 2006) ........... 29

*State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71 (2nd Cir. 2007)............. 35

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ........................................ 11

*United States v. New York,* 700 F. Supp. 2d 186 (N.D.N.Y. 2010) ............................................... 33

*United States v. Sued*, 143 F. Supp. 2d 346 (S.D.N.Y. 2001)...................................................... 25

*UWM Post, Inc. v. Bd. of Regents of Univ. of Wisconsin Sys.*, 774 F. Supp. 1163
   (E.D. Wis. 1991) ..................................................................................................................... 26

*Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001)...................................................................... passim

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) ...................................... 20, 21

*Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011) ................................... 32

*Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) ........................................................................ 24

*Walker v. City of Waterbury*, 253 Fed. App'x 58 (2d Cir. 2007) ................................................. 31

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................................... 25

*Wisconsin Realtors Ass'n v. Ponto*, 233 F. Supp. 2d 1078 (W.D. Wis. 2002) ........................... 24

*Women's Interart Ctr. v. New York City Econ. Dev. Corp.*, 03-cv-2732, 2005 WL 1241919
   (S.D.N.Y. May 23, 2005)........................................................................................................ 14

*Woods v. Rondout Valley*, 466 F.3d 343 (2d Cir. 2006) ......................................... 28, 29, 31, 32

*Ya-Chen Chen v. The City University of New York*, No. 11-cv- 0320, 2011 WL 5419792,
   (S.D.N.Y. Nov. 9, 2011) ......................................................................................................... 35

## **Statutes**

N.Y. Education Law §§ 350 ................................................................................................ 33

N.Y. Education Law § 352(1) ............................................................................................ 33

N.Y. Education Law § 6202(4) .......................................................................................... 38

N.Y. Education Law § 6304(d)(6) ..................................................................................... 35

N.Y. Education Law § 6306(1) .......................................................................................... 35

N.Y. General Municipal Law § 2 ...................................................................................... 33

Plaintiff Carol Leitner respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss ("Motion" or "Mot.") filed by Defendants Westchester Community College ("WCC"), Joseph Hankin, Chet Rogalski, Jianping Wang, and Gabrielle Miller (collectively, the "Defendants" or "Individual Defendants").

## PRELIMINARY STATEMENT

For nearly three decades, Professor Leitner taught speech communication classes at WCC in a manner that encouraged wide-ranging discussion of political and social issues. In 2007, in response to complaints regarding her frank criticism of student speeches, the WCC administration directed Professor Leitner to comply with WCC's faculty speech code, which requires faculty to treat students with "courtesy and respect, which, according to the administration, means that professors should not say anything that could make "any students *feel offended*" in class. In 2011, after Professor Leitner expressed a politically conservative viewpoint in class, the Defendants fired her for violating that very directive—not to "offend" students. Professor Leitner's improper termination led her to bring this action, which asserts claims against the Defendants for First Amendment retaliation (Counts 1-2), and for the enforcement of speech restrictions that are unconstitutionally vague as applied (Counts 3-6) and invalid under the overbreadth doctrine (Counts 7-8).

Forced to defend the indefensible—a prohibition on "offensive" viewpoints in college classrooms—the Defendants make arguments that ignore Second Circuit precedent as well as the extensive facts alleged in the Complaint. Rather, the Defendants choose to argue that the Complaint should be dismissed because they take a *different view of the facts.* The Defendants then proceed to make arguments based on the events as they describe them, avoiding the

steadfast requirement that facts in the Complaint be accepted as true for purposes of determining a motion to dismiss.

*First*, the Defendants argue that Professor Leitner's First Amendment retaliation claims should be dismissed because her in-class political speech was not protected and, in any event, the law in the area is "muddy," supporting a qualified immunity defense. Yet the key Second Circuit case on in-class faculty speech specifically holds that a college professor has a clearly established right against retaliation based on her "classroom discourse" and discussion of "controversial" views during class. Then, since the Defendants' position is foreclosed by binding precedent, they attempt to avert the Court's attention by asking the Court to find that Professor Leitner was *really* fired for being rude to students—and her political speech had *nothing* to do with her termination. In doing so, the Defendants ignore the plethora of allegations in the Complaint supporting a reasonable inference that Professor Leitner was fired *because of* her in-class political speech.

*Second*, the Defendants make similarly unpersuasive arguments for dismissal of Professor Leitner's as-applied vagueness claims. Without citing any legal authority, they assert the meaning of their policies forbidding "offensive" and "discourteous" faculty speech is a matter of "common sense." Yet time and again, federal courts have held that university speech regulations with the same (and similar) language were unconstitutionally vague. And the Second Circuit has explicitly "cautioned" college administrators not to punish the expression of "offensive" views in college classrooms. The Defendants also argue that Professor Leitner *should have known* she would be fired for being rude to students. This argument, however, is just a repackaged denial of the Complaint's factual allegations that Professor Leitner was fired

*because of* her in-class political speech, which again ignores the legal sufficiency of the Complaint's vagueness claims.

*Third*, the Defendants fail to separately analyze Professor Leitner's overbreadth claims, and, as a result, make *no argument* whatsoever on the key overbreadth issue: the scope of protected speech, including speech by Professor Leitner *and other WCC professors*, that was (and still is) potentially subject to the Defendants' speech restrictions. In this regard, overwhelming precedent establishes that college policies prohibiting "offensive" speech, and the like, are overbroad, and therefore unenforceable. Here, a written statement made "on behalf of the college" establishes that WCC's "courtesy and respect" speech code *means* professors cannot say anything in class that could "offend" students. That speech code, as written, and as enforced, is patently unconstitutional.

*Fourth*, the Defendants argue that WCC is entitled to sovereign immunity because it is part of the "SUNY system." However, even though the Defendants have the burden of establishing a factual record sufficient to prove their defense, they fail to set forth facts that would allow the Court to analyze the controlling Second Circuit sovereign immunity factors— including the *most important factor* of whether a judgment against WCC is binding on New York State. And conspicuously, they fail to mention that WCC is a *department of Westchester County,* which, under Supreme Court precedent, bars a sovereign immunity defense.

The Court should deny the Motion in its entirety.

## THE FACTUAL ALLEGATIONS

From 1981 to 2011, Carol Leitner was an Adjunct Professor in the WCC Communication and Media Arts Department (the "Department"). Complaint (hereafter "Comp.") ¶¶ 1-2.[1]  For

---

[1] The Complaint is attached as Exhibit 1 to the Affidavit of Curtis B. Leitner, ("Leitner Aff."), which is submitted with this Memorandum of Law.

nearly thirty years, Professor Leitner taught two performance-based speech classes through a methodology emphasizing student presentations and uninhibited class discussion on any and all topics—including controversial ones. Professor Leitner consistently held her students to the highest standards and gave them realistic assessments of their performance. *Id.* ¶¶ 2, 31.

After Professor Leitner had taught the art of public speaking in this way at WCC for more than twenty years, WCC changed its view of education and began to enforce a lenient approach to teaching, prioritizing student feelings over real improvement and academic standards. *Id.* ¶ 31. In an effort to force Professor Leitner to conform to WCC's new approach, WCC pursued baseless student complaints against her, and ultimately held a formal disciplinary meeting in 2004.[2] That meeting was the first "step" under WCC's three-step faculty disciplinary procedure. *Id.* ¶¶ 22; *see* Leitner Aff. Ex. 2.  In or around 2007, Eileen Shea, the chair of the Department, requested a step two disciplinary hearing based on student complaints, including a student who objected to Professor Leitner's harsh but honest critique of another student's poor performance. *Id.* ¶ 34.  Pursuant to the faculty disciplinary procedure, Dean Wang memorialized her findings in a September 6, 2007 letter (the "step two letter"). *See* Leitner Aff. Ex. 3.

Although Dean Wang stated that Professor Leitner's "integrity and competency as a teacher are not in question," *id.* Ex. 3 at 3, she also found that Professor Leitner had violated a faculty speech regulation in the WCC Student Handbook (the "speech code"), which states: "a student should be treated with courtesy and respect." Comp. ¶ 4; Leitner Aff. Ex. 4.  However, nowhere in the step two letter did Dean Wang explain what Professor Leitner had *actually said*

---

[2] Without having the benefit of access to the Defendants' records, and without copies of her own, Professor Leitner's recollection of the student complaint at issue in the step one meeting, set forth in paragraph 33 of the Complaint, was apparently incorrect. *See* Mot. 3. The documents the Defendants attach to the Motion do not, however, disclose the substance of the complaint that led to the step one meeting. *See* Mot. 3-4. Professor Leitner apologizes to the Court for the error.  The fact that she did not possess copies of the relevant records was one of the reasons she insisted on pursuing immediate discovery at the pre-motion conference.  For the Court's information, the parties have commenced such discovery.

that violated the speech code.   Rather, Dean Wang couched her conclusion in vague terms: Professor Leitner made "belittling, humiliating, and insulting remarks" in class.   Leitner Aff. Ex. 3 at 3.   The step two letter concluded by directing Professor Leitner (i) "not to use any language that can be construed as abusive, belittling, humiliating, or insulting to any students in the future, intentionally or unintentionally"; and (ii) "to make sure [she was] not making any students *feel offended*, insulted, [or] humiliated, whether [she did] so intentionally or unintentionally," and to "take immediate action" if she felt that she "*may have unintentionally offended a student.*" *Id.* ¶ 37; *Id.* Ex. 3 at 3-4 (emphasis added). For the next five semesters, Professor Leitner received consistently positive student reviews. Comp. ¶ 41.

