UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

CAROL LEITNER,

                         Plaintiff,

            -against-                                    12-CV-3778 (CS PED)

WESTCHESTER COMMUNITY COLLEGE, JOSEPH
HANKIN, in his personal and official capacity as President
of Westchester Community College, CHET ROGALSKI,
in his personal and official capacity as Dean and Vice
President of Academic Affairs, JIANPING WANG, in her
personal and official capacity as Associate Dean of the Arts
and Humanities, GABRIELLE MILLER, in her personal
and official capacity as Curricular Chairperson of the
Communications and Media Arts Department, and the
WESTCHESTER COMMUNITY COLLEGE
FEDERATION OF TEACHERS LOCAL #2431,

                         Defendants.

------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## UNION DEFENDANT'S MOTION TO DISMISS

RICHARD E. CASAGRANDE
Attorney for Union Defendant
Office & P.O. Address
52 Broadway - 9th Floor
New York, NY 10004
(212) 533-6300

CHRISTOPHER M. CALLAGY, Of Counsel

NYCLegal:157312

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE FIRST AMENDED COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

APPLICABLE STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT I
    PLAINTIFF'S DFR CLAIM IS BARRED BY THE STATUTE OF
    LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT II
    THE FAILURE TO ALLEGE THAT EACH AND EVERY MEMBER OF
    THE UNION AUTHORIZED THE ALLEGED UNLAWFUL ACTS BY
    THE UNION REQUIRES  THAT THIS CASE BE DISMISSED . . . . . . . 10

POINT III
    PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES  13

POINT IV
    THE FAC DOES NOT STATE A CLAIM FOR BREACH OF DFR  . . . . 14

        1.    Plaintiffs Cannot Establish That the Union
            Breached its Duty of Fair Representation  . . . . . . . . . . . . . . . 14

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

*A. Terzi Productions v. Theatrical Protective Union, 2 F.Supp.2d 485 (S.D.N.Y. 1998)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

*Albino v. City of New York, 80 A.D.2d 261, 438 N.Y.S. 2d 587 (2d Dept. 1981)   10*

*Alston v. Transport Workers Union of Greater N.Y., 225 A.D.2d 242, 639N.Y.S.2d 359(1st Dept. 1996)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009)* . . . . . . . . . . . . . . . *5*

*Butler v. McCarty, 306 A.D. 2d 607, 762 N.Y.S.2d 129 (3ʳᵈ Dept. 2003)* . . . . . . . *9*

*Duane Reade v. Local 388 Retail, Wholesale, Dept. Store Union,17 A.D.3d 277, 794 N.Y.S. 2d 25 (1ˢᵗ Dept 2005)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*

*Fink v. Time Warner Cable, _ F.3d _, 2013 WL 1859141(C.A.2(N.Y.))* . . . . . . . 5

*Hickey v. Hempstead Union Free School District, 36 A.D. 3d 760, 761, 829 N.Y.S. 2d 163 (2d Dept. 2007)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jacobs v. Board of Education of East Meadow Union Free School District, 64 A.D. 2d 148, 409 N.Y.S.2d 234, 237 (2d Dept. 1978)* . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*L-7 Designs, Inc. V. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011)* . . . . . . . . 5

*Lewis v. Klepak, 65 A.D.2d 637, 409 N.Y.S.2d 268 (3d Dept. 1978)* . . . . . . . . . . 9

*Lundren v. Kaufman Astoria Studios, Inc., 261 A.D. 2d 513, 514, 690 N.Y.S. 2d 609 (2d Dept. 1999)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Martin v. Curran, 303 N.Y. 276 (1951)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Matter of Civil Serv. Bar Assn. v. City of New York, 64 N.Y. 2d 188, 485 N.Y.S. 2d 227(1984)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Mounteer v. Baily, 86 A.D.2d 942, 448 N.Y.S. 2d 582 (3d Dept. 1982)* . . . . . . . . 9

*Mullen v. Bevona*, 1999 U.S.Dist. Lexis 16434 (S.D.N.Y. 1994) . . . . . . . . . . . . 10

*Roth v. UFT*, 5 Misc.3d 888 (Sup. Ct. Kings Co. 2004) . . . . . . . . . . . . . . . . . . . . . 8

*Saint v. Pope,* 12 A.D.2d 168, 211 N.Y.S. 2d 9 (4th Dept. 1961) . . . . . . . . . . . . 9

*Salemeh v. Toussaint*, 25 A.D.3d 411, 810 N.Y.S. 2d 1 (1st Dept. 2006) . . . . . . . 8

*United Steel Workers v. Rawson*, 495 U.S. 362, 372 (1990) . . . . . . . . . . . . . . . 10

*Walsh v. Torres-Lynch,* 266 A.D.2d 817 , 697 N.Y.S. 2d 434 (4th Dept. 1999) . . 8

## PRELIMINARY STATEMENT

Defendant Westchester Community College Federation of Teachers ("WCCFT" or "union") respectfully submits this memorandum in support of its motion to dismiss the First Amended Complaint ("FAC") dated March 6, 2013. As discussed below, the FAC should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because plaintiff fails to state a claim since the sparse facts alleged do not show that WCCFT breached its duty of fair representation to plaintiff, but rather reveal WCCFT's fulfillment of its duty to plaintiff at all relevant times and through the moment plaintiff decided not to proceed to arbitration in light of potentially negative collateral consequences to any future federal claim against defendant Westchester Community College. Moreover, plaintiff's claim is untimely and fails to allege endorsement by all the individual members comprising WCCFT of any actions taken by WCCFT at issue herein.

