UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CAROL LEITNER,                                      :
                                                    :
                          Plaintiff,                :
                                                    :
            - against -                             :
                                                    :
WESTCHESTER COMMUNITY COLLEGE,                      :
JOSEPH HANKIN, in his personal and official        :
capacity as President of Westchester Community      :
College, CHET ROGALSKI, in his personal and        :          12-cv-3778 (CS PED)
official capacity as Dean and Vice President of     :
Academic Affairs, JIANPING WANG, in her            :
personal and official capacity as Associate Dean of :          **ORAL ARGUMENT REQUESTED**
the Arts and Sciences, GABRIELLE MILLER, in        :
her personal and official capacity as Curricular    :
Chairperson of the Communications and Media         :
Arts Department, and WESTCHESTER                    :
COMMUNITY COLLEGE FEDERATION OF                     :
TEACHERS LOCAL # 2431,                              :
                                                    :
                          Defendants.               :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## PLAINTIFF CAROL LEITNER'S MEMORANDUM OF LAW IN OPPOSITION TO THE UNION DEFENDANT'S MOTION TO DISMISS


MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York  10017
(212) 856-9600
*Attorneys for Plaintiff Carol Leitner*

*Of Counsel*:

Catherine M. Foti
Curtis B. Leitner

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

THE FACTUAL ALLEGATIONS.......................................................................................2

LEGAL STANDARD............................................................................................................6

ARGUMENT.........................................................................................................................7

I.     *MARTIN v. CURRAN* IS INAPPLICABLE TO THE BREACH
OF DUTY OF FAIR REPRESENTATION CLAIM ALLEGED IN
THE FAC ..................................................................................................................7

        A.    *Martini v. Curran* Applies Only to Common Law Causes of
Action.............................................................................................................7

        B.    The Plain Language, Legislative History, and Purpose of Section
209-a(2)(c) of the Taylor Law Demonstrate that *Martin v. Curran*
Is Inapplicable ...............................................................................................9

        C.    New York Courts Routinely Permit DFR Claims Under the
Taylor Law....................................................................................................13

II.    THE FAC ADEQUATELY STATES A CLAIM AGAINST THE
WCCFT...................................................................................................................15

III.   PROFESSOR LEITNER'S DFR CLAIM IS TIMELY..................................18

IV.   PROFESSOR LEITNER WAS NOT REQUIRED TO EXHAUST
ADMINISTRATIVE REMEDIES BEFORE BRINGING HER DFR
CLAIM....................................................................................................................19

CONCLUSION....................................................................................................................21

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*Adeleke v. United States*, 355 F.3d 144 (2d Cir. 2004)..........................................................12

*Bacchus v. City of New York*, 12-civ-1663, 2013 WL 1345153
   (E.D.N.Y.   Mar. 29, 2013) ...................................................................................13

*Board of Education v. Ambach*, 70 N.Y.2d 501 (N.Y. 1987)........................................19, 20, 21

*Brown v. State Univ. of New York*, 12-civ-411, 2013 WL 312882
   (N.D.N.Y. Jan. 25, 2013) .....................................................................................10

*Butler v. McCarty*, 306 A.D. 2d 608 (Sup. Ct. App. Div. 3rd Dep't).....................................15

*Civil Serv. Bar Ass'n, Local 237 v. City of New York*, 64 N.Y.2d 188
   (N.Y. 1984) ...............................................................................................12, 13, 16

*Cowen & Co. v. Tecnoconsult Holdings Ltd.*, 96-civ-3748, 1996 WL 391884
   (S.D.N.Y. July 11, 1996) .....................................................................................15

*Cunningham v. Local 30, International Union of Operating Engineers*, 234
   F. Supp. 3d 383 (S.D.N.Y. 2002) .......................................................................16

*DiFolco v. MSNBC Cable*, 622 F.3d 104 (2d Cir. 2010)............................................................6

*Gear v. Dep't of Educ.*, 472 F. App'x 67 (2d Cir. 2012).........................................................10

*In re Cnty. of Westchester v. Mahoney*, 56 N.Y.2d 756 (N.Y. 1982) ....................................20

*Jackson v. New York City Transit*, 05-civ-1763, 2005 WL 2664527
   (E.D.N.Y. Oct. 19, 2005) .....................................................................................10

*Jackson v. Reg'l Transit Serv.*, 54 A.D.2d 305 (N.Y. App. Div. 4th Dep't 1976)...........13, 20

*Jund v. Town of Hempstead*, 941 F.2d 1271 (2d Cir. 1991) .................................................12, 13

*Knight-Ridder Broadcasting v. Greenberg*, 70 N.Y. 2d 151 (N.Y. 1987).............................11

*Langford v. International Union of Operating Engineers*, Local 30, 2011
   WL 672414 (S.D.N.Y. Feb. 23, 2011)............................................................8

*Lewis v. Klepack*, 65 A.D. 2d 637 (N.Y. App. Div 3rd Dep't)................................20

*Lin v. Metro Life Ins.*, 07-civ-3218, 2010 WL 668817 (S.D.N.Y. Feb. 25, 2010) ...............15

*Mandavia v. Columbia University*, 12-cv-2188, 2012 WL 618628
   (S.D.N.Y. Dec. 12, 2012)..................................................................15

*Marquez v. Screen Actors Guild*, 525 U.S. 33 (1998) ...........................................15

*Martin v. Curran*, 303 N.Y. 276 (1951) .....................................................passim

*McIntyre v. Longwood Central School District*, 7-civ-337, 2008 WL 850263
   (E.D.N.Y. Mar. 27, 2008) ...............................................................10

*Moses v. Westchester Cnty. Dep't of Corr.*, 10-civ-9468, 2013 WL 2641715
   (S.D.N.Y. June 13, 2013)...................................................................6

*People v. Newspaper & Mail Deliverers' Union*, 250 A.D. 2d 207 (N.Y. Sup. Ct.
   1st Dep't 1998) ...........................................................................9

*Riley v. Cnty. of Broome*, 95 N.Y.2d 455 (N.Y. 2000) ...........................................9

*Robert D'Onfrio v. City of New York*, 07-civ-731, 2010 WL 4673879
   (E.D.N.Y. Sept. 14, 2010)..................................................................9

*Roginsky v. Richardson-Merrell*, 378 F.2d 832 (2nd Cir. 1967) ...............................15

*Saint v. Pope*, 12 A.D. 2d 168 (N.Y. App. Div. 4th Dep't 1961) .............................15

*Sedacca v. Mangano*, 18 N.Y.3d 609 (N.Y. 2012)................................................9