In November 2010, Professor Leitner was teaching the "oral interpretation" section of her course, which requires students to recite and interpret poetry selections, followed by critique and discussion. *Id.* ¶ 42.   In or around November 15, a student, Aracelli Cruz, delivered a provocative poem, which lamented American politics by using language from the song "America the Beautiful."   Rather than formally reciting the poem, she sang it. *Id.* ¶ 44.   Ms. Cruz did not discuss the background of the poet or her interpretation of the poem—both critical parts of the "oral interpretation" assignment. *Id.* ¶ 45.   Because Professor Leitner had a difficult time understanding Ms. Cruz's recitation (and Ms. Cruz failed to provide her with a copy of the poem), Professor Leitner asked Ms. Cruz to repeat it.   During Ms. Cruz's second recitation of the poem, Professor Leitner asked Ms. Cruz about the poet's purpose in writing the poem, to encourage Ms. Cruz to discuss the poem and provide the requisite interpretation. *Id.* ¶¶ 46-47. Another student, not Ms. Cruz, answered the question and linked the poem's political perspective to the problem of illegal immigration—a timely issue in the news.   During a brief discussion of this topic, Professor Leitner expressed a politically conservative viewpoint on illegal

immigration, stating, in substance, that she favored Arizona's controversial immigration policy and questioned the fairness of providing public services to illegal immigrants. *Id.* ¶ 47.

The next day, Ms. Cruz's foster mother, Barbara Alammari, submitted a complaint stating that Professor Leitner's comments on illegal immigration offended Ms. Cruz as a person of Mexican descent. Although the second-hand complaint contained numerous false and misleading statements, it clearly acknowledged the political content of Professor Leitner's in-class speech. *Id.* ¶¶ 48-49; Leitner Aff. Exs. 5, 6. A few days later, Professor Leitner met with defendant Gabrielle Miller, the Department chair, and explained the inaccuracies in Ms. Alammari's complaint. *Id.* ¶ 53.

Three months later, in February 2011, Professor Miller referred the matter of Ms. Alammari's complaint to Dean Wang for formal discipline. Professor Miller made clear that Professor Leitner was disciplined *because of* the political ideas she expressed during the discussion of Ms. Cruz's poetry selection. In a February 2011 letter, Professor Miller wrote that Professor Leitner's comments belonged in a "political science" class and that her comments were "extremely disturbing." Comp. ¶ 54; Leitner Aff. Ex. 7 at 2. Yet Professor Leitner had taught her class through the discussion of political and social issues for decades. Comp. ¶ 2. Further, her syllabus made clear that discussion of "social issues" was part of her course. Indeed, this was a typical pedagogical approach: even Professor Miller's syllabus for the *same class* states that a class "objective" is to "organize ideas" and "defend them to others."[3] *Id.* ¶¶ 2, 55.

In or around March 21, 2011, Dean Wang requested a step three hearing to terminate Professor Leitner. *Id.* ¶ 59. Dean Wang's request included two additional student complaints, which were written in October 2010, five months earlier. Dean Wang and Professor Miller

---

[3] Underscoring the Defendants' retaliatory intent, Dean Wang and Professor Miller conducted a careless and transparently results-oriented "investigation" into Ms. Alammari's complaint. *See* Comp. ¶¶ 57-58.

sought to discipline Professor Leitner based on those complaints only *after* they learned of her in-class political speech during the "oral interpretation" exercise.[4] *Id.* ¶ 62.

On June 9, 2011, defendant Chet Rogalski, the Associate Dean and Vice President of Academic Affairs, held the step three hearing.[5]   Under the faculty disciplinary procedure, the point of the step three hearing was to determine whether Professor Leitner had followed Dean Wang's "suggestions for remediation," Leitner Aff. Ex. 2 at 2, in the step two letter—namely, not making "any students feel offended." Comp. ¶¶ 37-38.   Dean Rogalski concluded that Professor Leitner had violated that standard.   In a June 14, 2011 letter (the "step three letter") to defendant Joseph Hankin, the WCC President, Dean Rogalski urged President Hankin to terminate Professor Leitner. Comp. ¶¶ 66, 72-73.

Even though Dean Rogalski was recommending that Professor Leitner be fired, his letter did not discuss a single student complaint at issue, or explain which statements by Professor Leitner violated the speech code. *Id.* ¶¶ 72-73; Leitner Aff. Ex. 9.   Nevertheless, relying on the step three letter, President Hankin terminated Professor Leitner on July 6, 2011.[6] *Id.* ¶¶ 66-67.

---

[4] Dean Wang's hearing request violated WCC faculty discipline procedure, specifically, a 2001 arbitration decision (the "Ax decision") binding WCC's faculty union and the administration. Comp. ¶ 60. Under the Ax decision, before the administration formally disciplines a professor, the Department Chair is required to attempt to informally resolve student complaints by (i) referring the complaining student to the professor and (ii) meeting with both the student and professor in an effort to resolve the complaint. *Id.* at ¶ 60.  This procedure was not followed with respect to *any* of the student complaints at issue in Dean Wang's step three hearing request. *Id.* ¶¶60-62. These procedural violations further evidence the Defendants' retaliatory intent.

[5] Between Dean Wang's request for the hearing in March 2011 and the actual hearing in June 2011, the Defendants pursued additional student complaints against Professor Leitner, which were based, in part, on her protected speech. Specifically, on the first day of the spring 2011 semester, Professor Leitner repeatedly insisted—despite the objection of a South African student with a strong accent—that improvement in standard diction was an important part of the speech communication class, and her students would be expected to improve their standard pronunciation and reduce their regional dialects. Comp. ¶ 63. The administration pursued the complaints of several students who were offended by this incident. *Id.*  Professor Leitner's introductory statements were consistent with the course textbook and fall within the core of her academic subject matter as a speech professor.  Indeed, WCC itself makes clear that Professor Leitner's comments were appropriate: WCC's "Speech Pronunciation Improvement" center offers a program in "accent reduction." *Id.* ¶¶ 63-65.

[6] Based on documents attached to the Motion, the Defendants assert that Professor Leitner "forcibly detained" a student and "forced [her] to sign paperwork before being released." Mot. 9.  The Court should disregard these

On May 11, 2012, Professor Leitner filed a Complaint in this Court seeking relief from the Defendants' illegal conduct.  Specifically, the Complaint alleges claims under 42 U.S.C. § 1983 based on (i) First Amendment retaliation; (ii) the vagueness of the speech code and step two letter *as applied* to Professor Leitner's speech; and (iii) the overbreadth of the speech code, WCC's enforcement policy under the code, and the step two letter. The Complaint seeks damages for injuries Professor Leitner suffered as a result of the Defendants' unlawful conduct, including compensatory, emotional, and punitive damages; reinstatement; the correction of Professor Leitner's employment record; attorneys' fees; and prejudgment interest.[7] *Id.* pp. 32-33.

## LEGAL STANDARD

On a motion to dismiss, the Court is "constrained to accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable*, 622 F.3d 104, 110-11 (2d Cir. 2010) (citation, quotations and brackets omitted). The "duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Id.* at 113 (citation and quotations omitted).  In a retaliation case, such as this, it is "sufficient to allege facts from which a retaliatory intent . . . reasonably may be inferred." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (citations omitted).

---

documents—and the Defendants' inappropriate and not-so-subtle effort to cast Professor Leitner in a negative light—because they are not properly before the Court. The documents are not referenced in the Complaint, and Professor Leitner does not "rely heavily upon [the documents'] terms and effect, thereby rendering [them] integral" to the Complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court should note, however, that the Defendants blatantly mischaracterize the police report they quote in their Motion. The report *actually says* the student "was *not* restrained physically and *not* physically forced to sign the paperwork," and hence "no offense [was] alleged." Leitner Aff. Ex. 8 at 2 (emphasis added). Furthermore, Dean Rogalski's step three letter does not even mention this alleged incident as a basis for Professor Leitner's termination. *Id.* Ex. 9 at 1-2.

[7] After the parties' pre-motion conference on July 27, 2012, the Defendants sent Professor Leitner an August 29, 2012 letter asserting that her claims against WCC and the individual defendants in their official capacities are "frivolous" and demanding that she drop them. Leitner Aff. Ex. 10 at 5 (attachments not included).  Professor Leitner wrote the Defendants on September 20, 2012, explaining why the Defendants' sovereign immunity defense fails and concluding that she could not drop these claims. *See* Leitner Aff. Ex. 11.

## ARGUMENT

### I. THE COMPLAINT ADEQUATELY STATES FIRST AMENDMENT RETALIATION CLAIMS

The Defendants contend the Complaint fails to state a First Amendment claim for two reasons. First, they argue the Complaint does not "allege protected speech" because Professor Leitner was "acting in her capacity as a teacher, and not as a private citizen, when she engaged in the discussion[s] at issue. Mot. 26. Second, they argue their "restrictions on Plaintiff's in-class speech" were "reasonably related to a legitimate pedagogical concern." Mot. 27. Both arguments fail. The first argument is foreclosed by Second Circuit precedent specifically addressing a *college professor's in-class speech*, and their second argument is premised on a disagreement with the Complaint's factual allegations—an improper basis for dismissal.

#### A. The Complaint Adequately Alleges That Professor Leitner Engaged in Protected Speech

##### 1. Second Circuit Precedent Holds that a College Professor's In-Class Speech Is Constitutionally Protected

Contrary to the Defendants' first argument, a college professor's classroom discourse— including the expression of controversial and offensive views—is protected speech. The Second Circuit has unequivocally held that college administrators may *not* discipline a professor because of the "content of his classroom discourse" or "discussion of controversial topics in [the] classroom."[8] *Dube v. The State University of New York*, 900 F.2d 587, 598-99 (2d Cir. 1990) (quotations omitted). In *Dube*, the plaintiff professor described Zionism as a form of racism during a course on "The Politics of Race," rousing significant objections from the Jewish community. *Id.* at 589. Subsequently, the defendant administrators denied the professor tenure and terminated his appointment. *Id.* at 592. The professor claimed he was fired because the

---

[8] As discussed a p. 17 below, the court also rejected the administrators' qualified immunity defense.

community was "outraged by his teachings," while the administrators claimed they terminated the professor's reappointment based "solely on the academic merits." *Id.* at 593, 597.  In denying the administrators' summary judgment motion, the Second Circuit found there was a material issue of fact as to whether the administrators retaliated against the professor based on his discussion of "controversial topics in [the] classroom."[9] *Id.* at 598.