## THE FIRST AMENDED COMPLAINT

Essentially, plaintiff asserts that WCCFT breached its state law duty of fair representation to plaintiff by offering her only a token defense because the union and the college were in cahoots. Indeed, although plaintiff alleges that WCCFT assured the administration of only putting up a token defense on plaintiff's part, the FAC is bereft of a single fact establishing any such communication. See FAC at ¶9.

While the FAC does not allege any facts in support of plaintiff's allegation of token defense, it does make clear that plaintiff, in fact, met with her union representatives to discuss employment concerns relating to a student complaint. FAC at ¶55. Ordinarily, meeting with one's union representatives is a sign of fulfilling a duty of fair representation rather than breaching it.

Notwithstanding the actual support plaintiff received from her union, she alleges at ¶¶58-61 of the FAC that WCCFT - through the agency of then President Anne D'Orazio - advised the employer unlawfully and in contravention of its duty to plaintiff regarding the employer's stated intention to seek further discipline against plaintiff. This assertion rests on the spurious notion that conversations between union officials and administration officials within the context of potentially adverse employment action against a union member is somehow unusual or *per se* evidence of corruption.

Plaintiff further asserts that since plaintiff had not been informed by President D'Orazio that the union may have been shown a draft of a disciplinary letter subsequently delivered to plaintiff the logical inference is that the WCCFT breached its duty to her. Plaintiff, however, fails to allege a single fact that would support even a putative right to know such things prior to receiving a disciplinary letter. In any event, the FAC does make clear that plaintiff was assisted by WCCFT in her ongoing difficulties with her employer at all relevant times.

Incredibly, plaintiff asserts at ¶60 of the FAC that a supposed revision to a disciplinary letter "suggests" that it was the WCCFT who put the idea into the employer's impressionable mind. Even a suggestion requires more than nakedly self-serving assertions.

Straining further to find support of plaintiff's baseless claim, she alleges at ¶62 of the FAC that "apparently Professor D'Orazio" was offended by plaintiff's alleged in-class remarks surrounding an allegedly controversial political poem. This groundless allegation masquerading as a well-pleaded fact simply emphasizes plaintiff's own recognition that her claim lacks a basis in fact.

At ¶66 of the FAC, plaintiff attempts to turn an administrator's purported account of a conversation with President D'Orazio into evidence of breach by asserting that President D'Orazio's conveyance to the employer that the union,

3

indeed, would defend against the employer's disciplinary claims against plaintiff amounts to proof of bad faith. Plaintiff fails to allege, however, a single fact in support of the assertion that WCCFT did not defend plaintiff.

At ¶67 of the FAC, plaintiff asserts without facts that President D'Orazio intentionally did not disclose these "off the record" conversations.

At ¶69 of the FAC, plaintiff asserts without any offer of proof that President D'Orazio's representation of plaintiff resulted in a step three disciplinary hearing.

On February 26, 2013, in open Court, plaintiff's counsel acknowledged that plaintiff specifically decided not to pursue her disciplinary hearing through to arbitration:

> What she decided not to do was subsequently pursue, appeal that to arbitration.

Transcript of Argument Re Plaintiff's Motion to Amend Complaint, p. 4., a copy of which is annexed hereto as Addendum A.

At ¶76 of the FAC, plaintiff acknowledges the union's continued advocacy on her behalf by admitting that WCCFT officials specifically challenged the employer's approach to student complaints to ensure compliance with an earlier arbitration decision governing such matters. This simply cannot be construed as a breach of a duty of fair representation even assuming the truth of the assertions for purposes of

a motion to dismiss.

Indeed, at ¶78 of the FAC, plaintiff is forced to acknowledge that WCCFT submitted support for plaintiff's defense in writing to the administration. Plaintiff characterizes this submission as "perfunctory" notwithstanding its own earlier admission that plaintiff was in consultation with the union about her defense for a long period of time. Surely, plaintiff could have raised an objection then - or soon thereafter - had she any genuine or legitimate complaints about the representation she received from WCCFT at the time of her disciplinary hearings.

## APPLICABLE STANDARD

A complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face in order to survive a motion to dismiss.

*Fink v. Time Warner Cable*, __ F.3d __, 2013 WL 1859141 (C.A.2 (N.Y.)); *see also*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009).  A claim is deemed to

possess facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the alleged

misconduct.  *Id.*

The standard, however, requires more than a "sheer possibility that a defendant

has acted unlawfully."  *Ibid.*  Among other factors, any analysis of the plausibility of

a claim must consider the full factual picture presented by plaintiff, the particular

elements of the alleged cause of action, and the existence of alternative explanations

so obvious that plaintiff's inferences are rendered unreasonable.  *See L-7 Designs,*

*Inc. V. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011).