*Schmitt v. Hicksville UFSD No. 17*, 200 A.D. 2d 661
   (N.Y. App. Div. 2nd Dep't 1994) .......................................................10

*Spano v. Kings Park Cent. Sch. Dist.*, 61 A.D.3d 666
   (N.Y. App. Div. 2nd Dep't 2009) ...............................................14, 19 ,20

*Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120 (2d Cir. 1998)........................15

*State v. Cities Serv. Co.*, 180 A.D.2d 940 (N.Y. App. Div. 2nd Dep't 1992) ..................12

*Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91 (E.D.N.Y. 2004) ........................14

*Trainosky v. NYS Department of Taxation and Finance*, 105 A.D. 2d 525
(N.Y. App. Div. 3rd Dep't 1984) ................................................................................20

*Walker v. Schult*, 12-civ-1806, 2013 WL 2249159 (2d Cir. May 23, 2013) .......................6

*Walsh v. Torres Lynch*, 266 A.D. 2d 817 (N.Y. App. Div. 4th Dep't 1999) ........................15

## STATUTES AND RULES

N.Y.C.P.L.R. 217(2)(a) ...........................................................................9, 10, 11, 18

N.Y.C.P.L.R. 217(2)(b) .........................................................................................10

N.Y. Civ. Serv. Law § 201(5) ................................................................................10

N.Y. Civ. Serv. Law § 201(7) ..................................................................................9

N.Y. Civ. Serv. Law § 204(2) ................................................................................13

N.Y. Civ. Serv. Law § 205(d) ................................................................................11

N.Y. Civ. Serv. Law § 209-a(2)(c) .........................................1, 9, 10, 11, 12, 13, 18

N.Y. Exec. Law § 269(1-a)(c) ..................................................................................8

N.Y. Gen. Assoc. Law § 13 .....................................................................................7

N.Y. Penal Law § 10.00(7) ......................................................................................9

## OTHER AUTHORITIES

http://www.local372.org/who-we-are/members (Local 372 website) ....................................14

## PRELIMINARY STATEMENT

The conduct of the Westchester Community College Federation of Teachers Local # 2431 ("WCCFT") in this case is a perfect example of *why* the New York legislature enacted a statutory duty of fair representation ("DFR").   As an adjunct professor for Westchester Community College ("WCC") and a member of the WCCFT for nearly 30 years, the plaintiff, Professor Carol Leitner, was entitled to expect that her union representative would work to protect her interests.  Instead, in what can only be viewed as a betrayal of trust and an abrogation of its duty to Professor Leitner, the WCCFT specifically assured WCC that the union would not really be defending Professor Leitner, threw Professor Leitner's defense, and helped WCC fire her. *See* First Amended Complaint ("FAC"), ¶ 66 (the FAC is attached as Ex. 18 to the Supplemental Leitner Declaration ("Supp. Leitner Decl.")); *see also* Supp. Leitner Decl., Ex. 19.

The WCCFT now seeks to dismiss Professor Leitner's DFR claim, and avoid discovery concerning the extent of the WCCFT's undisclosed, bad faith conduct.  All four of the WCCFT's arguments for dismissal lack merit.  *First*, the WCCFT argues that, based on *Martin v. Curran*, 303 N.Y. 276 (1951), the WCCFT has no existence separate from its members. Therefore, the argument runs, Professor Leitner's claim should be dismissed because all WCCFT members—including Professor Leitner—were required to authorize or ratify the WCCFT's unlawful conduct, and the FAC does not allege that they did so.  The WCCFT's argument fails because *Martin*'s holding is limited to common law torts.  Because Professor Leitner's DFR claim is based on Section 209-a(2)(c) of the Taylor law, which explicitly requires an "*employee organization*" to honor its "duty of fair representation," N.Y. Civ. Serv. Law § 209-a(2)(c) (emphasis added), *Martin* is inapplicable.

1

*Second*, the WCCFT argues that Professor Leitner has not adequately pled that the WCCFT acted in bad faith because Professor D'Orazio, the WCCFT President and Professor Leitner's union representative, met with Professor Leitner and then represented her at the step three hearing. This argument is merely a preview of the WCCFT's defense, which is irrelevant for purposes of determining the adequacy of a complaint on a motion to dismiss. The WCCFT simply fails to acknowledge the numerous and specific allegations in the FAC that support the reasonable inference that the WCCFT acted in bad faith.

*Third*, the WCCFT argues that Professor Leitner's DFR claim is untimely because she was required to bring it within four months of her step three hearing in June 2011. Again, the WCCFT misconstrues Professor Leitner's claim, which is based on Professor Anne D'Orazio's *undisclosed communications with the WCC administration*. Professor Leitner learned of those communications through discovery, less than four months before she filed her amended complaint. Because the applicable statute of limitations runs from when Professor Leitner "knew or should have known" of the WCCFT's unlawful conduct, Professor Leitner's DFR claim is timely.

*Fourth*, the WCCFT argues that Professor Leitner failed to exhaust her administrative remedies. However, it is black letter New York law that a plaintiff is *not* required to exhaust administrative remedies before pursuing a DFR claim. Professor Leitner's DFR claim against the WCCFT is supported by ample factual allegations and was brought in a procedurally proper and timely manner. Accordingly, the WCCFT's motion should be denied.

### THE FACTUAL ALLEGATIONS

Professor Leitner fully incorporates the "Factual Allegations" Section of her original Memorandum of Law in Opposition to the Defendants' Motion to Dismiss, dated December 7,

2012.[1]  *See* Amended Leitner Affidavit (the "Amend. Leitner Aff."), Ex. 1, pp. 3-8.  This

Section sets forth the factual allegations relevant to Professor Leitner's DFR claim against the

WCCFT and her contract claim against WCC.  For clarity and ease of reference, Professor

Leitner respectfully requests that the Court read this Memorandum of Law after reviewing

Professor Leitner's original Memorandum of Law in Opposition to the Defendants' Motion to

Dismiss.

Professor Leitner's DFR and contract claims are based on the WCCFT's bad faith

conduct while representing Professor Leitner during WCC's disciplinary process.  On or around

November 18, 2010, Barbara Alammari, the parent of Aracelli Cruz, a student in Professor

Leitner's Speech Communications class during the fall 2010 semester, submitted written

complaints to Professor Gabrielle Miller, the Acting Chairperson of the Communications

Department, regarding Professor Leitner's in-class speech, including her political statements

about illegal immigration.  *See* FAC, ¶¶ 49-50; Amend. Leitner Aff., Exs. 5-6.  A few days later,

Professor Leitner discussed Ms. Alammari's complaints with Professor Miller, who, despite

Professor Leitner's explanation that Ms. Alammari's second-hand complaints were inaccurate,

said she would refer the matter to Dean Jianping Wang, the Associate Dean of the Arts and

Sciences, for discipline. *See* FAC, ¶ 54.  Concerned that she would be punished because of Ms.