Whether a professor's speech constitutes part of his "classroom discourse" under *Dube* is a question of fact.  In *Mahoney v. Hankin*, 844 F.2d 64 (2d Cir. 1988), a WCC political science professor alleged that the defendant administrators retaliated against him because of his in-class speech.  Specifically, the professor discussed a campus controversy regarding President Hankin's purported misuse of student activity funds as a "slush fund." *Id.* at 65, 68.  The Second Circuit held that "whether discussion of 'slush funds' is related to political science *is a question of fact* about which reasonable minds might differ." *Id.* at 68-69 (emphasis added).

### 2. *Garcetti* Does Not Change Second Circuit Law Governing a College Professor's In-Class Speech

The Defendants attempt to rely on *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and its progeny to argue that Professor Leitner's political speech was not protected. Mot. 20-23. Although *Garcetti* changed the law governing "customary employee-speech," *id.* at 425, the Court's opinion does not govern in-class speech by a college professor.  Indeed, in response to the dissent's objection that the decision would "imperil First Amendment protection of *academic*

---

[9] *See also Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001) (holding that a speech professor's use of a racial slur in class was constitutionally protected because the epithet "was germane to the subject matter of his lecture on the power and effect of language," and denying qualified immunity to the defendant administrator); *Cf. Rodriguez v. Maricopa County*, 605 F.3d 703, 708-09) (2010) (Kozinsky, J.) ("The desire to maintain a sedate academic environment does not justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms.") (citation, quotations, brackets, and ellipsis omitted).

*freedom in public colleges and universities,*" *id.* at 438 (emphasis added), the majority opinion explicitly stated that it did not address "*speech related to scholarship or teaching.*" *Id.* at 425 (emphasis added). Thus, *Dube* remains controlling Second Circuit law.

The Second Circuit has squarely held that a Supreme Court decision that *expressly declines to address a legal issue*, does not undermine Second Circuit precedent *on that issue* (*i.e.*, a college professor's in-class speech). *See Meachum v. Knolls Atomic Power Laboratory*, 381 F.3d 56, 70-71 (2d Cir. 2004), *vacated on other grounds, KAPL, Inc. v. Meachum*, 544 U.S. 957 (2005). Simply put, "the Supreme Court's dicta do not outweigh prior circuit authority." *Id.* Thus, "in the Second Circuit, the Supreme Court will not be held to have implicitly expressed an opinion on a question *which it explicitly declines to address*, so as to overrule Circuit precedent."[10] *Elementis Chemicals. v. T H Agric. & Nutrition*, 373 F. Supp. 2d 257, 270 (S.D.N.Y. 2005) (Sand, J.) (emphasis added). Because *Garcetti* explicitly declined to address a professor's in-class speech, *Dube* remains controlling Second Circuit precedent.[11]

### 3.    The Complaint Adequately Alleges That Professor Leitner's In-Class Speech Is Protected

The Complaint makes detailed factual allegations supporting the reasonable inference that the Defendants retaliated against Professor Leitner *because* she expressed controversial

---

[10] *See also United States v. Emmenegger*, 329 F. Supp. 2d 416, 429 (S.D.N.Y. 2004) ("This Court must follow [Second Circuit] precedent unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit."); *Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 503 n. 13 (S.D.N.Y. 2011) (same) *Garcia v. Lewis*, 05-cv-1153, 2005 WL 1423253, at *6 n. 68 (S.D.N.Y. June 16, 2005) (same).

[11] Indeed, post-*Garcetti*, other federal district courts have repeatedly held that a college professor's *in-class speech* is constitutionally protected. *See Kerr v. Hurd*, 694 F. Supp. 2d 817, 845-46 (S.D. Ohio 2010) (denying qualified immunity to defendant administrator because professor's in-class speech was protected by pre-*Garcetti* Sixth Circuit law); *see also Lopez v. Fresno City Coll.*, 11-cv-01468, 2012 WL 844911, *8-9 (E.D. Cal. Mar. 12, 2012) (professor's in-class speech is constitutionally protected); *Sheldon v. Bilbir Dhillon*, 08-cv-03438, 2009 WL 4282086, *4 (N.D. Cal. Nov. 25, 2009) (same).

political views relevant to a class discussion—precisely what *Dube* forbids. The Complaint alleges that, in connection with the *interpretation of a political poem*, Professor Leitner expressed her political viewpoint on illegal immigration. Comp. ¶¶ 42-47.  The Complaint avers that Professor Leitner's political speech was consistent with the "oral interpretation" project, her long-standing approach to teaching the course, her syllabus's provision for "[g]roup discussion about social issues," and even the Department chair's syllabus for the same class. *Id.* ¶¶ 2, 55. The Complaint also alleges that Professor Leitner engaged in additional protected speech when she insisted, despite a student's vocal resistance, that standard diction was part of her course, and she expected students to improve pronunciation and reduce their regional dialects. *Id.* ¶ 63. These allegations are more than adequate to show that Professor Leitner's in-class speech was protected: her political comments were part of the "content of her classroom discourse," *Dube*, 900 F.2d at 598, in connection with the "oral interpretation" of a student presentation, and her comments on pronunciation fell within the core of her "classroom discourse" as a speech professor. *Id.*

Without citing *Dube*, or any other case dealing with a *college professor's in-class speech*, Mot. 20-27, the Defendants argue that Professor Leitner's speech "in her capacity as a teacher" is not protected. Mot. 25.  However, the cases on which the Defendants rely, distinguishing between "speaking as a citizen" and "speaking as an employee" under *Garcetti*, do not apply to academic speech at the college level.  The plaintiff professor in *Dube*, after all, engaged in protected speech in the classroom *as a college professor*, and the Second Circuit unequivocally held that his speech was protected. *Dube*, 900 F.2d 597-98.  Indeed, *Dube* is consistent with long-standing Supreme Court precedent that affords *greater* First Amendment protection in the university context than the primary or secondary school context.  The Supreme Court has

explained that the "college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" and "the precedents of this Court leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972); *see also Kracunas v. Iona College*, 119 F.3d 80, 87 (2d Cir. 1997)[12] (citing *Dube*, 900 F.3d at 597-98, for the proposition that "the Supreme Court and this Court have consistently emphasized the importance of freedom in the community of American universities").[13]   Thus, the Defendants' entire line of argument that Professor Leitner "spoke as a teacher" is irrelevant.[14] *See* Mot. 20-23.

### B.   The Complaint Adequately Alleges the Defendants Retaliated Against Professor Leitner *Because of* Her Protected Speech

The Defendants' second argument is that they fired Professor Leitner based on "legitimate pedagogical concerns." Mot. 27.   Specifically, they say they fired her, *not* because of her protected speech, but because of *other purportedly legitimate reasons*: (i) Professor Leitner's "'abusive, belittling techniques' were . . . contrary to her professional obligations"; and (ii) her political speech was "unnecessary in teaching her class." *Id.*  This argument turns the standard of review on its head by *assuming the Defendants' version of the facts to be true*.   It ignores the Complaint's detailed allegations supporting the reasonable inference that the Defendants

---

[12] *Kracunas* was partially overruled on an unrelated issue. *See Hayut v. SUNY*, 352 F.3d 733, 751 n. 11 (2d Cir. 2003).

[13] Many cases draw the distinction between free speech principles in the university and secondary school contexts. *See DeJohn v. Temple Univ.*, 537 F.3d 301, 315 (3d Cir. 2008) ("Discussion by adult students in a college classroom should not be restricted. Certain speech, however, which cannot be prohibited to adults may be prohibited to public elementary and high school students."); *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1014-15 (N.D. Cal. 2007) ("While the words of the First Amendment remain static, the Supreme Court has shown us that these words can have very different meaning when applied to regulations imposed in primary and secondary schools than when applied to regulations applied in colleges and universities.").

[14] For example, the Defendants provide a lengthy discussion of *Kenney v. Genesee Valley BOCES*, 07-cv-6442, 2008 WL 343110 (W.D.N.Y. Feb. 6, 2008), which they say supports the proposition that instructional speech related to the "curriculum" is not protected. Mot. 23.   But the *Kenney* plaintiff was a "School Resource Officer" and "Criminal Justice Instructor" at a BOCES school, *id.* at *1—not a college professor. *Kenney*'s analysis does not purport to address academic freedom in the university context*, id.* at *4, and, therefore, is not instructive.

retaliated against Professor Leitner *because of* the "content of her classroom discourse," *Dube*, 900 F.2d at 598—namely, her political comments concerning illegal immigration and her insistence that students improve their pronunciation. *See* pp. 11-12 above.   On a motion to dismiss, factual issues must be resolved in Professor Leitner's favor. *See DiFolco*, 622 F.3d at 112-13 (reversing dismissal on the pleadings because the court "improperly chose between reasonably competing interpretations" of an extraneous document that raised "factual issues").

First, the Complaint alleges that, in or around July 2011, the Defendants terminated Professor Leitner for not complying with Dean Wang's step two letter, which directed Professor Leitner to avoid saying anything that could make "any students feel offended." Comp. ¶¶ 37, 66-67.  Second, the Complaint avers that Professor Miller disciplined Professor Leitner for making "extremely disturbing" comments which, based on Ms. Alammari's complaint, included core political speech. *Id.* ¶ 54. Third, in Professor Miller's own words, she disciplined Professor Leitner because her statements belonged in a "political science class," clearly indicating that Professor Leitner was punished for the *political content* of her speech. *Id.*  Fourth, in connection with Ms. Alammari's complaint about Professor Leitner's political comments, the Defendants conducted a careless and results-oriented investigation and violated WCC disciplinary procedures,[15] *id.* ¶¶ 57-58, 60-61, further underscoring their retaliatory intent. *See Women's Interart Ctr. v. New York City Econ. Dev. Corp.*, 03-cv-2732, 2005 WL 1241919, *28 (S.D.N.Y. May 23, 2005) ("departures from the normal procedural sequence" show retaliatory intent) (citation and quotations omitted).   Fifth, although Dean Wang and Professor Miller received

---

[15] The Defendants argue that the Ax decision's procedural requirements are "informal" and only apply to step one and step two hearings.  However, the Defendants' *own written statements* demonstrate that their assertion is wrong. First, when Professor Miller met with Professor Leitner concerning student complaints in the spring of 2011, she acknowledged the Ax decision's procedural requirements: "[A]ccording to *union protocol, I met with Carol Leitner and two students.*" Leitner Aff. Ex. 12 at 1 (emphasis added).   Second, according to Dean Rogalski's step three letter, Dean Wang argued that Professor Miller was "cautious about *following the proper protocol* regarding student complaints." Leitner Aff. Ex. 9 at 2 (emphasis added).

student complaints in October 2010, they declined to act on them until *after* they received the complaint about Professor Leitner's in-class political speech. *Id.* ¶ 62.