Here, plaintiff's conspiracy claims are easily resolved into implausibility once

the possibility of lawful motivation on behalf of WCCFT is considered.  All facts tend

to show the unreasonableness of plaintiff's scenario, most clearly revealed in the

union's willingness to pursue her claim all the way to arbitration.  Indeed, it is

difficult to imagine what could have possessed the union to seek arbitration on

plaintiff's behalf save its duty to fairly represent her in her longstanding dispute with

the employer.

7

## ARGUMENT

## POINT I

## PLAINTIFF'S DFR CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

Plaintiffs' DFR claim is time-barred.  New York Civil Practice Law and Rules

("CPLR") Section 217(2)(a) provides for a four month statute of limitations for DFR

claims:

> [A]ny action or proceeding against an employee
> organization subject to article fourteen of the civil service
> law or article twenty of the labor law which complains that
> such employee organization has breached its duty of fair
> representation regarding someone to whom such employee
> organization has a duty shall be commenced within four
> months of the date the employee or former employee knew
> or should have known that the breach has occurred, or
> within four months of the date the employee or former
> employee suffers actual harm, whichever is later.

The four month statute of limitations begins to run on the later of (1) the date

the aggrieved employee knows or should have known of the breach, or (2) the date

the employee suffered actual harm.  *See Alston v. Transport Workers Union of*

*Greater N.Y.*, 225 A.D.2d 242, 639 N.Y.S.2d 359 (1st Dept. 1996).

As set forth in the FAC, the timing of any actions taken by the union or which

could even remotely be construed as "arbitrary, discriminatory or [made in] bad

faith", *see Matter of Civil Serv. Bar Assn. v. City of New York*, 64 N.Y. 2d 188, 485 N.Y.S. 2d 227 (1984), occurred long before the four months preceding service of the FAC upon WCCFT.

Even assuming the facts as alleged on the face of the FAC, plaintiff was or should have been aware of the alleged facts giving rise to a claim of breach in and around the time of her step three hearing with the employer. It is beyond cavil that plaintiff did not assert a breach of the WCCFT's duty to fairly represent her until years after the fact. Recall that the employer's step three decision was issued on or about June 14, 2011.

Plaintiff now claims that it was only within the purview of the limited discovery already undertaken in this case that she has come to learn of the union's breach. This is patently ridiculous since plaintiff did not raise in her pleadings the slightest disagreement with the representation provided to her throughout the disciplinary process.

Plaintiff is simply seeking to hurl another claim against the wall of implausibility in hopes that something might stick. Claims fall upon such unreasonable hopes.

There simply is no question but that whatever claim plaintiff may have had matured four months beyond the step three hearing way back in June, 2011.

## POINT II

## THE FAILURE TO ALLEGE THAT EACH AND EVERY MEMBER OF THE UNION AUTHORIZED THE ALLEGED UNLAWFUL ACTS BY THE UNION REQUIRES THAT THIS CASE BE DISMISSED

The WCCFT is an unincorporated labor organization. To the extent the FAC asserts DFR causes of action against the WCCFT, they must be dismissed because the alleged conduct was not authorized or ratified by "each and every member" of the union as required by New York law.

This well-established principle is based on the decision of the New York Court of Appeals in *Martin v. Curran*, 303 N.Y. 276 (1951). *Martin* involved a libel suit against the National Maritime Union of America. The Court upheld the dismissal of the complaint in the action for failure to allege that each and every member of union ratified the conduct at issue.

As the Court of Appeals stated in *Martin*:

> So, for better or worse, wisely or otherwise, the Legislature has limited such suits against association officers, whether for breaches of agreements or for tortuous wrongs, to cases where the individual liability of every single member can be alleged and proven. Despite procedural changes, substantive liability in such cases is still, as it was at common law, "that of the members severally ...' In the kind of association now under consideration, only those members are liable who expressly or impliedly with full knowledge authorize or ratify the specific acts in question.

*Id.* at 282.

*Martin* has been repeatedly relied on by labor unions and other unincorporated associations to dismiss claims, and its continued vitality has been acknowledged again and again by various courts in this state. *See, e.g., Salemeh v. Toussaint*, 25 A.D.3d 411, 810 N.Y.S. 2d 1 (1st Dept. 2006); *Duane Reade v. Local 388 Retail, Wholesale, Dept. Store Union,* 17 A.D.3d 277, 794 N.Y.S. 2d 25 (1st Dept 2005), *lv. to appeal dismissed in part, appeal denied in part*, 5 N.Y.3d 707 (2005); *Walsh v. Torres-Lynch,* 266 A.D.2d 817 , 697 N.Y.S. 2d 434 (4th Dept. 1999)(duty of fair representation); *Roth v. UFT*, 5 Misc.3d 888 (Sup. Ct. Kings Co. 2004); *A. Terzi Productions v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998) (applying New York law dismissing multiple claims against union).