Alammari's complaint, Professor Leitner met with her WCCFT representatives, Professor Anne

D'Orazio and Richard Rosell, who is also a WCCFT official, to discuss her defense to the

complaint. *See Id.*, ¶ 55.

---

[1] For clarity and ease of reference, Professor Leitner respectfully requests that the Court first review Professor Leitner's original Memorandum of Law in Opposition to the Defendants' Motion to Dismiss, dated December 7, 2012. Second, the Court should review this memorandum, Professor Leitner's Memorandum of Law in Opposition to the Union Defendant's Motion to Dismiss, which incorporates the "Factual Allegations" Section from the original memorandum. Finally, the Court should review Professor Leitner's Memorandum of Law in Opposition to the College Defendants' Motion to Dismiss the First Amendment Complaint, which incorporates Sections of the original memorandum, dated December 7, 2012, and this memorandum.

Around the same time, Professor Miller drafted a disciplinary letter, dated November 22, 2010, that referred Ms. Alamarri's complaint to Dean Wang because she found the complaint "disturbing." *See id.*, ¶ 56.  Professor Miller's draft letter provided *no explanation* of why Professor Leitner's conduct with regard to Ms. Cruz was improper. *Id.*  Professor Miller, however, did not send the letter to Professor Leitner at that time, and Professor Leitner heard nothing about Ms. Alammari's complaint for three months, until late February 2011. *Id.*, ¶ 57.

On Friday, February 18, 2011, *unbeknownst to Proessor Leitner*, Professor D'Orazio met with Professor Miller. *See id.*, ¶ 58. The next Monday, February 21, 2011, Professor Miller emailed Professor D'Orazio a revised version of the November 22 disciplinary letter, and wrote: "Thank you for meeting with me on Friday, and thanks for taking a look at the letter. I don't want to make any mistakes!" Supp. Leitner Decl., Ex. 20; FAC, ¶ 59.  Notwithstanding that Professor Miller's revised disciplinary letter made serious allegations against Professor Leitner, which Professor Leitner vigorously contested, Professor D'Orazio told Professor Miller that the letter "looks fine." *Id.*  Further, Professor D'Orazio asked Professor Miller for a "list of people" that Dean Wang had spoken to during "her investigation," and Professor Miller said that she would give Professor D'Orazio a copy of Dean Wang's "notes." Supp. Leitner Decl, Ex. 20. Professor D'Orazio concealed *all of these communications* from Professor Leitner—whose interests she was supposed to be representing. *See FAC*, ¶ 61.

Moreover, upon information and belief, Professor D'Orazio helped Professor Miller make substantial revisions to, and then reviewed, the disciplinary letter that Professor Miller sent to Professor Leitner, date-stamped February 23, 2011. *See id.*, ¶¶ 56-60.  While the letter previously stated *only* that Ms. Alammari's complaint was "disturbing," Professor Miller's *revised* letter made three specific allegations of misconduct: (1) Professor Leitner violated Ms.

4

Cruz's "political rights" by denying her the opportunity to pick the poem of her choice; (2)

Professor Leitner made improper political comments that belonged in a "political science class";

and (3) Professor Leitner's comments about "Mexican immigrants"—which included core

political speech concerning illegal immigration—were "extremely disturbing," and caused Ms.

Cruz to feel humiliated. *See* FAC, ¶ 60; Amend. Leitner Aff., Ex. 7.

On March 2, 2011, a few weeks later, and, again, *unbeknownst to Professor Leitner*,

Professor D'Orazio had an improper "off the record" conversation with Dean Wang, which Dean

Wang apparently deemed important enough to *memorialize* in a memorandum. *See* FAC, ¶ 66;

Supp. Leitner Decl., Exhibit 18.  At that meeting, Professor D'Orazio made several "off the

record" representations to Dean Wang, making clear that the WCCFT did not have Professor

Leitner's best interests at heart.  Professor D'Orazio stated, *to the administrator responsible for

taking disciplinary action, if any, against Professor Leitner*, as follows: (1) that Professor Leitner

engaged in misconduct; and (2) that, notwithstanding outward appearances, "I want you to

understand that we are not defending" Professor Leitner, but only the "process" in order to

"protect the Union" because "Carol may turn against us." *Id.*  Thus, Professor D'Orazio gave

Dean Wang the "green light" to take formal disciplinary action against Professor Leitner with the

assurance that the WCCFT would merely "go through the motions" when defending her.

A few weeks later, armed with the assurance that the WCCFT would provide Professor

Leitner only a token defense,  Dean Wang requested a step three hearing to terminate Professor

Leitner on March 21, 2011. FAC, ¶ 69.  Thus, based on Professor D'Orazio's assurances—and

notwithstanding the procedural requirement (imposed by binding arbitration in the Ax arbitration

decision) that the administration must seek to informally resolve student complaints *before*

taking formal disciplinary action, *see* FAC, ¶ 70—Dean Wang did *not* seek to informally resolve Ms. Cruz's complaint.

On June 9, 2011, in contravention of the disciplinary procedures required by the Ax arbitration decision, *see id.*, ¶¶ 70-72, the WCC administration convened a step three hearing based on Ms. Cruz's complaint, and other student complaints concerning Professor Leitner's constitutionally protected speech. *See id.*, ¶¶ 73-75.  Consistent with Professor D'Orazio's undisclosed assurance to Dean Wang that the WCCFT would *not* provide a good faith defense of Professor Leitner, the WCCFT mounted a tepid defense, ignoring the obvious argument that the administration's conduct violated Professor Leitner's right to academic freedom. *See* FAC, ¶ 78. Dean Rogalski was unmoved by the WCCFT's assertion that a mere question of "pedagogical style" was at stake, and recommended that WCC terminate Professor Leitner. *See* FAC, ¶¶ 79-80; Amend. Leitner Aff., Ex. 9.

## LEGAL STANDARD

On a motion to dismiss, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor, considering factual allegations that make the claims plausible." *Moses v. Westchester Cnty. Dep't of Corr.*, 10-civ-9468, 2013 WL 2641715, *1 (S.D.N.Y. June 12, 2013) (citation and quotations omitted).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Walker v. Schult*, 12-civ-1806, 2013 WL 2249159, *3 (2d Cir. May 23, 2013). "The duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable*, 622 F.3d 104, 110-11 (2d Cir. 2010) (citation, quotations and brackets omitted). Thus,

"[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker*, 2013 WL 2249159, at *3. Here, Professor Leitner has pled factual content sufficient to draw a reasonable inference that the defendant WCCFT is liable for the misconduct alleged.