The Defendants completely ignore the above allegations, and insist they fired Professor Leitner because of her allegedly "abusive, belittling techniques," and "insulting" and "humiliating" comments. Mot. 27. In support of their argument, the Defendants cite *only* the step two letter. However, in doing so, they quote selectively, failing to repeat essential statements in the letter—the directive to "make sure that [one is] not making any students feel offended," and to take "corrective action" if a student "may have [been] offended." These statements, which the Defendants conveniently ignore, are integral to the standard set forth in the step two letter, rendering it facially unconstitutional. *See Saxe v. State College Area School District*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) ("The Supreme Court has held time and again, *both within and outside the school context*, that the mere fact that someone *might take offense* at the content of speech is not sufficient justification for prohibiting it.") (emphasis added). Moreover, even if the Defendants were entitled to quote selectively from the step two letter, they fail to demonstrate why the Complaint's *numerous additional allegations* supporting the inference that they retaliated against Professor Leitner because of her protected speech are insufficient. *See* pp. 14-15 above. The Defendants' argument is nothing more than a denial of the Complaint's factual allegations—which cannot prevail on a motion to dismiss.

The Defendants also contend that they fired Professor Leitner because her "personal opinions regarding illegal immigrants were unnecessary in the teaching of her class," and hence they had a "legitimate pedagogical" reason to fire her. Mot. 27. This argument fails for the same reasons: again, it merely raises issues of fact concerning (i) the Defendants' motivation for disciplining Professor Leitner; and (ii) the relevance of Professor Leitner's political comments to

her class.  The Second Circuit has squarely held that the pertinence of a college professor's in-class speech to her subject is an issue of fact. *See Mahoney*, 844 F.2d at 68 (relevance of a WCC professor's in-class comments was a factual issue).

Here, Professor Leitner's political comments were made during a discussion concerning an "oral interpretation" of a *political poem*, and were consistent with her longstanding teaching methodology. Comp. ¶¶ 2, 5, 42-47; *see also* p. 12 above.  Thus, the Complaint adequately alleges Professor Leitner's in-class political speech was part of her "classroom discourse." *Dube*, 900 F.2d at 598.[16]  The Defendants' mere denials do not address the legal sufficiency of the Complaint.

### C.    The Individual Defendants Are Not Qualifiedly Immune From Professor Leitner's First Amendment Claims

A qualified immunity defense must establish that the Individual Defendants "did not violate a clearly established right of which they should have known." *Peoples v. Fischer*, 11-cv-2694, 2012 WL 2402593, *4 (S.D.N.Y. June 26, 2012) (citation and quotations omitted). This standard does not mean that "official action is protected by qualified immunity unless the very action in question has previously been held unlawful," but rather "that in the light of pre-existing law the unlawfulness must be apparent." *Jackler v. Byrne*, 658 F.3d 225, 242-43 (2d Cir. 2011) (citation and quotations omitted).

When a qualified immunity defense is asserted *on the pleadings*, "the plaintiff is entitled to all reasonable inferences from the facts alleged . . . that defeat the immunity defense." *Giambalvo v. Sommer*, 10-cv-6774, 2012 WL 4471532, *6 (S.D.N.Y. Sept. 19, 2012) (citations

---

[16] As noted above, *see* p. 10, the Second Circuit has held that the question whether a WCC political science professor's comments about a "slush fund" was "related to political science is a question of fact." *Mahoney v. Hankin*, 844 F.2d 66, 68 (2d Cir. 1988). Professor Leitner's political speech—which directly related to a class assignment—was, if anything, *more* relevant to her class than the professor's speech in *Mahoney*.

and quotations omitted). The Defendants face "a *formidable hurdl*e because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial." *Edmonds v. Cent. N.Y. Psychiatric Ctr.*, 10-cv-5810, 2011, WL 3809913, *7 (S.D.N.Y. Aug. 25, 2011) (emphasis added) (citations, quotations and brackets omitted).

The Defendants argue that Professor Leitner's First Amendment claim is based on a "muddy" area of law and "imposes a burden on the Individual Defendants which has eluded and divided the courts." Mot. 34, 34 n. 35. The Second Circuit says otherwise. Indeed, three precedential Second Circuit cases addressing *in-class faculty speech*—one of which was brought *against WCC*—show that college administrators may not retaliate against a professor for expressing "offensive" viewpoints during class discussion.

In *Dube*, the Second Circuit *rejected the administrators' qualified immunity defense*. In deciding whether the professor's claim that the defendant administrators retaliated against him because of his in-class speech could withstand a motion for summary judgment, the Court held: "assuming the defendants retaliated against [the plaintiff professor] based on the content of his classroom discourse, such conduct was, as a matter of law, objectively *un*reasonable." *Id.* at 598. (emphasis in original). The court emphasized that such retaliation is a "violation of *long-standing and clearly established First Amendment law.*" *Id.* at 597 (emphasis added).

Indeed, the Second Circuit subsequently underscored *Dube*'s holding in *Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001), when the Court explicitly "cautioned" college administrators *not* to discipline professors for the expression of "controversial, even offensive, views" during class discussion: "*Dube serves as a caution to governmental administrators not to discipline a college*

*teacher for expressing controversial, even offensive, views* lest a 'pall of orthodoxy' inhibit the free exchange of ideas in the classroom."[17] *Id.* at 467 (emphasis added).

Finally, in *Mahoney*, discussed above, *see* pp. 10, 16 n. 16, the Second Circuit considered an appeal from the district court's decision denying the defendant administrators' motion for summary judgment. In its denial, the district court held that defendants were "*not shielded by qualified immunity.*" *Id.* 68 (emphasis added). The Second Circuit dismissed the administrators' interlocutory appeal, holding that the professor's First Amendment claim raised sufficient factual issues to preclude a qualified immunity defense. *Id.* at 68-69.

Given *Dube*, *Vega*, and *Mahoney*, all of which remain binding law, the "unlawfulness" of the Defendants' conduct was readily "apparent."[18] *Jackler*, 658 F.3d at 243.   And in any case, whether the unlawfulness of the Individual Defendants' actions was *in fact apparent to them* is a question of fact, which cannot be resolved on a motion to dismiss.[19]

---

[17] Ignoring *Vega*'s explicit "caution" to college administrators, the Individual Defendants argue that *Vega* supports their immunity defense because the administrators in *Vega* received qualified immunity. Mot. 34-35. The *Vega* professor's conduct, however, is easily distinguishable from Professor Leitner's speech.  In *Vega*, a writing instructor conducted a "clustering" exercise where his students called out "a series of vulgar, sexually explicit words and phrases," which led to "all the students but one . . . yelling their contributions, with two standing on chairs." *Vega*, 273 F.3d at 467.  The Second Circuit emphasized that the *Vega* professor's "toleration of the students' shouted vulgarities *was far removed from* [the *Dube* professor's] *expression of his political views.*" *Id.* (emphasis added). It was also "far removed" from Professor Leitner's "expression of [her] political views" concerning the "oral interpretation" of a political poem.

[18] Defendants cite *Panse v. Eastwood*, 303 Fed. App'x. 933, 934 (2d Cir. 2008) (summary order) for the proposition that "it is an open question in this Circuit whether *Garcetti* applies to classroom instruction." Mot. 21.  *Panse* is not relevant here for several reasons. First, *Panse* is a summary order with "no precedential effect." *Jackler*, 658 F.3d at 244. Second, *Panse*'s statement about the reach of *Garcetti* does not apply to *college classrooms*. *Panse* concerned the speech of a high school art teacher, *Panse*, 303 Fed. App'x. at 935, and the court's "open question" comment relied on cases involving the speech of an elementary school teacher and another high school teacher. *Id.* at 934 (citing *Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477 (7th Cir. 2007) and *Lee v. York County Sch. Div.*, 484 F.3d 687 (4th Cir. 2007)).  The Defendants cannot use *Panse* to circumvent clear statements of Second Circuit law in precedential cases.

[19] In support of their qualified immunity defense, the Defendants also rehash their factual argument on the merits of Professor Leitner's First Amendment claims, arguing that the "act of disciplining Plaintiff for her failure to curtail the use of 'abusive, belittling techniques' . . . was undertaken in furtherance of a legitimate pedagogical concern." Mot. 35.  In support of this argument, the Defendants cite nothing more than (i) the 2007 step two letter and (ii) the transcript from the parties' pre-motion conference. *See* Mot. 35. Again, this argument is merely a denial of the factual allegations in the Complaint. *See* pp. 13-16 above.  Thus, the Individual Defendants have not surmounted the

## II.    THE COMPLAINT SUFFIENTLY STATES
## AS-APPLIED VAGUENESS CLAIMS

The Defendants contend Professor Leitner's vagueness claims fail for two reasons. First, according to the Defendants, the speech code and step two letter have "common sense" meanings. Mot. 32-33.  Second, the Defendants argue that Professor Leitner reasonably should have known that her "belittling, insulting, and humiliating" speech was prohibited. Mot. 30, 33. Both arguments fail.  At the outset, ample precedent establishes that the Defendants' speech restriction—particularly Dean Wang's directive to avoid "offensive" speech—is unconstitutionally vague.  Further, the Defendants' second argument, once again, improperly ignores the allegations in the Complaint.