Indeed, cases have recently been dismissed against the United Federation of Teachers ("UFT"), a teachers' union, due to the failure to allege and prove that 100% of the membership approved the acts in question. *Roth v. UFT, supra.* In particular, duty of fair representation claims have been dismissed against the UFT, as well as other unions due to the failure to comply with the requirements of *Martin v. Curran, supra*.

Thus, in *Walsh v. Torres-Lynch, supra.*   The Appellate Division, Fourth Department  dismissed a duty of fair representation claim against a teachers union, reasoning that:

> The failure to allege that the individual members of the union authorized or ratified the complained of conduct renders the amended complaint fatally defective as against the union.

*See also, Butler v. McCarty*, 306 A.D. 2d 607, 762 N.Y.S.2d 129 (3rd Dept. 2003)(dismissing duty of fair representation case against the union due to the failure to comply with *Martin v. Curran*); *Saint v. Pope,* 12 A.D.2d 168, 211 N.Y.S. 2d 9 (4th Dept. 1961) (same); *accord, Mounteer v. Baily*, 86 A.D.2d 942, 448 N.Y.S. 2d 582 (3d Dept. 1982)(describing *Martin v. Curran* as long settled in New York and dismissing case against union).

Plaintiffs have not, and indeed cannot, allege and prove that 100% of the WCCFT's membership ratified and approved the conduct they complain of. Accordingly, the DFR claim should be dismissed on these grounds as well.

## POINT III

## PLAINTIFF FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

Plaintiff has admitted that she abandoned her arbitration in favor of other pursuits most notably the instant lawsuit. *See* Transcript of Argument Re Plaintiff's Motion to Amend Complaint, p. 4., a copy of which is annexed hereto as Addendum A.

The law on this issue is gravely clear: an employee may not maintain a state law fair representation claim against her union without first exhausting the remedies available under contract. *See Lewis v. Klepak*, 65 A.D.2d 637, 409 N.Y.S.2d 268 (3d Dept. 1978).

Since plaintiff chose to short circuit the contractual remedies available to her at arbitration, she should not now be permitted to seek to hold liable the very union that was amenable to advancing her claim at arbitration but for her intervening request that it not do so.

## POINT IV

## THE FAC DOES NOT STATE A CLAIM FOR BREACH OF DFR

### 1.     Plaintiffs Cannot Establish That the Union Breached its Duty of Fair Representation

It is well established that mere errors in judgment or disagreements over approach to conflict resolution in a labor relations context do not constitute a breach of the duty of fair representation, *Albino v. City of New York,* 80 A.D.2d 261, 438 N.Y.S. 2d 587 (2d Dept. 1981), since the union management is not required to be infallible.  "In order to establish a breach of the duty of fair representation, it is necessary to show that the union's conduct was arbitrary, discriminatory, or in bad faith." *Hickey v. Hempstead Union Free School District*, 36 A.D. 3d 760, 761, 829 N.Y.S. 2d 163 (2d Dept. 2007), *quoting, Lundren v. Kaufman Astoria Studios, Inc.*, 261 A.D. 2d 513, 514, 690 N.Y.S. 2d 609 (2d Dept. 1999); *Ponticello, supra,* 225 A.D. 2d at 751.

The court may also not become involved in second-guessing the union's decisions to proceed or not proceed on a member's behalf, so long as such determinations are made in good faith.  *Jacobs v. Board of Education of East Meadow Union Free School District*, 64 A.D. 2d 148, 409 N.Y.S.2d 234, 237 (2d Dept. 1978), *appeal dismissed*, 46 N.Y.2d 1075 (1979).

Thus, mere negligence or fears about what might have been said in of the record conversations are insufficient to state a cause of action for breach of the duty of fair representation. *United Steel Workers v. Rawson*, 495 U.S. 362, 372 (1990); *Mullen v. Bevona*, 1999 U.S.Dist. Lexis 16434 (S.D.N.Y. 1994).

None of the actions WCCFT took on plaintiff's behalf could even remotely be construed to be "arbitrary or discriminatory" or to have been made in "bad faith." WCCFT made informed decisions, base on consultation with plaintiff, that resulted in representation and full argument at the step three hearing, as well as a willingness to proceed to arbitration.

Even if this Court were to credit plaintiff's allegation that WCCFT was only willing to defend the contract and not the personality or acts of plaintiff, it would still have to acknowledge that it was plaintiff herself who chose to prevent the WCCFT from a possible victory at arbitration which would have resulted in the relief sought by plaintiff in the first place.

In addition, plaintiff has failed to demonstrate how the actions taken by the union reveal that she was somehow treated differently by it as compared to other members.

Hence, the DFR claim should be dismissed on these grounds too.