## ARGUMENT

I.   ***MARTIN v. CURRAN* IS INAPLICABLE TO THE BREACH OF DUTY OF FAIR RESPRSENTATION CLAIM ALLEGED IN THE FAC**

A.   ***Martin v. Curran* Applies Only to Common Law Causes of Action**

The WCCFT argues that Professor Leitner's DFR claim should be dismissed under the New York Court of Appeals decision in *Martin v. Curran*, 303 N.Y. 276 (1951). In *Martin,* the Court dismissed a libel claim against a union brought under N.Y. Gen. Assoc. Law § 13, a procedural statute that permits service of process upon the president or treasurer of an unincorporated association.[2]  The Court held that, *at common law*, an unincorporated association "has no existence independent of its members," *Martin*, 303 N.Y. at 280, and that Section 13 did not change the common law.  Thus, the Court found that common law claims against unincorporated associations require that every member authorize or ratify the unlawful conduct and dismissed the plaintiff's claim for libel for failure to allege that the wrongful conduct had been authorized by all the union's members:

---

[2] Section 13 of the General Associations Law provides as follows:

> An action or special proceeding may be maintained, against the president or treasurer of such an association, to recover any property, or upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, *against all the associates*, by reason of their interest or ownership, or claim of ownership therein, either jointly or in common, or their liability therefore, either jointly or severally. Any partnership, or other company of persons, which has a president or treasurer, is deemed an association within the meaning of this section.

N.Y. Gen. Assoc. Law § 13 (emphasis added).

> So, for better or worse, wisely or otherwise, the Legislature has limited such suits against association officers [under N.Y. Gen. Assoc. Law § 13,] *whether for breaches of agreements or for tortious wrongs*, to cases where the individual liability of every single member can be alleged and proven.  Despite procedural changes, substantive liability in such cases is still, *as it was at common law*, 'that of the members severally.'

*Martin*, 303 N.Y., at 282 (emphasis added); *see also Langford v. International Union of Operating Engineers*, Local 30, 2011 WL 672414, *19 (S.D.N.Y. Feb. 23, 2011) ("*Martin* . . . held that in *common-law* actions against unincorporated associations, such as unions, the individual liability of every single member must be alleged and proven.") (quotations omitted) (emphasis added).   However, *Martin* was based on common law liability, not on liability arising from a violation of a statutorily created right.  Recognizing this distinction, New York courts do not apply *Martin*'s holding to statutory violations when the statute imposes obligations on a union *as an entity* or when *Martin*'s liability rule would frustrate statutory objectives.

For example, in *Langford v. International Union of Operating Engineers, Local 30*, 10-civ-1644, 2011 WL 672414 (S.D.N.Y. Feb. 23, 2011) (Holwell, J.), an unincorporated union relied on *Martin* for the proposition that the union could not be sued for state law claims of race and sex discrimination unless its discriminatory acts were authorized or ratified by all union members.  Judge Holwell rejected that argument as "an overbroad reading of *Martin*'s holding," *id.* at *20, which does not apply to "statutory causes of action." *Id.* at *19; *see also id.* at 20 (*Martin* held that "suits against unincorporated associations had to plead the individual liability of every member . . . *in the context of common-law causes of action*, specifically referring to tort and contract claims.") (emphasis added); *id.* ("*Martin* . . . is heavily tied in with common-law principles").  As Judge Holwell explained, the plain text of N.Y. Exec. Law § 269(1-a)(c) makes it "an unlawful discriminatory practice" for a "*labor organization*" to engage in discrimination:

When the statute specifically charges labor organizations such as Local 30 with liability for discriminatory practices in apprenticeship programs, it has evinced the Legislature's judgment that for the purposes of the statute, contrary to *Martin*'s holding, that the labor organization does have an existence independent of its members. Moreover, applying *Martin* to this statute would clearly frustrate the legislative intent behind its enactment. . . .

*Id.* at 20 (citing *Martin*, 303 N.Y. at 282).

Similarly, in *People v. Newspaper & Mail Deliverers' Union*, 250 A.D. 2d 207 (N.Y. App. Div. 1st Dep't 1998), the First Department held that *Martin* does not apply to charges of criminal enterprise liability against unions because the Penal Law's definition of "persons" explicitly applies to *unions. See* N.Y. Penal Law § 10.00(7). The First Department explained that the legislature "armed prosecutors to seek indictment of corrupt associations," *Newspaper & Mail Deliverers' Union*, 250 A.D. at 492, and applying *Martin* would "clearly frustrate the legislative intent behind the Penal Law." *Id.* at 492.

**B.    The Plain Language, Legislative History, and Purpose of Section 209-a(2)(c) of the Taylor Law Demonstrate that *Martin v. Curran* Is Inapplicable[3]**

In this case, Professor Leitner has asserted a claim against the WCCFT for a violation of Section 209-a(2)(c) of the Taylor Law, which is subject to the statute of limitations set forth in N.Y.C.P.L.R. 217(2)(a).   Section 209-a(2) of the Taylor Law, titled "Improper employee organization practices," provides that "[i]t shall be an improper practice of an *employee organization* or its agents deliberately . . . (c) to breach *its duty* of fair representation." N.Y. Civ. Serv. Law § 209-a(2)(c) (emphasis added);[4] *see also Robert D'Onfrio v. City of New York*, 07-

---

[3] Under New York law, courts analyze legislative intent based on (1) the text of the statute; (2) the statute's legislative history, *see Riley v. Cnty. of Broome*, 95 N.Y.2d 455, 463-64 (N.Y. 2000); and (3) the "purpose of the act and the objects to be accomplished." *Sedacca v. Mangano*, 18 N.Y.3d 609, 615 (N.Y. 2012).  All three indicia of legislative intent counsel against applying *Martin* to Section 209-a(2)(c) claims.