### A.    The Defendants' Speech Restrictions Did Not Provide Notice To, and Were Arbitrarily Enforced Against, Professor Leitner

The vagueness doctrine requires "that punishment should be imposed only if the defendant could reasonably be expected to have known that his conduct was proscribed. Additionally, in order to prevent arbitrary and discriminatory enforcement, a law must provide sufficient standards to guide its application." *Marchi v. BOCES*, 173 F.3d 469, 480 (2d Cir. 1999). The Second Circuit has made clear that teachers cannot be punished pursuant to policies that fall short of these standards. *Id.* at 479-80 (applying vagueness doctrine to an administrator's directive regarding teacher's classroom spech).[20] In the high school context, which affords *less* protection than the college context, the "relevant inquiry is whether, based on existing regulations, policies, discussion and other forms of communication between school

---

"formidable hurdle" of establishing qualified immunity on the pleadings. *Edmonds*, 2011 WL 3809913, at *7 (citation and quotations omitted).

[20] *See also Kramer v. New York City Board of Education*, 71 F. Supp.2d 335, 356 (E.D.N.Y. 2010) (Weinstein, J.) (upholding as-applied vagueness claim based on a teacher's in-class speech).

administration and teachers, it was reasonable for the school to expect the teacher to know that her conduct was prohibited." *Id.* (internal quotations and citation omitted).   Additionally, an administrator's interpretation and enforcement of a speech regulation needs to be considered.[21] When a regulation "is capable of reaching" protected expression, such as a professor's in-class speech, "the [vagueness] doctrine demands a *greater degree of specificity than in other contexts*." *Id.* at 480 (emphasis added).

Without citing any legal authority, the Defendants argue the speech code and the step two letter have a "common sense" meaning from "everyday parlance." Mot. 32-33. Numerous courts disagree, and have repeatedly sustained as-applied vagueness challenges to college and secondary school speech restrictions using the same (and similar) language.

For example, in *McCauley v. University of Virgin Islands*, 618 F.3d 232 (3rd Cir. 2010), the Court found that there are "fatal flaws [in] attempting to prohibit 'offensive' speech" in the university context because the term "offensive" is "on its face, *sufficiently broad and subjective* that it could conceivably be applied to cover any speech that offends someone." *Id.* at 248-49 (citations, quotations, and ellipsis omitted).   Courts have held that college regulations prohibiting "offensive" speech are unconstitutionally vague as applied to a professor's in-class speech and a college coach's speech.[22]   Indeed, the Second Circuit has "cautioned" administrators to give

---

[21] *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) ("When reviewing a regulation for vagueness, "we are relegated . . . to the words of the [regulation] itself, to the interpretations the court below has given to analogous statutes, and perhaps to some degree, *to the interpretation of the statute given by those charged with enforcing it*.") (emphasis added and brackets omitted).

[22] *See Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996) (policy prohibiting speech that had the effect of "creating an intimidating, hostile, or *offensive* learning environment" was unconstitutionally vague as-applied to a professor's "confrontational teaching style designed to shock his students and make them think and write about controversial subjects") (emphasis added); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (policy prohibiting speech that "subjects an individual to *an intimidating, hostile or offensive*" educational environment based on an individual's race was enjoined  because the standard requires a "subjective reference") (emphasis added); *Silva v. Univ. of New Hampshire*, 888 F. Supp. 293, 298 (D.N.H. 1994) (policy prohibiting speech that created "a hostile or *offensive* working or academic environment" was vague as-applied to a professor's in-class speech because "it employs an impermissibly subjective standard") (emphasis added).

professors room to express "controversial, even offensive," views in class. *Vega*, 273 F.3d at 467. In addition, the step two letter uses *other terms* that courts have concluded were unconstitutionally vague in the college and high school contexts—including prohibitions on "insulting" and "abusive" speech.[23]

Setting aside the overwhelming precedent contradicting the Defendants' "common sense" argument, their argument misunderstands what it means to bring an *as-applied* vagueness claim. Professor Leitner's as-applied vagueness claims do *not* turn on whether the speech code and step two letter have a "common sense" meaning. Mot. 32-33. What matters is whether Professor Leitner received reasonable notice that she would be fired *because of the speech alleged in the Complaint*.[24]

Here, the Complaint's detailed factual allegations support the reasonable inference that the speech code and step two letter were applied arbitrarily, and without sufficient notice, to Professor Leitner's expression of a politically conservative viewpoint. Specifically, the Complaint alleges: (i) Professor Leitner has discussed social and political issues in her class for decades; (ii) the Defendants had no standards to guide enforcement of the speech code or step two letter; (iii) administrators reached different conclusions regarding whether to pursue

---

[23] *See Kyriacou v. Peralta Cmty. Coll. Dist.*, 08-cv-4630 , 2009 WL 890887, at *9 (N.D. Cal. Mar. 31, 2009) (upholding college students' vagueness claims against policy prohibiting "disruptive" and "*insulting*" conduct") (emphasis added); *Killion v. Franklin Regional School Dist.*, 136 F.Supp.2d 446, 458-59 (W.D. Pa. 2009) (high school policy providing that "if a student verbally or otherwise *abuses* a staff member, he or she will be immediately suspended," was enjoined because "to determine what constitutes 'abuse,' punishable under the policy, one must make a subjective reference") (emphasis added); *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 701 (W.D. Pa. 2003) (high school speech policy using terms "*abusive*," "harassment," "inappropriate," and "*offend*" enjoined because those terms "could permit [the defendant administrators] to apply them arbitrarily") (emphasis added); *see also Smith ex rel. Smith v. Mount Pleasant Pub. Sch.*, 285 F. Supp. 2d 987, 994 (E.D. Mich. 2003) (secondary school policy prohibiting speech that threatens the "well being" or "dignity" of others enjoined because it invites a "subjective interpretation" and "vests virtually unbridled discretion in the administrators charged with its application and enforcement"); *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 867 (E.D. Mich. 1989) (college policy prohibiting "stigmatizing and victimizing statements" enjoined as unconstitutionally vague).

[24] *See VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010) ("[I]n the context of an as-applied vagueness challenge, a court's analysis should be confined to the litigant's actual conduct.").

discipline against Professor Leitner based on the same student complaints; (iv) the Defendants failed to identify *which statements* by Leitner were improper and used purposefully vague language to describe her alleged violation of the speech code; and (v) Dean Rogalski's step three letter did not discuss *any* of the student complaints at issue in the hearing. *See* Comp. ¶¶ 37-38, 68-73.

**B.     The Defendants' Reliance on *diLeo* and *Marchi* Ignores the Allegations in the Complaint**

The Defendants' second argument insists that Professor Leitner's vagueness claims should be dismissed based on two summary judgment decisions, *diLeo v. Greenfield,* 541 F.2d 949 (2d Cir. 1976), and *Marchi v. BOCES*, 173 F.3d 469 (2d Cir. 1999). *See* Mot. 30-33.

In *diLeo*, the Second Circuit rejected the plaintiff teacher's motion for summary judgment on the claim that he was fired based on an unconstitutionally vague "due and sufficient cause" standard. *diLeo*, 541 F.2d at 952-53.   The *diLeo* teacher did not contest the developed evidentiary record of his "derelictions and bizarre conduct," *id.* at 953, *e.g.*, harassing students and refusing to answer their questions, nor did he argue that he was terminated for other conduct that he reasonably believed was appropriate. *Id.*  Seizing on *diLeo*, again a summary judgment case, the Defendants improperly assume their version of events, arguing that Professor Leitner should have known her "belittling, humiliating, and insulting remarks" would be "the cause of her eventual termination." Mot. 30.  Their argument fails.

First, there is *no* factual record here—much less, as in *diLeo*, a developed factual record that is uncontested. *See id.* at 951-52 (teacher did not "testify at the [disciplinary] hearing" or "prepare a response" to the evidence against him). Second, and more fundamentally, the Complaint adequately alleges that Professor Leitner was terminated *because of* her in-class political speech and comments on standard pronunciation, *see* pp. 13-16 above, which she could

22

not possibly have known were prohibited. *See* pp. 21-22 above.  In short, instead of addressing whether the Defendants' speech restrictions are vague as applied to *the conduct alleged in the Complaint*, the Defendants merely assert that Professor Leitner was fired for different conduct.

The Defendants also argue that *Marchi* "militates in favor of dismissal" because Professor Leitner purportedly "received extensive guidance regarding the proscribed behavior." Mot. 30, 33. The Defendants provide no citation to the Complaint, or any document it incorporates, for their factual assertion that Professor Leitner "received extensive guidance" on the meaning of "offending" students—or any other part of the step two letter.  The Court cannot rely on the Defendants' unsupported assertions on a motion to dismiss.  More to the point, as a matter of law it is not *possible* to give meaningful guidance regarding Dean Wang's vague directive not to "offend" students. *See Dambrot*, 55 F.3d at 1184 (enforcing ban on "offensive" racial comments requires an impermissible "subjective reference"); *see also* pp. 20-21 n. 22 and n. 23 above.  Furthermore, the administrative directive in *Marchi* prohibited "references to religion" in a teacher's "instructional program," *Marchi*, 173 F.3d at 480—a model of clarity compared to the Defendants' flat prohibition of "offensive" or "discourteous" speech.[25]

---

[25] The Individual Defendants have waived any qualified immunity argument with respect to Professor Leitner's *vagueness claims* by failing to raise the issue in their Motion. *See Chavez v. United States*, 764 F. Supp. 2d 638, 646 (S.D.N.Y. 2011) ("It is well-established that motions must be made in a party's moving papers, not in a reply brief."); *Emigra Group v. Fragomen, Del Rey, Bernsen &* Loewy, 612 F. Supp. 2d 330, 349 (S.D.N.Y. 2009) (same). The qualified immunity argument advanced in Point IV of the Motion addresses *only* Professor Leitner's First Amendment retaliation claims. *See* Mot. 33-35.

Even had the Individual Defendants raised a defense to these claims, they would have done so to no avail. Professor Leitner's as-applied vagueness claims are clearly established.  In *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589 (1967), the Supreme Court invalidated college speech regulations restricting faculty speech as "plainly susceptible of sweeping and improper application." *Id*. at 599. Further, the Second Circuit clearly explained the vagueness doctrine in the context of a teacher's classroom speech in *Marchi v. BOCES*, 173 F.3d 469, 479-80 (2d Cir. 1999).  As a district court in this Circuit acknowledged, *"[r]ecognized is a teacher's right to notice of what classroom conduct is prohibited." Kramer v. New York City Bd. of Educ.*, 715 F. Supp. 2d 335 (E.D.N.Y. 2010) (Weinstein, J.) (internal quotations and citations omitted) (emphasis added).  Thus, any argument that the Individual Defendants had a reasonable belief that they were acting in accordance with the law fails.