15

## CONCLUSION

For the foregoing reasons, Defendant WCCFT respectfully requests that his

Motion to Dismiss the First Amended Complaint be granted in its entirety, along with

such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            May 24, 2013

                        RICHARD E. CASAGRANDE
                        Attorney for Defendant WCCFT
                        Office & P.O. Address
                        52 Broadway, 9th Floor
                        New York, New York 10004
                        (212) 533-6300

            By:         _____
                        CHRISTOPHER M. CALLAGY (CC5115)
                            Of Counsel

# EXHIBIT A

1

D2qileic ag                    MOTION

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAROL LEITNER,

4              Plaintiff,

5         v.                          12 Civ. 3778 CS

6   WESTCHESTER COMMUNITY COLLEGE,
    et al.,
7
               Defendants.
8
    ------------------------------x
9
                              White Plains, N.Y.
10                            February 26, 2013
                              3:35 p.m.
11
    Before:
12
                   HON. CATHY SEIBEL,
13
                              District Judge
14
                       APPEARANCES
15  MORVILLO, ABRAMOWITZ, GRAN, IASON, ANELLO & BOHRER
         Attorney for Plaintiff
16  CATHERINE FOTI
    CURTIS BRETT LEITNER
17
    GAINES, GRUNER, PONZINI & NOVICK
18       Attorney for Defendants
    DENISE M. COSSU
19  JOHN MARTIN MURTAGH, JR.

20  ALSO PRESENT: CHRISTOPHER CALLAGY

21
                       MOTION
22

23

24

25

D2qileic ag              MOTION

1        THE COURTROOM DEPUTY:  Carol Leitner v. Westchester

2   Community College.

3        THE COURT:  Good afternoon Mr. Leitner, Ms Foti,

4   Ms Cossu and Mr. Murtagh.  And I guess in the back we have

5   Mr. Callagy from the union.

6        I have Mr. Leitner's letter dated January 29 regarding

7   plaintiff's desire to amend and I have Ms Cossu's February 19th

8   letter in opposition.  And I guess there are two arguments.

9   One, which is perhaps not Ms Cossu and Mr. Murtagh's to make,

10  which is the claim of breach of duty of fair representation and

11  whether that is within the statute of limitations or not.

12  Mr. Callagy, I don't know if you want to be heard?

13       MR. CALLAGY:  Well, your Honor, obviously the record

14  before you doesn't contain any notice of appearance from the

15  union.  But I don't think plaintiff's counsel would dispute

16  that whatever harm they complain of occurred long ago and they

17  had reason to believe if they ever felt aggrieved they were

18  armed way back then, well outside the four-month statute of

19  limitations.  And I think having reviewed what's attached to

20  plaintiff's counsel letter, even the e-mails they attach do not

21  on their face, even if you accept them as you would at this

22  stage, they do not on their face make out any breach of that

23  duty.

24       THE COURT:  I'm not sure I agree with that.  I mean I

25  don't know that they on their face make out anything.  The

D2qileic ag                    MOTION

1    question is whether they make a breach of duty plausible.  And

2    of course I lack the full context.  But it did seem to me that

3    at the very least that somebody at the union was helping

4    somebody at the college draft a letter that was going to be

5    given to Mr. Leitner and that somebody at the union said to

6    somebody at the college, off the record but she said it,

7    that -- made remarks suggesting that the union was going to

8    have to grieve Ms Leitner's dismissal so that Ms Leitner

9    wouldn't sue the union, but that the union's heart was not in

10   it because they understood that Ms Leitner had some big

11   problems.

12            That in the long run is very harmful to Mr. Leitner's

13   case against the college, but it sounds like a sufficiently

14   plausible claim.  Of course I would have to see the complaint

15   itself, but to me, it seems to me that would be the basis for

16   drafting a plausible claim.

17            And with respect to the statute of limitations, it

18   seems to me that what the plaintiff knew a long time ago was

19   that she lost, but I don't know that she would have had a basis

20   to say that the union's heart wasn't in it before she got these

21   documents in 2012.

22            MR. CALLAGY:  If I may, I don't think plaintiff's

23   counsel would dispute, there's a reason the case challenging

24   termination of Professor Leitner did not go forward for

25   arbitration, and that is at the request of Professor Leitner,

D2qileic ag                MOTION

1    the demand for arbitration was withdrawn.  It would be perverse

2    in the extreme after extensive discussions with Professor

3    Leitner a long time ago where she requested that the

4    arbitration demand be withdrawn because of a federal lawsuit

5    that they might file or had filed against the college to now

6    say that because they didn't go forward to arbitration is a

7    basis for bringing the union in.

8            THE COURT:  Now I'm realizing something I didn't

9    realize.  So the matter in which, according to the

10   off-the-record discussion, the union was kind of just going to

11   go through the motions never came to pass?

12           MR. CALLAGY:  It did not go to arbitration because

13   plaintiff, as I am informed anyway, asked that it not.

14           MR. LEITNER:  If I may, the matter that went forward

15   was a step three hearing which did go forward.  The union was

16   representing Professor Leitner at a step three hearing that was

17   to decide whether or not she should be terminated and she lost

18   at that hearing.  What she decided not to do was subsequently

19   pursue, appeal that to arbitration.  That's what she decided

20   not to do.  Had she prevailed at the step three hearing she'd

21   still be teaching here today.

22           THE COURT:  I'm going to allow the amendment with

23   respect to the union.  And if you, when you get the complaint,

24   think you have a motion to dismiss you can make you can let me

25   know.  It seems to me you are probably more likely to prevail

D2qileic ag                    MOTION

1   at summary judgment if you're going to prevail but I won't

2   predict that.