[4]  The WCCFT is an "employee organization" covered by Section 209-a. *See id.* § 201(5) ("The term 'employee organization' means an organization of any kind having as its primary purpose the improvement of terms and conditions of employment of public employees. . . ."); *see also* FAC, ¶ 139 (Article II of the WCCFT constitution states it is the WCCFT's objective to "achieve and maintain optimal terms and conditions of employment . . . *in*

civ-731, 2010 WL 4673879, *10 (E.D.N.Y. Sept. 14, 2010); *Jackson v. New York City Transit*, 05-civ-1763, 2005 WL 2664527, *3 (E.D.N.Y. Oct. 19, 2005) (stating that a "DFR claim arises under New York Civil Service Law 209-a(2)(c) . . . .").[5]  Section 217 of the CPLR, entitled "actions complaining about conduct that would constitute a union's breach of its duty of fair representation," provides a four month statute of limitations specifically for DFR claims against an "*employee organization*." *See* N.Y.C.P.L.R. 217(2)(a) (emphasis added).   Since these provisions were amended at the same time,[6] the plain language of Sections 209-a(2)(c) and 217(2)(a)[7] make unmistakable that an *employee organization*—as opposed to its members severally—has *its own* duty of fair representation.[8]  Moreover, the Taylor Law was not enacted until 1967, *over fifteen years after Martin was decided, see* Supp. Leitner Decl., Ex. 22 (bill jacket for 1967 law enacting the Taylor Law), and N.Y. Civ. Serv. Law § 209-a(2)(c) and N.Y.C.P.L.R. 217(2)(a)-(b) were not enacted until 1990. *See id.*, Ex. 21, (bill jacket for 1990 amendments).

---

accordance with the Taylor Law of New York State.") (emphasis added).  Additionally, Professor Leitner is a "public employee" covered by the Taylor Law. *See* N.Y. Civ. Serv. Law § 201(7) ("The term 'public employee' means any person holding a position by appointment or employment in the service of a public employer. . . .").

[5] *See also Gear v. Dep't of Educ.*, 472 F. App'x 67, 68 (2d Cir. 2012) (summary order) (citing N.Y. Civ. Serv. Law § 209-a(2)(c) as the source of "a fair representation claim under state law"); *Brown v. State Univ. of New York*, 12-civ-411, 2013 WL 312882, *2 (N.D.N.Y. Jan. 25, 2013) ("Labor organizations representing public sector employees in York State have a duty of fair representation under N.Y. Civ. Serv. Law § 209-a(2)(c)"); *Schmitt v. Hicksville UFSD No. 17*, 200 A.D. 2d 661, 662 (N.Y. App. Div. 2nd Dep't 1994) ("In order to establish a claim for breach of the duty of fair representation in violation of Civil Service Law § 209-a(2), it is necessary to show that the union's conduct was arbitrary, discriminatory, or in bad faith.").

[6] Both provisions were added in the same 1990 law, titled "AN ACT to amend the civil practice law and rules and the civil service law, in relation to fair representation cases." *See* Supp. Leitner Decl., Ex. 21 (bill jacket of 1990 law), at 000011.

[7] The 1990 bill also added a four month statute of limitations for claims against employers "an essential element of which is that *an employee organization breach its duty of fair representation*," N.Y.C.P.L.R. 217(2)(b) (emphasis added).

[8] *Cf. Langford*, 2011 WL 672414, at *20 ("When the [discrimination] statute specifically charges labor organizations such as Local 30 with liability for discriminatory practices in apprenticeship programs, it has evinced the Legislature's judgment that for the purposes of the statute, contrary to *Martin*'s holding, that the labor organization does have an existence independent of its members.").

In addition, the legislative history of Section 209-a(2)(c) and Section 217(2)(a), in particular, the memoranda of support from the Public Employee Relations Board[9] and the Governor's Office, show that the legislature intended to empower union members to bring state law DFR claims before the PERB *and in court*.[10]  The memoranda of support explicitly state that the amendments grant *concurrent jurisdiction* over DFR claims to both the PERB and the courts, and that the *same legal principles* govern claims in each forum.  *See id.*, Ex. 21, at 000008 (PERB memorandum stating that  the "bill also clearly ensures that *the standard of care in duty of fair representation cases will be identical in the State courts and at PERB*, by using the same language in the CPLR and § 209-a(2)(c) of the Civil Service Law, *again ensuring that selection of forum will not affect the application legal principles*") (emphasis added); *id.*, Ex. 21, at 000014 (Governor's Memorandum stating that "[t]his bill would continue to vest jurisdiction over DFR claims in PERB . . . *and in the state courts* . . . [and] would place PERB in *the same position as the courts in bringing before it all parties necessary for the fair and equitable disposition of a claim found to be meritorious*. . . .") (emphasis added); *see also generally, id.*, Ex. 21, 000006-000009, 000013-000016 (memoranda of support from the PERB and the Governor's Office).[11]  Thus, the legislative history of Section 209-a(2)(c) and Section 217(2)(a)

---

[9] N.Y. Civ. Serv. Law § 205(d) provides that the PERB may:

> [E]stablish procedures for the prevention of improper employer and employee organization practices as provided in section two hundred nine-a of this article, and to issue a decision and order directing an offending party to cease and desist from any improper practice, and to take such affirmative action as will effectuate the policies of this article (but not to assess exemplary damages), including but not limited to the reinstatement of employees with or without back pay. . .

[10] *See Knight-Ridder Broadcasting v. Greenberg*, 70 N.Y. 2d 151, 164 (N.Y. 1987) (stating that the "Memorandum in Support" of an amendment "reveals" how "the legislature understood" the law).

[11] The Governor's Memorandum of Support makes clear that the both the PERB and the Court have jurisdiction to resolve "improper practice charges which allege a breach of the duty [of fair representation] in the failure to process or *improper processing of a claim of a violation of a collective bargaining agreement*." Supp. Leitner Decl., Ex 21, at 000014.

11

demonstrates that unions, as entities, were intended to be held accountable in court for violations of the duty of fair representation.

Notwithstanding the plain text and legislative history of Sections 209-a(2)(c) and 217(2)(a), the application of *Martin* to DFR claims would make these provisions meaningless. *See State v. Cities Serv. Co.*, 180 A.D.2d 940, 942 (N.Y. App. Div. 2nd Dep't 1992) ("A court should avoid a statutory interpretation rendering the provision meaningless or defeating its apparent purpose."). As the Second Circuit has explained, the *Martin* liability standard is essentially impossible to meet. *See Jund v. Town of Hempstead*, 941 F.2d 1271, 1281 (2d Cir. 1991) (rejecting the application of *Martin* to Section 1983 claims because "[r]equiring proof [of authorization or ratification] . . . would prove an insurmountable obstacle to virtually any plaintiff."). It simply is not plausible that the legislature (1) imposed a duty of fair representation on "employment organizations," (2) provided a statute of limitations for bringing DFR claims against "employment organizations" in court, and yet (3) *also intended* that *Martin* would render that duty unenforceable in court. Applying *Martin* to Section 209-a(2)(c) claims would subvert the basic principle that "the existence of a statutory right implies the existence of all necessary and appropriate remedies." *See Adeleke v. United States*, 355 F.3d 144, 149 (2d Cir. 2004).