### III.   THE COMPLAINT ADEQUATELY STATES OVERBREADTH CLAIMS

The Defendants incorrectly conflate Professor Leitner's as-applied vagueness claims and overbreadth claims, Mot. 27-33, and thereby fail to address the *distinct* standard, and case law, that governs overbreadth claims.[26]   As with Professor Leitner's vagueness challenge, the Complaint meets the requirements for alleging claims that (i) the speech code, (ii) WCC's enforcement policy with respect to the speech code, and (iii) the step two letter, are invalid under the overbreadth doctrine.

#### A.    The Overbreadth Standard

A "showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction" removes "the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (citation and quotation omitted) (emphasis in original). In certain circumstances, the "overbreadth determination is a factual inquiry." *Nitke v. Ashcroft*, 253 F.Supp. 2d 587, 605 (S.D.N.Y. 2003) (three judge panel).[27]   In the context of a facial challenge, the court "may consider not only the text of the specific statute or regulation, but also *how it has been interpreted by the persons who*

---

[26] With respect to Professor Leitner's overbreadth claims, the Defendants reiterate the same argument they made against Professor Leitner's vagueness claims. Relying on *Marchi*, 173 F.3d at 480, they assert that Professor Leitner "received extensive guidance" regarding the meaning of the Defendants' speech restrictions. Mot. 33.  Again, there is no basis for their assertion that Professor Leitner received "extensive guidance" on the meaning of the step two letter, and *Marchi*'s prohibition of "references to religion" is readily distinguishable. *See* p. 23 above.  But more importantly, the Defendants' argument regarding the alleged "guidance" they gave *to Professor Leitner* misunderstands the point of a facial challenge.  Professor Leitner's facial challenge to (i) the speech code and (ii) WCC's enforcement policy regarding the speech code, seeks to vindicate, not only her rights, but also the rights of *other WCC faculty members* whose speech has been, and will be, chilled by the speech code and WCC's enforcement practices. *See, e.g., Shea on Behalf of Am. Reporter v. Reno*, 930 F. Supp. 916, 939 (S.D.N.Y. 1996) (three judge panel) ("The doctrine of overbreadth recognizes that an unconstitutional restriction of freedom of expression may deter *parties not before the court from engaging in protected speech* and thereby escape judicial review.") (emphasis added).

[27] *See also Wisconsin Realtors Ass'n v. Ponto*, 233 F. Supp. 2d 1078, 1088 (W.D. Wis. 2002) (overbreadth determination required factual development).

*are charged with its implementation, and what their actual practices are.*" *United States v. Sued*, 143 F. Supp. 2d 346, 352 (S.D.N.Y. 2001) (emphasis added).[28]

### B. The Complaint Adequately Alleges That the Speech Code, WCC's Policy of Enforcement, and the Step Two Letter, Are Overbroad

The Complaint alleges that the speech code is facially invalid both (i) as written and (ii) as enforced under WCC policy and practice. At the outset, the phrase "courtesy and respect" can easily reach constitutionally protected, though disagreeable, speech. In *Richard v. City of Pasadena*, 889 F. Supp. 384 (C.D. Cal. 1995), for example, the court found the plaintiff city council member stated an overbreadth claim against a policy mandating "courteous" relations with others. The court explained that the policy's

> lack of definitions and use of judgment-laden terms directly threatens political speech. "Courteous" expression is very much a matter of personal opinion. And it takes little imagination to foresee that in a political setting, opinions that one disagrees with can readily become "discourteous expression" the moment they are uttered.

*Id.* at 392. The same is true in the "college classroom" setting, which is "peculiarly the marketplace of ideas," *Healy*, 408 U.S. at 180 (citation and quotations omitted), including "controversial, even offensive" ideas. *Vega*, 273 F.3d at 467.[29]

---

[28] *See also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (when evaluating a "facial challenge, [the Court] must consider the county's authoritative constructions of the ordinance, *including its own implementation and interpretation of it.*"(emphasis added); *Ward v. Rock Against Racism*, 491 U.S. 781, 795 (1989) ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis" of an overbreadth challenge and the possibility of a limiting construction); *Paulsen v. Gotbaum*, 90-cv- 6152, 1992 WL 8361, *1 n. 1 (S.D.N.Y. Jan. 15, 1992) (in the overbreadth context, a court "may evaluate the Rules of the Parks Department in light of long standing practices").

[29] The court's analysis in *Coll. Republicans v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007), similarly shows the overbreadth of a "courtesy" requirement. The court enjoined a college speech regulation requiring students to be "civil to one another" because "the word 'civil' is broad and elastic—and its reach is unpredictably variable in the eyes of different speakers." *Id.* at 1018. The court supported its holding by explaining that "civility" has the same meaning as "courtesy," which "could be understood as permitting only those forms of interaction that produce as little friction as possible." *Id.* at 1019.

WCC administrators cannot punish speech they find "discourteous" or "disrespectful" without deterring a significant amount of "controversial, even offensive," protected faculty speech in the process.  Indeed, the Defendants' application of the "courtesy and respect" standard to Professor Leitner, as alleged in the Complaint, demonstrates how easily a WCC professor's controversial *ideas* can be perceived as discourteous.  Professor Leitner was punished because a student of Mexican heritage felt affronted by a discussion of illegal immigration.   Indeed, in the university (and secondary school) context, numerous cases, including challenges brought by professors and college employees, have invalidated policies as unconstitutionally overbroad because they prohibited speech deemed "offensive," "intimidating," "demeaning," "hostile," "stigmatizing," and "victimizing," or required that speech be "civil" and "not provoke, harass, intimidate, or harm another."[30]

Even if the speech code *as written* was not overbroad, the Complaint adequately alleges that WCC's *policy of enforcement* is overbroad.[31]  Here, Dean Wang provided an authoritative

---

[30] *See DeJohn v. Temple University*, 537 F.3d 301, 317 (3d Cir. 2008) (sexual harassment policy prohibiting "intimidating, hostile, or *offensive*" speech enjoined as facially overbroad because the phrase "hostile or offensive environment" is "difficult to cabin" and "could encompass any speech that might simply be offensive to a listener") (emphasis added); *College Republicans v. Reed*, 523 F.Supp. 2d 1004, 1016 (N.D. Ca. 2007) (policy requiring speech among students to be "civil" enjoined as unconstitutionally overbroad); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370 (M.D. Pa. 2003) (student conduct policy prohibiting "acts of intolerance" and requiring communication "in a manner that does not provoke, harass, intimidate, or harm anther" enjoined as unconstitutionally overbroad); *Saxe v . State College Area School District*, 240 F.3d 200, 202 (3d Cir. 2001) (Alito, J.) (school district policy prohibiting speech that is "intimidating," "hostile," or "*offensive*" based on various enumerated characteristics enjoined as unconstitutionally overbroad) (emphasis added); *Booher v. Board of Regents*, 1998 U.S. Dist. LEXIS 11404, *3 (D. Ky. 1998) (sexual harassment policy prohibiting "intimidating," "hostile," or "*offensive*" speech of a "sexual nature" enjoined as unconstitutionally overbroad in case involving *a professor's in-class speech*) (emphasis added); *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (policy prohibiting speech that "subjects an individual to an intimidating, hostile or *offensive*" educational environment based on an individual's race was enjoined  as unconstitutionally overbroad in a case brought by a college coach) (emphasis added); *UWM Post, Inc. v. Bd. of Regents of Univ. of Wisconsin Sys.*, 774 F. Supp. 1163, 1165 (E.D. Wis. 1991) (student speech policy prohibiting "*demeaning*," "intimidating," and "hostile" speech enjoined as unconstitutionally overbroad) (emphasis added); *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 856 (E.D. Mich. 1989) (student speech policy prohibiting "stigmatizing" and "victimizing" speech enjoined as unconstitutionally overbroad).

[31] In a case where a regulation was valid as *written*, the Ninth Circuit explained that the regulation may nonetheless be overbroad as *interpreted and enforced*:

construction of the "courtesy and respect" standard "on behalf of the college" in the step two letter, Comp. ¶ 37; Leitner Aff. Ex. 3 at 4, and Dean Rogalski enforced that standard, without qualification, in his step three letter. Comp. ¶ 66; Leitner Aff. Ex. 9.  As noted, the step two letter explicitly states that the "courtesy and respect" standard requires "not making any students feel offended." Comp. ¶ 37; Leitner Aff. Ex. 3 at 4.  Thus, the Complaint adequately alleges that, as enforced by the Defendants, the speech code prohibits a wide range of protected speech under clearly established Second Circuit law, and is therefore overbroad. *See Vega*, 273 F.3d at 467. Indeed, even in the secondary school context, "no one would suggest that a school could constitutionally ban any unwelcome verbal conduct which *offends* an individual." *Saxe*, 240 F.3d at 215 (emphasis added) (quotations and ellipses omitted).   Numerous courts have enjoined college speech policies just like Dean Wang's construction of the speech code. *See* pp. 26 n. 30. above.  For the same reasons, the Complaint adequately alleges that the step two letter, which evidences the manner in which WCC enforces its speech code, is also unconstitutionally overbroad. *See Marchi*, 173 F.3d at 479-80 (applying overbreadth doctrine to administrator's written directive to a teacher).[32]

---

> Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy.

*Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011). Thus, a plaintiff may bring a "facial challenge to [WCC's] enforcement policy (as distinct from a facial challenge to [the speech code] as written)." *Id.* at 855. Here, as in *Hoye*, Professor Leitner adequately alleges that the Defendants' "own pronouncements"—specifically, the step two letter and Professor Miller's February 2011 letter—show the Defendants enforce an overbroad "content-discriminatory enforcement policy," and "[t]hat policy is unconstitutional." *Id.* at 856.