3           Let me ask a question though, Mr. Leitner.  Isn't the

4   union allowed to say, you know what, we think the employer is

5   justified in firing this person?

6           MR. LEITNER:  The union is allowed to decline to go to

7   arbitration but that's not the basis of our claim.  Professor

8   Leitner's claim was that the union acted in bad faith by

9   leading her in thinking that it was fighting for her interests

10  when actually it was going behind her back and encouraging the

11  administration to act against her.

12          THE COURT:  You can make that argument, if you like.

13  That's just going to strengthen the college's argument that

14  that's why they fired Professor Leitner.  I can hear the

15  argument now.  Even our own union thought she was a nightmare.

16  But that doesn't mean that there isn't a DFR claim again the

17  union.  I'm going to allow that on the theory that discovery of

18  the breach was November 2012.  Of course, if as things develop

19  it turns out that the plaintiff knew or should have known of

20  the claim sooner, then it may be addressed on summary judgment.

21          Now, the other claim is against the college for

22  breaching the CBA.  And I understand why these kinds of claims

23  are brought; I can't say I completely get them.  How is it a

24  breach of the CBA for the college to have stood by while the

25  union breached its duty of fair representation?

D2qileic ag                    MOTION

1    MR. LEITNER:  The claim isn't that the college stood

2    by.  The claim is that the union breached the CBA by violating

3    the academic freedom provision.  The claim is that the college

4    breached the CBA, not the union.

5    THE COURT:  The theory is the college in its CBA says

6    what?  That you have academic freedom and therefore when they

7    fired her based on what she said in class, that was a breach of

8    the CBA?

9    MR. LEITNER:  Yes, when they restricted what she could

10   say in class.

11   THE COURT:  Doesn't the CBA itself say that her

12   freedom is limited in that she has no privilege to discuss in

13   her classroom controversial matters which have no relation to

14   his or her subject?

15   MR. LEITNER:  It does.  Professor Leitner's speech

16   wasn't made in the context of a political discussion about a

17   political poem.  It's frequent in her class to talk about the

18   subject that is the topic of the student's presentation.  That

19   would be like saying in an abortion debate, which she

20   frequently had in her class, she wouldn't be allowed to make a

21   statement that's controversial.

22   THE COURT:  She's a speech teacher, not a politics

23   teacher.  If the kids misspelled abortion and you went off on

24   the pros and cons of abortion, I would think that that would

25   not be covered by this provision in the CBA.  So we may have

D2qileic ag                MOTION

1    some interesting debate later on about whether in a speech
2    class, the politics, how closely related to her subject the
3    politics may be.  And I express no view on that.

4         What about the defendant's argument that you haven't
5    filed a notice of claim which the Education Law requires.

6         MR. LEITNER:  They cite a provision that only applies
7    to school districts, boards of education, BOCES and related
8    officials.  It does not apply to community colleges.  So we
9    think it has no application.  In fact, WCC is part of
10   Westchester County under the law and there's a different notice
11   of claim provision that applies to counties, except that notice
12   of claim provision doesn't apply to contract claims, it only
13   applies to torts, which we believe is why the defendants have
14   tried to shoehorn their position to it's a wrong notice of
15   claims statute.

16        THE COURT:  What about that, Ms Cossu?

17        MS. COSSU:  Well, I don't have the Education Law in
18   front of me at the moment, your Honor, but I think that the
19   provision of the notice of claim, and I'd be happy to address
20   it in a dismissal motion, but I do believe that the provision
21   of the notice of claim in the Education Law would require that
22   the notice of claim have been filed with respect to this
23   matter.  I don't agree with Mr. Leitner on that.

24        THE COURT:  I'll to the same thing.  I'll allow the
25   amendment and you can let me know if you think you have a basis

D2qileic ag          MOTION

1   to move to dismiss.

2         There's also a motion to dismiss pending, and

3   Ms Cossu's letter suggests that the proposed amended complaint

4   makes changes beyond those necessary to bring the new claims,

5   but also changes some things with respect to the previous

6   claims.  Is that accurate, Mr. Leitner?

7         MR. LEITNER:  What it changes is a factual inaccuracy

8   that was in the complaint that was actually brought to our

9   attention by defense counsel.  We had alleged in the complaint

10  that a certain student incident occurred in 2004 and we were

11  corrected that it actually occurred in 1991, the incident where

12  Professor Leitner said to a student that he had large lips and

13  that may have contributed to the speech issue.

14        What we did is, the truth of the matter is that that

15  complaint happened in 1991.  So we took it out of the complaint

16  and described what actually did happen in 2004.

17        MS. COSSU:  Your Honor, I received a proposed redlined

18  amended complaint over the weekend before my letter to you was

19  due.  I wasn't about to engage in a line-by-line.  I saw that

20  that particular allegation had been changed.  It was removed.

21  My assumption is that the allegations that were contained in

22  that original complaint that was somewhat, that were discussed

23  in the original motion to dismiss, that many of them had been

24  changed.  And I would just propose to you that at this juncture

25  that Mr. Leitner should not be permitted to change those

D2qileic ag              MOTION

1  allegations.  It may possibly change the Court's determination.