Finally, a primary objective of the Taylor Law—the resolution of labor disputes by public sector unions acting as the exclusive bargaining representatives of employees—would be fatally undermined if *Martin* applied to DFR claims. Even before Section 209-a(2)(c) explicitly recognized that "employee organizations" owe a "duty of fair representation," the New York Court of Appeals held that "courts in New York have recognized a . . . duty of fair representation on the part of public sector unions *predicated on their role as exclusive bargaining representatives.*" *Civil Serv. Bar Ass'n, Local 237 v. City of New York*, 64 N.Y.2d 188, 195-96

(N.Y. 1984) (emphasis added); *see also Jackson v. Reg'l Transit Serv.*, 54 A.D.2d 305, 309 (N.Y. App. Div. 4th Dep't 1976) ("[A] lack of fair representation leaves the employee remediless to hold his job and, therefore, constitutes a serious injustice to the employee. . . . We cannot believe that the Legislature intended to vest in the unions such unfettered discretion as to deprive injured employees of all remedies for breach of contract."); N.Y. Civ. Serv. Law § 204(2) (a "certified" union "shall be the *exclusive representative* . . . of all employees in the appropriate bargaining unit") (emphasis added).  Thus, the Taylor Law presupposes (and now, with Section 209-a(2)(c), clearly requires) that union representatives represent their members fairly and in good faith.  If a union representative can engage in bad faith, discriminatory, and arbitrary conduct during a member's grievance process with impunity—unless every single member of the union, *including the aggrieved member herself*, authorizes or ratifies the representative's bad faith conduct— public employees cannot possibly rely on public sector unions as their "exclusive bargaining representatives." *Civil Serv. Bar Ass'n*, 64 N.Y.2d, at 196.

C.     **New York Courts Routinely Permit DFR Claims Under the Taylor Law**

Consistent with the above analysis, a district court in this Circuit recently recognized that "[b]oth New York state and federal courts routinely allow claims by public employee plaintiffs alleging that their unions breached their duty of fair representation to proceed in court." *Bacchus v. City of New York*, 12-civ-1663, 2013 WL 1345153, *3 (E.D.N.Y. Mar. 29, 2013) (emphasis added).  If *Martin*'s authorization or ratification requirement applied to DFR claims under the Taylor Law, the court's statement would make no sense. *Cf. Jund*, 941 F.2d at 1281 (*Martin* liability requirement is an "*insurmountable obstacle to virtually any plaintiff*.") (emphasis added).  In *Bacchus*, the court denied a union's motion to dismiss a DFR claim based on the union's representation of the plaintiff during the grievance process—conduct which could not

13

possibly have been authorized or ratified by all 25,000 members of the defendant Board of

Education Employees Local 372,[12] much less by the aggrieved plaintiff. *See also Spano v. Kings*

*Park Cent. Sch. Dist.*, 61 A.D.3d 666, 670 (N.Y. App. Div. 2nd Dep't 2009) (reversing grant of

summary judgment to public sector union on DFR claim based on, *inter alia*, the conduct of the

local union's president, which was clearly not authorized or ratified by the entire union

membership); *Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 104 (E.D.N.Y. 2004)

(denying motion to dismiss a public sector DFR claim based on the allegation that a "a TWU

representative approached one of [the plaintiff's] physicians and instruct[ed] the doctor not to

cooperate during the arbitration proceedings," an act that was clearly not authorized or ratified

by the entire union membership) (quotations omitted).

Even the New York Court of Appeals has engaged in an extensive discussion of the

merits of a DFR claim against a public sector union, though the allegations could not possibly

satisfy *Martin*. In *Civil Serv. Bar Ass'n v. City of New York*, 64 N.Y.2d 188 (N.Y. 1984), the

Court analyzed a DFR claim based on a union's decision to settle an arbitration rather than

defend against an appeal from a favorable arbitration judgment, a decision that was approved by

a membership "vote of 190 to 60," *id.* at 193, and could therefore not satisfy *Martin*. The Court

found no breach because there was "no arbitrary, discriminatory or bad-faith conduct by the

Union," *id.* at 198, implying that there *could* have been a breach if evidence existed that the

union's decision violated that standard.

The cases WCCFT cites in support of its argument that *Martin* applies to Professor

Leitner's DFR claim are inapposite. *See* WCCFT Br., 11-12. These cases mostly involve

---

[12] *See* http://www.local372.org/who-we-are/members (Local 372 website) (last visited June 24, 2013) (" Local 372 represents nearly 25,000 Department of Education employees who provide essential support services to the 1.1 million children —and their families—in New York City public schools.").

*common law torts*—not DFR claims—or provide *no analysis* by the court as to why *Martin* should apply to DFR claims pursuant to Section 209-a(2)(c).[13]

## II.    THE FAC ADEQUATELY STATES A CLAIM AGAINST THE WCCFT

The WCCFT asserts that it did not act in "bad faith" because it made "informed decisions," "consult[ed] with" Professor Leitner, provided her "representation and full argument" at the step three hearing, and was willing to "proceed to arbitration."  WCCFT Br., 15.  This argument *completely ignores* the detailed allegations in the FAC supporting the reasonable inference that the WCCFT breached its duty of fair representation through Professor D'Orazio's dishonest and bad faith conduct.  The WCCFT's argument is merely a preview of its defense to Professor Leitner's claim, which is irrelevant to whether the FAC has adequately pled a DFR claim.