[32] Given WCC's faculty disciplinary procedure, the Defendants cannot dispute that they fired Professor Leitner *because* she did not "follow" Dean Wang's step two letter. *See* Leitner Aff. Ex. 2 at 2. Thus, to the extent *either* the speech code or the step two letter is unconstitutionally overbroad, their application to Professor Leitner is invalid, and the step three hearing is invalid. *See Hicks*, 539 U.S. at 118-19. Furthermore, even if the Court were to adopt a narrowing construction, Professor Leitner would still be entitled to a new hearing unless the Defendants could demonstrate that they fired Leitner pursuant to a permissible *narrowed standard* as opposed to the step two letter as

## IV.    THE ELEVENTH AMENDMENT DOES NOT APPLY
## TO PROFESSOR LEITNER'S CLAIMS

The Defendants argue that WCC is entitled to sovereign immunity, and as a result, Professor Leitner's claims against WCC and her equitable claims for reinstatement should be dismissed. Mot. 13-20. Both arguments fail.

### A.    WCC Is Not Entitled to Sovereign Immunity

Under Second Circuit law, a sovereign immunity determination requires an "overall assessment of the relationship between the State and the entity in question," based on "many factors." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (setting forth six factors)[33] (citation and quotations omitted). The party asserting immunity bears the burden of providing "facts supporting" the defense. *Woods v. Rondout Valley*, 466 F.3d 232, 238 (2d Cir. 2006).

The Defendants, here, however, neither address the sovereign immunity factors nor come forward with the relevant facts.  They do not come close to meeting their burden.  Instead, they repeatedly assert that WCC is "part of the SUNY system," Mot. 14-17, without explaining *what that means* and *why it is even relevant* under Second Circuit law.  The Defendants apparently fail to address the relevant factors because doing so forecloses their defense.

---

*originally written*—which is patently overbroad. *Cf. Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 92, 86 (1965) (reversing conviction because "we are unable to say that the . . . courts in this case did not judge the petitioner by an unconstitutional construction of the ordinance" as opposed to a court-imposed narrowing construction).

[33] The six factors set forth in *Gollomp* were: "(1) how the entity is referred to in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding upon the state." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (citations and quotations omitted)

1.     **WCC Is a Department of Westchester County, and Therefore Is Not Entitled To Sovereign Immunity**

Bedrock sovereign immunity principles bar WCC's defense.  The Supreme Court has held that the "bar of the Eleventh Amendment" does "not extend to *counties and similar municipal corporations*." *Mt. Healthy v. Doyle*, 429 U.S. 274, 280 (1977).[34]  Here, a review of the Laws of Westchester County unequivocally demonstrates that WCC is a "department of Westchester County." *See id.* § 164.71 (attached as Leitner Aff. Ex. 14) (WCC is a "*county department.*") (emphasis added). In *Feingold v. Hankin*, 269 F. Supp. 2d 268 (S.D.N.Y. 2003), the court held that WCC has "no juridical existence *other than as a department of Westchester County.*" *Id.* at 275 (emphasis added).   Because Westchester County is a "municipal corporation," *see* N.Y. General Municipal Law § 2 (defining "municipal corporation" to include a "county"),[35] WCC is a department *within* a "municipal corporation."[36] This fact forecloses WCC's sovereign immunity defense under Supreme Court precedent. *See Mt. Healthy*, 429 U.S. at 280.

----

[34] *See also Woods*, 466 F.3d at 243 (sovereign immunity "does not extend to a municipal corporation . . . or units of local government, such as . . . counties.")

[35] *See also Dean v. Westchester County P.R.C.*, 309 F. Supp. 2d 587, 589 (S.D.N.Y. 2004).

[36] In contrast to WCC, SUNY is a "corporation created in the state education department," N.Y. Educ. Law § 352(1), which is why the Second Circuit has held that SUNY is entitled to sovereign immunity. *See Dube*, 900 F.2d at 594 (SUNY is "part of the government of the State"). Importantly, WCC is *not* part of the SUNY corporation under the Education Law and New York case law. *See* Education Law §§ 350 (defining the term "community colleges," which are *not* included in the definition of SUNY in Section 352); 352(3) (Section 350 *et seq.* of the N.Y. Education law is attached to the Leitner Affirmation as Exhibit 15.); *see also* Leitner Aff. Ex. 11 at 2-4 (analyzing relation between WCC and SUNY and providing case law). For example, although the Fashion Institute of Technology, North Country Community College, and Schenectady Community College are listed as "community colleges," along with WCC, in the "SUNY Viewbook," *see* Leitner Aff. Ex. 13 at 4 (listing community colleges), New York courts have uniformly held these colleges are *not* "part of SUNY." *See Mostaghim v. Fashion Inst. of Tech.*, 01-cv-8090, 2001 WL 1537544, *3 (S.D.N.Y. Dec. 3, 2001); *Planck v. SUNY Bd. of Trustees*, 795 N.Y.S. 2d 147, 149 (3d Dep't 2005); *Brown v. North Country Community College*, 311 N.Y.S.2d 517, 519 (Sup. Ct. Essex Co. 1970).   Because SUNY community colleges are not part of the SUNY corporation, and hence not "part of the government of the State," district court decisions granting sovereign immunity to SUNY community colleges based on *no analysis* other than a citation to *Dube* are not persuasive, and certainly not controlling. *See Davis v. Stratton*, 575 F.Supp.2d 410, 424 (N.D.N.Y. 2008); *Staskowski v. County of Nassau*, No. 05-cv-5984, 2006 WL 3370699, at *1 (E.D.N.Y. 2006).

Although the Defendants bear the burden of proving sovereign immunity, they have not come forward with *any* facts that would call into question the fact that WCC is a department of Westchester County, or otherwise explain how a county department can invoke the immunity defense.[37]   This omission dooms their Motion.

### 2.    WCC Has Failed to Show it is Entitled to Sovereign Immunity Under the Controlling Second Circuit Factors

Even if the Court were to determine that WCC's status as county department is not dispositive of the question of immunity, the Second Circuit's sovereign immunity factors cannot support a finding of immunity on the record before the Court.   Critically, the "cardinal component," *Gollomp*, 568, F.3d at 366, of the Second Circuit's sovereign immunity analysis is "whether a money judgment against a state instrumentality or official would be *enforceable against the State.*" *Id.* (emphasis added).[38] The Defendants duck the issue by arguing that "one third of the operating costs of WCC are paid by New York." Mot. 15. Their assertion is irrelevant because the "cardinal factor" does not ask whether the State provides funding to WCC, but whether a judgment against WCC would "be paid *directly from the New York State treasury.*" *Gorton v. Gettel*, 554 F.3d 60, 63 (2d Cir. 2009) (emphasis added);[39] *see also* Leitner Aff. Ex. 11 at 4-5. Here, nothing suggests a judgment against WCC would "be paid directly from

---

[37] The Defendants' omission is especially glaring given their assertion that "*WCC is unusual, if not unique,*" in how it was established, securing "additional county sponsorship." Mot. 14 (emphasis added).

[38] As a practical matter, this issue is "dispositive" of the sovereign immunity defense. *See Gorton v. Gettel*, 04-cv-0236, 2007 WL 2154193, *8 n. 4 (S.D.N.Y. June 22, 2007) ("[G]iven the structure of the [Eleventh Amendment] analysis prescribed [by the Second Circuit] in *Woods* it is hard for this Court to imagine any scenario in which this final *Mancuso/Woods* factor [, *i.e.*, whether obligations of the entity are binding on the State,] *would not be dispositive* of the question of Eleventh Amendment immunity.") (emphasis added).

[39] *See also Mt. Healthy*, 429 U.S. at 280 (school board that "receives a significant amount of money from the State" was not entitled to sovereign immunity because it was "more like a county or city than . . .  like an arm of the State"); *see also Gorton*, 554 F.3d at 63 (rejecting the argument that a "judgment would be binding on New York State because it provides [an entity] financial support").

the New York State treasury." *Id.* at 64. Indeed, New York law suggests otherwise.[40]   The
Defendant's failure to address the "cardinal" factor is dispositive of their Motion.[41]

Moreover, additional factors also weigh against WCC's immunity defense.  First, as to
"how the entity is referred to in its documents of origin," *Gollomp*, 568 F.3d at 366 (quotations
omitted), the fact that WCC is a "department of" a "municipal corporation," weighs decisively
against immunity.[42]   Second, with regard to "how the governing members of the entity are
appointed," *Gollump*, 568 F.3d at 366 (quotations omitted), because a *majority* of WCC's Board
of trustees (six of ten) are appointed by the Westchester County Board and the WCC student
body, *see* N.Y. Education Law § 6306(1) (attached as Leitner Aff. Ex. 16), this factor weighs
against immunity.[43]   Third, with regard to "how the entity is funded," *Gollomp*, 568 F.3d at 366

---

[40] *See* N.Y. Education Law § 6304(d)(6) (The "local legislative body or board . . . shall authorize the board of
trustees of the [community] college to elect a treasurer, establish a bank account or accounts in the name of the
college," and "authorize the treasurer to *pay all proper bills and accounts of the college . . . from funds in its
custody*.") (emphasis added) (attached as Leitner Aff. Ex. 16)

[41] In *Kohlhausen v. SUNY Rockland Community College*, 2011 WL 1404934 (S.D.N.Y. 2011), the court misapplied
the factor of "whether a money judgment against [the entity] would be enforceable against the State." *Gollomp*, 568
F.3d at 366. The court incorrectly found that this factor weighed *in favor of sovereign immunity* because "judgments
rendered against the SUNY community college . . . are simply paid out of the community college's operating
budget, to which the state contributes one-third." *Kolhausen*, 2011 WL 1404934 at *7. But this holding is directly
contradicted by Second Circuit precedent, which rejects the proposition that "because some money [of an entity]
may have been derived from state appropriations, a judgment against the [entity] is, in effect, a judgment against the
state." *Woods*, 466 F.3d at 249; *see also Gorton*, 554 F.3d at 63-64.

[42] *See Woods*, 466 F.3d at 244 (because "New York law can fairly be construed to identify boards of education . . .
as '*municipal corporations*,'" the "first *Mancuso* factor" weighed against immunity) (emphasis added).