2  It would certainly change my discussion of what the allegations

3  of the complaint were in making my motion to dismiss.

4        THE COURT:  If all he did is correct one --

5        MS. COSSU:  It's not a correction, your Honor.  It's a

6  withdrawal of certain factual allegations.

7        THE COURT:  Isn't that what you want?

8        MS. COSSU:  I would like the whole complaint to be

9  dismissed, your Honor.

10        THE COURT:  You're inching your way there.  What's

11  wrong with fixing a mistake?

12        MS. COSSU:  But I'm being put in a position where the

13  proposed amendments were very circumscribed.  They had to do

14  with Professor Leitner making an allegation of failure to

15  represent, and then an allegation which, if you can establish

16  the failure to represent, then you can come after the college

17  on the breach of contract claim.  You must have the precedent

18  of a failure to represent before the college has any liability

19  in that.  And I don't think that Mr. Leitner would disagree

20  with me on that discussion or representation as to what the law

21  is.

22        So my letter to you, your Honor, was solely on that I

23  wanted to bring to the Court's attention that there was some

24  other issues in this proposed amended complaint that

25  Mr. Leitner submitted to us for our review.  But basically I

D2qileic ag                 MOTION

1    did not engage in that type of an analysis looking at the

2    redline.  I only addressed the issues that were presented as

3    what would be necessary to amend the complaint to add these two

4    additional claims.

5                THE COURT:  So why don't we do this.  And this is

6    somewhat selfish on my part, but the motion was filed last

7    month and you bundled, so it was fully submitted last month.

8    What I would propose to do is set a schedule for the filing of

9    the amended complaint.  I'll deny the pending motions without

10   prejudice to renewal and then it will be up to the defendants

11   who can either tell me you want to submit a whole new motion or

12   if you only want to move against the new part of the complaint

13   and you want to rely on your previously filed papers as to the

14   old part you can to that.  If you think there are changes

15   between the old part and the new part such that you want to

16   resubmit the whole thing, that's fine.  I don't want to kill

17   trees and I don't want you to have to repeat your work.  If it

18   turns out that everything you said in the first motion remains

19   viable and you just want me to rely on your previous set of

20   motion papers supplemented by whatever motion you want to make

21   against the new claims, I'll do that.  Or if you want to make a

22   whole new motion that's fine with me too.  If you want to give

23   me a new brief but with old declaration since it has all the

24   attachments, whatever, I want to make it easy for you.  I don't

25   want to turn to this motion and then three months from now when

11

D2qileic ag                    MOTION

1   the new motion is fully submitted turn to it separately.  And I

2   don't want to sit on this one while the other one is being

3   briefed.

4          When can you file your, is it going to be your first

5   amended complaint or your second?

6          MR. LEITNER:  Our first amended complaint.

7          THE COURT:  How long do you need?

8          MR. LEITNER:  We'd like to file it a couple of days

9   before March 9th.  That's the day we receive the discovery

10  that's at issue in the statute of limitations argument.

11         THE COURT:  March 7th, that's --

12         MR. LEITNER:  March 6th.

13         THE COURT:  That's a week from tomorrow.  How long

14  after that would you, Mr. Callagy, and you, Ms Cossu, like for

15  your motions to dismiss the first amended complaint?

16         MS. COSSU:  30 days, your Honor.

17         THE COURT:  Okay.  April 5th.  And Mr. Leitner, how

18  long for your opposition?  Do you want the same thing?

19         MR. LEITNER:  Okay.

20         THE COURT:  That will be May 6th.  And reply May 20th.

21         MS. COSSU:  My esteemed colleague advises me that that

22  April 5th date is a holiday.

23         MR. MURTAGH:  Just about a week after Easter and

24  Passover, your Honor.

25         THE COURT:  April 19th.  I have so many motions that

D2qileic ag                    MOTION

1   it really doesn't matter to me. Do you want 45 days?

2          MR. LEITNER: It may matter to us, your Honor. We'd

3   like to move things along.

4          THE COURT: You tell me how long you'd like. I'm

5   going to give them 45 days. You can have 45 if you like.

6          MR. LEITNER: We'll take 30.

7          THE COURT: From April 19th would be May 20th and then

8   how long do you need for reply, two weeks?

9          MS. COSSU: Two weeks is fine, Judge.

10         THE COURT: June 3rd. I'm going to deny the pending

11  motion without prejudice to renewal. I guess you bundled the

12  last motion. If you're going to bundle this one too just make

13  sure if either side does need a little time that you put in

14  your letter asking for it that you agree to bundle.

15         MS. COSSU: Just so I'm clear on how to incorporate

16  the prior motion, because I know that you have piles of

17  motions, but it was a pretty substantial motion, and I would

18  not want to have to reinvent the wheel or kill that many more

19  trees.

20         THE COURT: We have courtesy copies of that motion

21  already?

22         MS. COSSU: I believe so.

23         THE COURT: What you can do is you can do it in your

24  notice of motion, in your brief, and just say we hereby

25  incorporate the motion we previously made.