A union breaches its duty of fair representation if its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Mandavia v. Columbia University*, 12-cv-2188, 2012 WL 618628, *14 (S.D.N.Y. Dec. 12, 2012).[14]  A union shows "bad faith" when "it acts with an improper intent, purpose or motive." *Spellacy v. Airline Pilots Ass'n*-

---

[13] As a preliminary matter, the WCCFT incorrectly states that the Third Department's decision in *Butler v. McCarty*, 306 A.D. 608 (N.Y. App. Div. 3rd Dep't), "dismiss[ed] [a] duty of fair representation case against the union due to the failure to comply with *Martin v. Curran*."  WCCFT Br., 12.  In fact, *Butler* did not analyze a DFR claim, or even cite *Martin*. *See Butler*, 306 A.D. at 608 (stating that "plaintiff denied in his papers before the Supreme Court that he was alleging that NYSUT breached a duty of fair representation").  And the two Fourth Department cases that dismiss DFR claims based on *Martin* are unavailing.  In *Walsh v. Torres Lynch*, 266 A.D. 2d 817 (N.Y. App. Div. 4th Dep't 1999), the court provided *no explanation* for its decision that *Martin* applies to DFR claims. *Id.*, at 818 (cited at WCCFT Br., 12).  Further, *Saint v. Pope*, 12 A.D. 2d 168 (N.Y. App. Div. 4th Dep't 1961), was decided *decades before* the Taylor Law recognized a statutory cause of action for breach of the duty of fair representation, and relied on the proposition that N.Y. Gen. Assoc. Law § 13 did not change the common law liability of unions. *Id.*, at 172.  Moreover, this Court is *not* bound by Fourth Department precedent and "is bound only by decisions by the New York Court of Appeals and the Court of Appeals for the Second Circuit." *Cowen & Co. v. Tecnoconsult Holdings Ltd.*, 96-civ-3748, 1996 WL 391884, *4 n. 3 (S.D.N.Y. July 11, 1996).  In the absence of a Court of Appeals decision on point, this Court should "consider all the data the highest court of the state would use," and "not slavishly follow lower or even upper court decisions." *Roginsky v. Richardson-Merrell*, 378 F.2d 832, 851 (2nd Cir. 1967) (Friendly, J.); *see also Lin v. Metro Life Ins.*, 07-civ-3218, 2010 WL 668817, *1 (S.D.N.Y. Feb. 25, 2010) (same).

[14] *See also Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998) (the duty of fair representation requires a union "to exercise its discretion with *complete good faith and honesty*") (emphasis added).

*Int'l*, 156 F.3d 120, 126 (2d Cir. 1998). "Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." *Id.* (citations omitted). Thus, Professor D'Orazio acted in bad faith if she "purposefully concealed or misrepresented matters in [her] dealings" with Professor Leitner. *Cunningham v. Local 30, International Union of Operating Engineers*, 234 F. Supp. 3d 383, 399 (S.D.N.Y. 2002). Assessing a DFR claim "is essentially a factual determination." *Civil Serv. Bar Ass'n, Local 237*, 64 N.Y.2d at 196.

The FAC alleges that Professor D'Orazio, the WCCFT President and Professor Leitner's union representative, acted dishonestly and in bad faith while representing Professor Leitner in the WCC disciplinary process. *See* FAC, ¶¶ 141-43. As explained below, the FAC provides specific facts from which the Court can draw the reasonable inference that Professor D'Orazio misled Professor Leitner into thinking that the WCCFT was fighting for her job, when, *unbeknownst to Professor Leitner*, the WCCFT was assisting and encouraging the administration's efforts to terminate her, and essentially throwing Professor Leitner's defense. *See* FAC, ¶ 9.

First, in late February 2011, Professor D'Orazio advised Professor Miller regarding the drafting of a disciplinary letter accusing Professor Leitner of misconduct, which was ultimately used to terminate Professor Leitner. Professor D'Orazio did not tell Professor Leitner about her involvement with the disciplinary letter. *See* FAC, ¶¶ 56-62. As the FAC specifically alleges:

- Professor Miller's initial draft of the letter lacked *any* substantive explanation of Professor Leitner's misconduct. *Id.*, ¶ 56.

- Professor D'Orazio met with Professor Miller on Friday, February 18, 2011. *Id.*, ¶ 58.

- The following Monday, Professor D'Orazio emailed Professor Miller as follows: "Thank you again for meeting with me on Friday, and thanks for taking a look at the letter. I don't want to make any mistakes!" *See* Supp. Leitner Decl., Ex. 20; FAC, ¶ 59.

16

- A few days later, Professor Miller sent Professor Leitner a substantially revised version of the disciplinary letter. *See* FAC, ¶ 60

- Professor D'Orazio responded to Professor Miller's email, stating that "[Y]our letter looks fine," without ever mentioning her review of, or involvement with, the letter to Professor Leitner. *Id.*, ¶ 61.

While the WCCFT and WCC argue that these allegations are "nakedly self serving assertions," WCCFT Br., 3, and "blatant speculation," WCC Br., 7, Professor D'Orazio's involvement with the content of the letter is a reasonable inference from the facts alleged in the FAC. And in any event, even if Professor D'Orazio provided no assistance to Professor Miller, she still reviewed the letter with false allegations against Professor Leitner and said, "[Y]our letter looks fine," without telling Professor Leitner.

Second, in early March 2011, *before* Dean Wang decided to pursue formal discipline against Professor Leitner, Professor D'Orazio had an "off the record" meeting with Dean Wang. At that meeting, Professor D'Orazio discussed a confidential meeting she had had with Professor Leitner, told Dean Wang that Professor Leitner had engaged in misconduct, and then assured Dean Wang that the WCCFT was "not defending" Professor Leitner, but only going through the motions to protect the WCCFT *from* Professor Leitner. *See* Supp. Leitner Decl., Ex. 19; FAC, ¶ 66. Dean Wang's memoranda of this back-stabbing conversation, by itself, would be sufficient to draw an inference of Professor D'Orazio's bad faith.

Third, Professor D'Orazio's tepid defense of Professor Leitner at the step three hearing was consistent with her undisclosed representation to Dean Wang—which Dean Wang thought important enough to *memorialize in a memorandum*—that the WCCFT was "not really defending" Professor Leitner. *See* FAC, ¶ 78.

Professor D'Orazio's undisclosed communications with the administration encouraged and aided the WCC administration in taking disciplinary action to terminate Professor Leitner. These detailed allegations, which the WCCFT does not mention, *see* WCCFT Br. at 15, are more than sufficient to state a DFR claim against the WCCFT.

## III.   PROFESSOR LEITNER'S DFR CLAIM IS TIMELY

The WCCFT argues that Professor Leitner's DFR claim is time-barred because it was not filed within four months of her step three hearing, which occurred on or around June 9, 2011. *See* WCCFT Br., 9. This argument ignores the detailed allegations in the FAC.

A DFR claim under Section 209-a(2)(c) must be brought against an "employee organization . . . within fourth months of *the date the employee or former employee knew or should have known that the breach has occurred,* or within four months of the date the employee or former employee suffers actual harm, *whichever is later.*" N.Y.C.P.L.R. 217(2)(a) (emphasis added). Thus, Professor Leitner's DFR claim should have been filed within four months of the date she "knew or should have known" of the WCCFT's breach.