[43] *See Moche v. City Univ. of New York*, 781 F. Supp. 160, 166 (E.D.N.Y. 1992) (finding that CUNY community
college was not entitled to sovereign immunity, in part, because five out of ten members of the college's board of
trustees "must be appointed by local legislative bodies"); *cf. Walker v. City of Waterbury*, 253 Fed. App'x 58, 61 (2d
Cir. 2007) (summary order) ("That a *majority* of the Board's members are accountable to the statewide electorate—
either directly or through the elected officials who appoint them—strongly indicates that the [Waterbury Financial
Planning and Assistance Board] is state agency rather than an instrumentality of the City.") (emphasis added).  Here,
the fact that "a majority of the [WCC] Board's members are accountable" to a local electorate "strongly indicates"
that WCC is an instrumentality of Westchester County rather than the State. *Id.*

(quotations omitted), the fact that "one third of the operating costs of WCC are paid by New York," Mot. 15, further cuts against sovereign immunity.[44]

Although Professor Leitner believes the facts she has set forth settle the issue of sovereign immunity, even were the Court to determine that the sovereign immunity factors in this case "point in different directions," *Gorton*, 554 F.3d at 63, such a conclusion would not justify a finding that the immunity defense protects the Defendants, but rather leads the Court to a more specific analysis of "the two purposes underlying the Eleventh Amendment—protection against state liability and respect for state sovereignty." *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 296 (2d Cir. 1996). On the limited record before the Court, both purposes weigh against immunity. First, WCC has provided *no* evidence that "a judgment in this case" would "be paid directly from the New York State treasury." *Gorton*, 554 F.3d at 64. Second, "the specific indignity against which sovereign immunity protects is the insult to a State of being haled into court without its consent." *Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1640 (2011). Nothing in the record shows that New York State has been "haled into court" by Professor Leitner's lawsuit.

Thus, the record before the Court does not support a finding of sovereign immunity. To the contrary, on the present record, a majority of the factors, including the "cardinal" factor of state liability, weigh against WCC's sovereign immunity defense.[45]

### 3.   WCC Is Not Entitled to Sovereign Immunity Merely Because It Is Part of the "SUNY System"

Having ignored the Second Circuit's sovereign immunity jurisprudence, the Defendants' entire argument is as follows: (i) SUNY is entitled to sovereign immunity, *Dube*, 900 F.2d at

---

[44] In *Woods*, 466 F.3d at 245, the Second Circuit held that the "funding factor" weighed against sovereign immunity because boards of education received only 39.9% of their funding from the State—*more* than WCC receives.
[45] *See Innis Arden Golf Club v. Pitney Bowes, Inc.*, 514 F. Supp. 2d 328, 337-38 (D. Conn. 2007) (denying sovereign immunity defense because of incomplete and ambiguous record).

594; (ii) WCC is "part of the SUNY system," Mot. 14-17, and therefore (iii) WCC is also entitled to sovereign immunity.   The Defendants' argument fails on its own terms.   But more fundamentally, the argument is based on *one* sovereign immunity factor: the state's "veto power" over the entity asserting immunity. *Gollomp*, 568, F.3d at 366.   Under Second Circuit law, that factor is not dispositive.

First, the argument fails on its own terms because all colleges within a university system do not necessarily have *the same* Eleventh Amendment status. The "CUNY system," for example, "consists of eleven senior colleges and six community colleges which are overseen by CUNY's central administration." *Gengo v. CUNY*, 08-cv-681, 2011 WL 1204716, *2 (E.D.N.Y. Mar. 29, 2011).   CUNY "senior colleges" are entitled to sovereign immunity, *Clissuras v. CUNY*, 359 F.3d 79, 83 (2d Cir. 2004), and the CUNY "central administration" is entitled to sovereign immunity. *Geagan v. CUNY*, 09-cv-271, 2011 WL 3370395, *8 (S.D.N.Y. July 14, 2011).   Nonetheless, district courts have found that CUNY "community colleges" are *not* entitled to sovereign immunity,[46] and, at minimum, that membership in the "CUNY system" does not, in itself, establish sovereign immunity.[47]   Moreover, SUNY and CUNY community colleges operate under a similar statutory framework.[48]

---

[46] *See Geagan,* 2011 WL 3370395, at *8 n. 11; *McKie v. Laguardia Cmty. Coll.*, 04-cv-5555, 2008 WL 4489796, *3 n. 3 (E.D.N.Y. Sept. 30, 2008); *Moche v.CUNY*, 781 F. Supp. 160, 165-66 (E.D.N.Y. 1992).

[47] *Gengo*, 2011 WL 1204716, *3 (describing Eleventh Amendment status of CUNY community colleges as "an open question in this Circuit," but stating that the Second Circuit "has noted in dicta that CUNY community colleges *may not qualify for sovereign immunity* because under state law it appears the City may be responsible for paying any judgments" against them) (emphasis added).

[48] *See United States v. New York,* 700 F. Supp. 2d 186, 189 (N.D.N.Y. 2010) ("CUNY's community colleges are funded under the same system that applies to SUNY's community colleges."); *see also* N.Y. Education Law § 6202(4) (CUNY community colleges, *like SUNY community colleges*, are subject to the framework in Article 126, Section 6301 *et seq*. of the Education Law). Section 6202 of the Education Law is attached as Leitner Aff. Ex. 17.

Second, although the Education Law grants the SUNY trustees a degree of "veto power" over WCC, [49] *see* Mot. 15-16, the Supreme Court has held that the "veto power" factor is not dispositive. *See Hess v. Port Auth.*, 513 U.S. 30, 48 (1994) ("[R]endering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a States treasury.") (emphasis added).   Underscoring the point, the Second Circuit held that a BOCES is not entitled to sovereign immunity even though "the Education Law grants the Commissioner [of the Education Department] *substantial veto power over*" BOCES. *Gorton*, 554 F.3d at 63. (emphasis added).[50]   Thus, the Defendants' "SUNY system" argument does not relieve them of their burden under the Second Circuit's sovereign immunity factors—a burden they have not even tried to meet.

**B.     The Complaint Adequately Alleges Claims for Equitable Relief**

Even if WCC has sovereign immunity, Professor Leitner may seek reinstatement.[51]   The case of *Dube v. SUNY*, 900 F.2d 587 (2d Cir. 1990), which the Defendants use to argue that WCC is entitled to sovereign immunity, *Dube v. SUNY*, 900 F.2d 587 (2d Cir. 1990), but which they *fail to cite* in their argument regarding reinstatement, Mot. 18-20, squarely holds that a

---

[49] Notwithstanding this veto power, the Education Law makes clear that the "relationship between SUNY and each of the state's community colleges" is "attenuated." *Mostaghim v. Fashion Inst. of Tech.*, 01-cv-8090, 2001 WL 1537544, *2 (S.D.N.Y. Dec. 3, 2001).  "SUNY oversees the adoption of policies and procedures," but "it is [WCC's] own board of trustees and the administration of the president it appoints who implement procedures and operates the community college." *Id.*  The Defendants have not come forward with evidence showing otherwise.

[50] Tellingly, the State's control over BOCES is nearly indistinguishable from the SUNY trustees' control over WCC. The New York Commissioner of Education must approve: (i) the creation of a BOCES; (ii) the appointment of a BOCES CEO; (iii) the content of BOCES' programs and services; and (iv) various aspects of BOCES' budget.  *See Gorton v. Gettel*, 04-cv-0236, 2007 WL 2154193, at *7 (S.D.N.Y. June 22, 2007); *compare* Mot. 14-16 (describing SUNY's control over WCC).

[51] Additionally, Professor Leitner's equitable claims for the correction of her employment record, which the Defendants do not address, are not barred by sovereign immunity. *See Malkan*, 2012 WL 4722688, at *8 ("Clearing plaintiff Malkan's personnel file of references to an unlawful termination would be directed toward preventing future violations of the plaintiff's federal civil rights. It therefore is prospective relief . . . and is not barred by the Eleventh Amendment.").

college professor may bring a claim for reinstatement *even when the college is entitled to sovereign immunity. See id.* at 589, 594-95 (affirming order that professor could pursue "prospective relief for reinstatement"). Thus, Second Circuit precedent establishes that "claims for reinstatement to previous employment" are not barred by sovereign immunity. *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 96 (2nd Cir. 2007) (emphasis added).[52]   Under these cases, the injury caused by Professor Leitner's termination is "both (1) ongoing and (2) potentially curable by" by reinstatement.[53] *Id.* at 97.

## CONCLUSION

Professor Leitner's claims are supported by ample factual allegations and supporting case law. Accordingly, the Defendants' Motion should be denied in its entirety.

Dated: New York, New York
     December 7, 2012

MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO
& BOHRER P.C.

By: _____
Catherine M. Foti
Curtis B. Leitner
Attorneys for Plaintiff Carol Leitner
565 Fifth Avenue
New York, NY 10017

---

[52] *See also Dotson v. Griesa*, 398 F.3d 156, 178-79 (2d Cir. 2005); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985). Numerous district court cases have reached the same result in cases involving *university professors. See Malkan v. Mutua*, 12-cv-236, 2012 WL 4722688, *7 (W.D.N.Y. Oct. 3, 2012) (plaintiff's "claim for reinstatement to the position of Clinical Professor is therefore not barred by the Eleventh Amendment"); *Rehman v. State Univ. of New York at Stony Brook*, 596 F. Supp. 2d 643, 655 (E.D.N.Y. 2009) (same); *Kulkarni v.CUNY*, 01-cv-3019, 2001 WL 1415200, at *6 (S.D.N.Y. Nov. 13, 2001) (same regarding equitable claim for appointment to a senior position).

[53] The Individual Defendants fail to acknowledge, let alone explain, *any* of the above case law. Instead, they cherry pick a case that held, with no explanation, that a professor's claim for reinstatement did not allege an "ongoing" violation of law because "her employment with CUNY ha[d] ended." *Ya-Chen Chen v. The City University of New York*, No. 11-cv- 0320, 2011 WL 5419792, *9 (S.D.N.Y. Nov. 9, 2011). *Ya-Chen Chen*, however, does not cite— and is contradicted by—controlling Second Circuit law. This Court should not follow *Ya-Chen Chen* and follow binding Second Circuit precedent.