D2qileic ag                    MOTION

1          MS. COSSU:  I can refer to the docket number.

2          THE COURT:  That's fine.  Or if you want to give me a

3     new brief but you don't want to give me all those exhibits

4     again you can just supplement the declaration and incorporate

5     the old declaration, however you like, to minimize duplication.

6     Because I don't want my need to push this, kick this can down

7     the road to inconvenience you guys.  All right.  Anything else

8     we should do now?

9          MR. LEITNER:  One more issue.  We've been having a

10    dispute regarding the scope of discovery permitted by your

11    order on July 27th after our first premotion conference.  And

12    we've met several times and haven't been able to resolve it.

13    We're wondering how you'd like us to address that.

14         THE COURT:  What's the dispute?

15         MR. LEITNER:  You ruled on July 27th that Professor

16    Leitner could proceed to document discovery only with respect

17    to her -- not with respect to other professors because the

18    motion to dismiss might narrow things.  The other side has

19    given us hard documents in the possession of various defendants

20    and WCC personnel and run a search on the WCC e-mails, it's our

21    understanding, correct me if I'm wrong, for the phrase Carol

22    Leitner.  And based on what we've seen so far we imagine there

23    are going to be many more relevant documents that have the

24    words Carol or Leitner or other targeted searches.  We think

25    they've missed a lot of important documents.

D2qileic ag                MOTION .

1      THE COURT:  Right.  There might be documents that just

2  say Professor Leitner or Leitner.  Can you at least run

3  Leitner?  Carol there could be a million.

4      MR. MURTAGH:  Our motion, and I have to say

5  parenthetically I did not expect to be debating this issue, I

6  didn't know this was on the agenda today.  I apologize.  I

7  don't have the transcript of our prior conference here which I

8  think would be helpful.  But it was certainly clear to us, we

9  thought, in context, your Honor, Mr. Leitner, and I see he was

10  anticipating this agenda because he does have the transcript,

11  he was expressing the concern at the first conference that his

12  mother was getting on in years and was concerned to have the

13  case move and so forth.  We understood your Honor to direct

14  limited discovery as to Carol Leitner and her personnel records

15  and so forth.  We've turned over 5 to 6,000 pages of documents

16  already, every file of anyone connected to the college related

17  to Carol Leitner.  Obviously she had a personnel file of 20

18  years or more.  But all of those documents.

19      Frankly, the notion that at a school, at any

20  institution, but certainly a school the size of Westchester

21  Community College that Mr. Leitner wants our IT people to

22  undertake a search of every e-mail at the college in I guess

23  the last 20 years if there's e-mail that long ago for the name

24  Carol...

25      THE COURT:  That's not happening.  What about the name

D2qileic ag                    MOTION

1    Leitner?  If you did it for Carol Leitner, why not just run the

2    name Leitner?

3              MR. MURTAGH:  Your Honor, I'll ask him to run the name

4    Leitner.  We turned over thousands of pages of e-mails.  I'm

5    hesitant to suspect that there won't be more, but I'll ask our

6    people to do that.

7              THE COURT:  You need not turn over anything that came

8    out in the first search.

9              MR. MURTAGH:  That makes it more burdensome.  Somebody

10   will have to figure that out.

11             THE COURT:  I bet some computer whiz can figure out a

12   way to tell the computer give me everything with Leitner that

13   doesn't also come up when you search for Carol Leitner.  One of

14   your undergraduates can probably figure out how to do it.

15             MR. LEITNER:  Also, your Honor, we don't think a

16   global search of every single e-mail account at WCC is

17   necessary for the word Leitner.  It can be more targeted to

18   certain people which would reduce Mr. Murtagh's concern.  She

19   can run the name Leitner for Dean Wang in a certain period.

20             THE COURT:  I'm all for that.  But I don't think --

21             MR. MURTAGH:  We'll search for the word Leitner, your

22   Honor.

23             THE COURT:  It seems very unlikely to me that there

24   will be relevant documents that just discuss Carol without

25   mentioning her last name anywhere in the document.  So I think

D2qileic ag          MOTION

1    Leitner is fine.  But to the extent you can narrow the users,

2    great.

3              MR. LEITNER:  We want to make sure that we're not

4    limiting ourselves now with respect to after the motion to

5    dismiss when we have the conference before heading into

6    discovery that we can search for more targeted terms like Carol

7    at a specific point.

8              THE COURT:  We'll take it up --

9              MR. MURTAGH:  We have a motion pending, we're now

10   going to go through motion practice again and we're sort of, I

11   don't know if half pregnant is the right analogy, your Honor.

12   We want you to do discovery on your side.  Incidentally, your

13   Honor, it might be appropriate for us to start serving

14   discovery demands and the plaintiff at this point which we had

15   not previously requested.

16             THE COURT:  That's up to you.  If you want to spend

17   the money on doing it now, God bless.  I will take up after the

18   motion is decided what further discovery is appropriate.

19   There's just no point in fighting about it now.  Anything else?

20             MR. LEITNER:  No, your Honor.

21             THE COURT:  All right.  I will look forward to your

22   papers.

23             (Proceedings adjourned)

24

25