Contrary to the WCCFT's argument, Professor Leitner's DFR claim is *not* based on the assertion that the WCCFT did a subpar job of defending Professor Leitner at the step three hearing (although that may well be true). Rather, her claim is based on WCCFT's bad faith both before and during the hearing. As explained in Section II above, pp. 15-18, Professor Leitner was not aware of Professor D'Orazio's unlawful conduct until Professor Leitner's counsel learned of it through discovery, after November 9, 2012. *See* Supp. Leitner Decl., Ex. 23 (letter seeking to amend complaint based on newly discovered evidence). It was only then that Professor Leitner "knew or should have known" that she had a DFR claim against the WCCFT.

18

Because Professor Leitner filed the FAC within four months of that time, on March 6, 2013, her DFR claim is timely.

## IV.    PROFESSOR LEITNER WAS NOT REQUIRED TO EXHAUST ADMINISRATIVE REMEDIES BEFORE BRINGING HER DFR CLAIM

The WCCFT argues that Professor Leitner's DFR claim fails because she did not exhaust her administrative remedies—in particular, because she did not appeal the adverse determination in her step three hearing (in which she was represented by the WCCFT) to arbitration. *See* WCCFT Br., 13. New York law is clear, however, that a DFR claim does *not* require the plaintiff to exhaust administrative remedies. To the contrary, a DFR claim *excuses* a union member from exhausting the contractual procedures that would otherwise apply.

In *Board of Education v. Ambach*, 70 N.Y.2d 501 (N.Y. 1987), the New York Court of Appeals explained that when a union breaches its duty of fair representation, a union member is not required to exhaust contractual grievance procedures:

> As a general proposition, when an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract. Unless the contract provides otherwise, only when the union fails in its duty of fair representation can the employee *go beyond the agreed procedure and litigate a contract issue directly against the employer.*

*Id.* at 508 (emphasis added). Thus, when a union member adequately alleges a DFR claim, the member can "go beyond" her administrative remedies and litigate "directly against the employer." *Id; see also Spano v. Kings Park Central School District*, 61 A.D. 3d 666, 671 (N.Y. App. Div. 2nd Dep't 2009) ("[A] union employee may maintain a direct action against an employer, *despite a failure to exhaust available administrative remedies*, where the employee can prove that the union as bargaining agent breached its duty of fair representation in the

handling of the employee's grievance. . . .").[15] These cases recognize that "when a union has failed to represent an employee fairly—effectively depriving the employee of full use of the agreed procedures—[]*concern for employees' rights require that they be allowed to pursue grievances beyond the contractual mechanism*." *Ambach,* 70 N.Y.2d at 509 (emphasis added).

The WCCFT ignores this overwhelming precedent and relies on *Lewis v. Klepack,* 65 A.D. 2d 637 (N.Y. App. Div 3rd Dep't), for the proposition, in the WCCFT's words, that an employee may not bring a state law DFR claim "against her union without first exhausting the remedies available under contract." WCCFT Br., 13. That is not *Klepack*'s holding. If it were, *Klepack* would be contradicted by the Court of Appeals's ruling in *Ambach* (as well as *Spano, Trainosky,* and *Jackson,* cited above). In fact, *Klepack* stands for the narrow proposition that a union member must exhaust administrative remedies that she *has a right to pursue without union representation. See id.* at 637 (explaining that exhaustion of administrative remedies is not required in "a situation in which the employee is *solely dependent on the union* for the processing of his grievance," but finding that the plaintiff "had the right to process his grievance through the first three steps of the grievance procedure yet failed to do so") (emphasis added).

Here, Professor Leitner was "solely dependent on the union" to appeal the step three decision to arbitration. Indeed, the New York Court of Appeals has specifically ruled that only WCCFT and the WCC administration—*not* individual faculty members—may invoke the arbitration clause of the WCCFT-WCC collective bargaining agreement. *See In re Cnty. of Westchester v. Mahoney,* 56 N.Y.2d 756, 758 (N.Y. 1982) (rejecting a WCC professor's

---

[15] *See also Trainosky v. NYS Department of Taxation and Finance,* 105 A.D. 2d 525, 526 (N.Y. App. Div. 3rd Dep't 1984) ("We are not persuaded by [the union member's] contention that [the union] breached its duty of fair representation, *thereby enabling her to bypass her administrative remedies* and proceed directly against [the employer.]") (emphasis added); *Jackson v. Reg'l Transit Serv.,* 54 A.D. 2d 305, 308 (N.Y. App. Div. 4th Dep't 1976) ("[T]he policy underlying the principle that a wrongfully discharged employee may bring an action against his employer, *despite a defense that the employee failed to exhaust his contractual remedies,* provided that the employee can prove that the union as bargaining agent breached its duty of fair representation should apply with equal force to the public sector.").

individual demand for arbitration because "[o]ur reading of the collective bargaining agreement as a whole establishes the parties' plain and unambiguous intent to limit the right to demand step 3 grievance arbitration *to the college and the union*") (emphasis added); *see also* Supp. Leitner Decl., Ex. 24 (WCC-WCCFT CBA, § 7.4(1)) ("A grievance which is not adjusted under Step 2 [of the grievance procedure,] may, *at the request of the College or the Union* . . . be promptly submitted to arbitration. . . .") (emphasis added).

Additionally, because the nerve of Professor Leitner's DFR claim is that her WCCFT representative, Professor D'Orazio, acted in bad faith by agreeing to not really defend her in the disciplinary process, *see* FAC at ¶ 66, and by assisting the administration with its pursuit of discipline against her, Professor Leitner was "effectively deprive[ed] . . . of the full use of the agreed [contractual] procedures." *Ambach,* 70 N.Y.2d at 509.  It would be absurd to require Professor Leitner to cast her lot with the WCCFT when her union representative, the president of the organization, assured the administration she would represent Professor Leitner with one hand tied behind her back. *See* FAC, ¶ 66 (Professor D'Orazio assured that administration that "I want you to understand that we are not defending" Professor Leitner).  Thus, Professor Leitner was entitled to bring suit against the WCCFT without exhausting her administrative remedies.

CONCLUSION

Professor Leitner's DFR claim against the WCCFT is supported by detailed factual allegations and supporting case law.  Thus, the WCCFT's motion to dismiss should be denied.

Dated: New York, New York
      June 24, 2013

                         MORVILLO ABRAMOWITZ GRAND
                         IASON & ANELLO P.C.

By:_____
                         Catherine M. Foti
                         Curtis B. Leitner
                         565 Fifth Avenue
                         New York, New York 10007
                         Tel.:  (212) 856-9600

                         *Attorneys for Plaintiff Carol Leitner*